

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*EX REL.* [UNDER SEAL]<br><br>AND<br><br>STATE OF FLORIDA<br>*EX REL.* [UNDER SEAL]<br><br>PLAINTIFF,<br><br>v.<br><br>[UNDER SEAL],<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 8:09-cv-1625-T-35TGW<br><br>SECOND AMENDED<br>COMPLAINT FOR VIOLATION<br>OF FEDERAL AND STATE FALSE<br>CLAIMS ACTS<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA & UNDER<br>SEAL<br>(AS REQUIRED BY 31 U.S.C. §<br>3730(b)(2))** |



{00047703; 1}

UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*EX REL*. DR. DARREN D. SEWELL, | ) | CASE NO. 8:09-cv-1625-T-35TGW |
| | ) | |
| AND | ) | |
| | ) | |
| STATE OF FLORIDA | ) | SECOND AMENDED |
| *EX REL*. DR. DARREN D. SEWELL | ) | COMPLAINT FOR VIOLATION |
| | ) | OF FEDERAL AND STATE FALSE |
| PLAINTIFF, | ) | CLAIMS ACTS |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| FREEDOM HEALTH, INC., OPTIMUM | ) | **FILED IN CAMERA & UNDER** |
| HEALTHCARE, INC., AMERICA'S 1ST | ) | **SEAL** |
| CHOICE HOLDINGS OF FLORIDA LLC, | ) | **(AS REQUIRED BY 31 U.S.C. §** |
| LIBERTY ACQUISITION GROUP LLC, | ) | **3730(b)(2))** |
| HEALTH MANAGEMENT SERVICES OF | ) | |
| USA LLC, GLOBAL TPA LLC, AMERICA'S | ) | |
| 1ST CHOICE HOLDINGS OF NORTH | ) | |
| CAROLINA LLC, AMERICA'S 1ST CHOICE | ) | |
| HOLDINGS OF SOUTH CAROLINA LLC, | ) | |
| AMERICA'S 1ST CHOICE INSURANCE | ) | |
| COMPANY OF NORTH CAROLINA, INC., | ) | |
| AMERICA'S 1ST CHOICE HEALTH PLANS, | ) | |
| INC., DR. KIRANBHAI C. PATEL, DR. | ) | |
| DEVAIAH PAGIDIPATI, SIDDHARTHA | ) | |
| PAGIDIPATI, RUPESH SHAH AND MITAL | ) | |
| PANARA, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## COMPLAINT

For their complaint, the United States of America ex rel. Dr. Darren D. Sewell, M.D. (the "United States") and the State of Florida ex rel. Dr. Darren D. Sewell, M.D. (the "State of Florida") allege as follows:

## I.     INTRODUCTION

1.     This is an action to recover damages and civil penalties on behalf of the United States and the State of Florida (collectively the "Real Parties") under the Federal False Claims Act, 31 U.S.C. §§ 3729–33 (the "FCA"), and the Florida False Claims Act, Fla. Stat. §§ 68.081–.092 (the "FFCA"), against Freedom Health, Inc., Optimum Healthcare, Inc., America's 1st Choice Holdings of Florida LLC, Liberty Acquisition Group LLC, Health Management Services of USA LLC, Global TPA LLC, America's 1st Choice Holdings of North Carolina LLC, America's 1st Choice Holdings of South Carolina LLC, America's 1st Choice Insurance Company of North Carolina, Inc. ("AFC-NC"), America's 1st Choice Health Plans, Inc. ("AFC-SC"), Dr. Kiranbhai C. Patel, Dr. Devaiah Pagidipati, Siddhartha Pagidipati, Rupesh Shah, and Mital Panara ("Defendants").

2.     Freedom Health, Inc. ("Freedom") and Optimum Healthcare, Inc. ("Optimum") were founded in 2004 as private managed care organizations covering health insurance benefits for Medicare beneficiaries, pursuant to contracts with the Centers for Medicare and Medicaid Services ("CMS"), the federal agency that administers Medicare.  The Medicare Advantage ("MA") program, through which Freedom, Optimum, AFC-NC, and AFC-SC offer their health plans, is designed to apply

to Medicare a form of the "managed care" model commonly used by private health insurance companies. Under the managed care model, rather than paying for individual services one at a time as they are delivered to beneficiaries, the managed care organization pays a fixed amount each month for each individual "member" of the plan— commonly called a monthly "capitation" payment. The entity receiving this capitation payment (often a hospital, physician group, or another health insurance company) is responsible for paying hospitals, physicians and all other medical providers for health care services provided to a member of the plan.

3.      Through the MA program, Medicare allows private health insurers to set up managed care plans to cover Medicare beneficiaries. Medicare pays a monthly capitation rate for each beneficiary enrolled as a member of a MA plan. MA plans must then use that money to pay hospitals, physicians and other health care providers for the services the plan members receive.

4.      Freedom entered into a contract with CMS to operate MA plans in 2005, and the contract, following annual renewals, remains ongoing. Freedom receives the vast majority of its revenue from Medicare premiums, which totaled approximately $492 million in 2011 and $381 million through the third quarter of 2012. Freedom similarly contracted with CMS and the Florida Agency for Health Care Administration ("AHCA") to allow Florida Medicaid recipients to enroll in Freedom's managed care plans. Freedom received approximately $60 million in Medicaid premiums in 2011 and $58 million through the third quarter of 2012. Combined, the Medicare and Medicaid

premiums accounted for substantially all of Freedom's $552 million in total revenue for 2011 and $439 million in total revenue through the third quarter of 2012.

5.      Optimum has an ongoing contract with CMS to operate MA plans. Optimum receives substantially all of its revenue from Medicare premiums, which have increased significantly in recent years.  Optimum's Medicare premiums totaled $135 million in 2011 and $180 million through the third quarter of 2012.  Optimum has also contracted with CMS and AHCA to offer its managed care plans to recipients dually eligible for Medicare and Medicaid.

6.      Freedom and Optimum are co-owned by America's 1st Choice Holdings of Florida LLC.  Though they have separate CMS contracts and are operated under their own names, Freedom and Optimum are effectively the same entity.  The companies share the same management (their compliance officers are the only exception) and use the same offices, databases, network systems, and storage facilities.   Freedom and Optimum employ largely the same staff.  The managers and employees conduct the business of both plans jointly and concurrently, such that Freedom and Optimum follow the same policies and engage in the same practices. The fraudulent conduct described herein is common to both Freedom and Optimum. It is also shared in many respects by AFC-NC and AFC-SC, which employ many of the same staff as Freedom and Optimum and use many of the same resources, such as Freedom's and Optimum's system for submitting diagnoses for risk adjustment payment. *See* ¶¶135-145.

7.      Strict rules govern the management of MA plans to ensure both that the Medicare beneficiaries receive the heath care they need, and that the Federal and State

governments do not overpay for these services.   Defendants have consistently and deliberately violated those program rules in order to fraudulently increase their profits, and in the process have deprived the sickest of their members the medical care to which they were entitled.

8.     First, Freedom and Optimum have defrauded CMS by knowingly submitting incorrect and/or unsubstantiated risk adjustment data to CMS.  Under the MA payment system, CMS adjusts the monthly capitation rate it pays MA plans for each member to account for the member's health risk.  CMS pays MA plans more if the plans' members have certain diseases or illnesses that routinely require more expensive care. CMS makes these enhanced payments in reliance on data—known as "Risk Adjustment" data—submitted by the plans about the health status of their members.

9.     Freedom and Optimum knowingly submit incorrect and unsubstantiated risk adjustment data to CMS in order to fraudulently increase their capitation payments. Freedom's and Optimum's fraudulent practices include, without limitation: (a) using internal coding auditors to submit false risk adjustment data to CMS; (b) submitting risk adjustment data to CMS without checking their validity and by knowingly using an automated submission processing system that is incapable of filtering out invalid data (a fraudulent practice that AFC-NC and AFC-SC also engage in); (c) conducting an internal audit that identified a significant percentage of risk adjustment data that did not qualify for CMS payment, without refunding the overpayments or alerting CMS to the audit results; (d) in the ordinary course of business, failing to correct or notify CMS about risk adjustment data they determine to have been incorrect and improperly submitted; and (e)

causing physicians to perform medically unnecessary and unreasonable procedures in order to increase risk scores.

10.     Second, Freedom and Optimum fraudulently induced CMS to authorize them to expand their service areas.  As a precondition to any such service area expansion, a plan is required to demonstrate that it has in place a sufficient network of doctors, clinics, and hospitals available to serve enrollees in the expanded service areas.  Freedom and Optimum had no such networks in place when they applied to expand their service area, but fraudulently induced CMS to approve their applications by listing in their applications a rented network of health care providers that they did not intend to use in practice, and in fact have not utilized since CMS approved their applications.

11.     Third, Freedom and Optimum have used a variety of discriminatory enrollment practices to minimize their risk and increase their profitability by gaming the capitation system.  Freedom and Optimum manipulate their membership and enrollment policies to fraudulently avoid responsibility for the most expensive members, while pocketing the money they earned from the least expensive members.  Freedom's and Optimum's fraudulent practices include, *inter alia*: (a) selectively disenrolling sick (expensive) members from its MA plans; (b) encouraging sick, costly members to disenroll from its plans; and (c) selectively concealing from CMS enrollment mistakes that, if corrected, would have required it to reimburse CMS for costly claims.

12.     In addition to its standard MA plans, Freedom and Optimum contracted with CMS to operate Special Needs Plans ("SNPs") for their chronically ill and/or especially vulnerable beneficiaries.  SNPs are supposed to provide extra health care

services and management to better facilitate care for these at-risk beneficiaries. Thus for example, an SNP might provide special disease management and care tracking programs for patients with conditions such as diabetes in order to ensure the patient is compliant with dietary and blood sugar management protocols. Because such plans are specifically designed to serve sicker members, the capitation rates are frequently higher than for non-SNP plans.

13.     Freedom and Optimum manipulated their enrollment and disenrollment policies for their SNPs to fraudulently increase their revenue and decrease their costs. As with their regular MA plans, Freedom and Optimum improperly kicked sick enrollees out of their SNPs in order to game the capitation rate system. In addition, Freedom and Optimum enrolled relatively healthy individuals as members of their SNPs in order to get the enhanced capitation rate CMS was paying Freedom and Optimum for their SNPs.

14.     Fourth, Freedom and Optimum have also knowingly failed to provide their SNP members with basic care services that they were contractually and legally obligated to provide as part of their MA contracts and under CMS regulations. Freedom and Optimum also secured CMS's approval to operate SNPs by falsely representing in their solicitations that they would offer services they had no intention of actually providing, and have not in fact provided.

15.     Through each of these fraudulent schemes, practices and machinations, Freedom and Optimum have illegally sought and obtained higher capitation rates than they were entitled to receive, and have fraudulently refused to provide services that the United States and Florida paid them to provide.

16.     The Federal and Florida False Claims Acts provide that any person who knowingly submits or causes to be submitted a false or fraudulent claim to a governmental entity for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages suffered by the government.   The Acts allow any person having information regarding a false or fraudulent claim against the government to bring an action on behalf of himself (the "*qui tam* plaintiff" or "relator") and the government and to share in any recovery.

17.     Based on these provisions, *qui tam* plaintiff Dr. Darren D. Sewell, M.D. seeks to recover damages and civil penalties arising from Defendants' actions in presenting false claims for payment and approval, false records, and false statements to the United States and the State of Florida, and in avoiding known obligations to pay money to the United States.

18.     Dr. Sewell also seeks in this action to recover damages resulting from the Defendants Global TPA, LLC, Freedom and Optimum's retaliation against him for lawful acts he took to stop or in furtherance of other efforts to stop one or more violations of the False Claims Act and Florida False Claims Act, as well as his having provided assistance to a government agency conducting an investigation or inquiry into an alleged violation of law, rule, or regulation by Defendants.

19.     Dr. Sewell also seeks in this action to recover damages resulting from Defendants Rupesh Shah and Mital Panara's defamation of Dr. Sewell by publishing false and defamatory statements about Dr. Sewell to third parties, which false statements caused damage to Dr. Sewell.

20.    Dr. Sewell also seeks in this action to recover damages resulting from Defendants Global TPA, LLC, Freedom and Optimum's conversion of his personal iMac laptop computer and all data and confidential information stored on that computer.

## II.    PARTIES

21.    *Qui tam* plaintiff Dr. Darren D. Sewell, M.D. ("Relator") is a resident of St. Petersburg, Florida and was an employee of Defendant Global TPA, LLC ("Global TPA"), a management entity that staffs Defendant Freedom Health, Inc. ("Freedom") and Optimum Healthcare, Inc. ("Optimum") until his constructive discharge on September 7, 2012. Global TPA hired Relator as a consultant in November 2007, before hiring him full-time in February 2008 as the Chief Medical Officer/Senior Vice President of Health Services for Freedom and Optimum, a title that was shortened in April 2008 to Senior Vice President of Health Services. From 2008 to 2010, Relator was head of the Health Services Department, the department in charge of making clinical decisions. Relator was responsible for overseeing the administration of medical benefits in order to ensure the delivery of health care services through Freedom's and Optimum's benefit structure. Relator worked closely with Freedom's and Optimum's Pharmaceutical Department, Provider Operations Department, and Medical Risk Adjustment Department, and he reported to Siddhartha ("Sidd") Pagidipati, Freedom's Chief Operating Officer. From 2010 until September 7, 2012, Relator worked in Freedom's and Optimum's Medicare Revenue Management ("MRM") Department, reporting to Vice President of Revenue Management Mital Panara. At the MRM Department, Relator was responsible for working with Freedom providers and auditors on risk adjustment coding practices. In

March 2011, to better reflect his new responsibilities, Global TPA changed Relator's title to Vice President of Special Projects. Relator had an employment relationship with Global TPA, Freedom, and Optimum until his constructive discharge on September 7, 2012. Prior to working for Freedom and Optimum, Relator held senior positions at two other health maintenance organizations, serving as Vice President of Health Services for Universal Health Care, Inc. in St. Petersburg, Florida, and before that as Medical Director for PacifiCare Health Care Systems, Inc. in Denver, Colorado.

22.     Real Parties, on whose behalf Relator brings this suit, are the United States and the State of Florida.   The United States has ongoing contracts with Defendants Freedom and Optimum through the Centers for Medicare and Medicaid Services ("CMS") of the Department of Health and Human Services, in accordance with Freedom's and Optimum's participation in the Medicare and Medicaid programs. The State of Florida has contracts with Freedom through the Agency for Health Care Administration ("AHCA"), pursuant to Freedom's participation in the Medicaid program, and, pertinently to this case, is required to make monthly payments to Freedom and Optimum for Medicaid benefits that Freedom and Optimum contracted to cover as part of their Medicare special needs plans for beneficiaries dually-eligible for Medicare and Medicaid.

23.     Defendant Freedom Health, Inc. ("Freedom") is a Florida corporation with its principal place of business in Tampa, Florida.   Freedom is a health maintenance organization ("HMO"), operating in thirty counties throughout Florida pursuant to a certificate of authority from the Florida Office of Insurance Regulation and the approval

of CMS and AHCA. Freedom participates in the MA program under contract with CMS. Freedom employs few workers, having contracted with Defendant Global TPA to supervise and manage its day-to-day operations. Like Global TPA, Freedom's sole owner is Defendant America's 1st Choice Holdings of Florida, LLC, a holding company controlled by Defendant Dr. Kiranbhai ("Kiran") C. Patel.

24.     Defendant Optimum Healthcare, Inc. ("Optimum") is a Florida corporation with its principal place of business in Tampa, Florida. Optimum is an HMO, operating in twenty-eight counties throughout Florida pursuant to a certificate of authority from the Florida Office of Insurance Regulation and the approval of CMS. Optimum participates in the MA program under contract with CMS. Like Freedom, Optimum employs few workers, having contracted with Defendant Global TPA to run its day-to-day operations. Like Freedom and Global TPA, Optimum's sole owner is Defendant America's 1st Choice Holdings of Florida, LLC.

25.     Defendant America's 1st Choice Holdings of Florida, LLC is a Florida Limited Liability Company controlled by Dr. Kiran C. Patel that is the sole owner of Freedom and Optimum, as well as their management company, Global TPA. Its principal place of business is in Tampa, Florida.

26.     Defendant Liberty Acquisition Group, LLC is a Florida Limited Liability Company controlled by Dr. Kiran C. Patel that owns 55% of America's 1st Choice Holdings of Florida, LLC. Its principal place of business is Tampa, Florida.

27.     Defendant Health Management Services of USA, LLC is a Nevada Limited Liability Company controlled by Defendant Dr. Devaiah Pagidipati that owns 20% of America's 1st Choice Holdings of Florida, LLC.

28.     Defendant Global TPA, LLC ("Global TPA") is a Florida Limited Liability Company with its principal place of business in Tampa, Florida. Global TPA operates under contracts with Freedom and Optimum to supervise and manage Freedom's and Optimum's day-to-day operations, including utilization management, grievances and appeals, marketing and enrollment, administrative services and contracts management, information systems management and reporting, member services, provider relations and network development, provider credentialing and re-credentialing, and claims management. As such, Global TPA technically employs the majority of Freedom's and Optimum's workers and is responsible for the bulk of Freedom's and Optimum's operations. Global TPA's sole owner is America's 1st Choice Holdings of Florida, LLC, a holding company controlled by Dr. Kiran C. Patel.

29.     Defendant America's 1st Choice Holdings of North Carolina, LLC is a North Carolina Limited Liability Company controlled by Defendant Dr. Kiran C. Patel. Its principal place of business is Tampa, Florida.

30.     Defendant America's 1st Choice Insurance Company of North Carolina, Inc. is a North Carolina corporation owned by Dr. Kiran C. Patel with its principal place of business in Benson, North Carolina. It is a private fee-for-service health plan operating under a contract with CMS.

31.     Defendant America's 1st Choice Holdings of South Carolina, LLC is a South Carolina Limited Liability Company controlled by Defendant Dr. Kiran C. Patel.

32.     Defendant America's 1st Choice Health Plans, Inc., is a South Carolina corporation controlled by Defendant Dr. Kiran C. Patel.  It is a private fee-for-service health plan operating under a contract with CMS.

33.     Defendant Dr. Kiranbhai C. Patel ("Dr. Patel"), known as "Kiran C. Patel" or colloquially within Freedom and Optimum as "Dr. K," is a resident of Tampa, Florida. Dr. Patel is a physician who emigrated from India and established a cardiology practice in the Tampa area in the early 1980s.  Dr. Patel has founded several businesses, most prominently WellCare HMO, Inc., an HMO that Dr. Patel established in 1992 and sold in 2002 for an estimated $200 million.  The terms of the WellCare sale excluded Dr. Patel from the HMO market for five years, during which time he invested in several large real estate ventures.  Upon the expiration of his non-compete provision in 2007, Dr. Patel purchased Defendants Freedom and Optimum in a deal worth $50 million.  Following the purchase, Dr. Patel assumed the titles of Freedom's and Optimum's President and CEO. Dr. Patel remains Chairman of Freedom and Optimum, but has named Rupesh Shah, his brother-in-law and a former WellCare executive, as CEO.  Dr. Patel controls Freedom and Optimum through his control of Defendant Liberty Acquisition Group, LLC, a holding company that owns a majority of Defendant America's 1st Choice Holdings of Florida, LLC, the holding company that, in turn, owns Defendants Freedom, Optimum, and Global TPA.  Dr. Patel also owns Defendants America's 1st Choice Insurance

Company of North Carolina, Inc. and America's 1st Choice Health Plans, Inc. Dr. Patel is approximately 60 years old.

34.    Defendant Dr. Devaiah Pagidipati, known colloquially within Freedom and Optimum as "Dr. P," is a physician who emigrated from India in the 1970s and established a pediatric anesthesiology practice in Tennessee before later moving to Florida. Dr. Pagidipati is now a resident of Ocala, Florida. Dr. Pagidipati founded Freedom in 2004, along with his son, Sidd Pagidipati. Dr. Pagidipati relinquished his positions as President and CEO of Freedom when he sold the company to Dr. Patel in 2007, but received a 20% ownership interest in Freedom and Optimum through his control of Health Management Services of USA, LLC. Dr. Pagidipati also retained positions on Freedom's and Optimum's boards of directors, which he continues to hold. Dr. Pagidipati is approximately 60 years old.

35.    Defendant Siddhartha "Sidd" Pagidipati is the Chief Operating Officer of Freedom and Optimum, and a resident of Tampa, Florida. Together with his father, Sidd Pagidipati founded Freedom in 2004. He became COO of both Freedom and Optimum following Dr. Patel's acquisition in 2007. Sidd Pagidipati is approximately 35 years old.

36.    Defendant Rupesh Shah is the CEO of Freedom and Optimum. Shah has a longstanding and close relationship with Dr. Patel. He served as the CEO of WellCare HMO, Inc. during Dr. Patel's tenure. Shah remained at WellCare as a Senior Vice President after Dr. Patel sold the company. He left WellCare in 2008 and joined Freedom/Optimum despite an active non-compete agreement. Between 2008 and September 2009, Shah served in a senior capacity at Freedom and Optimum, concealing

{00047703; 1}                                    13

his presence at the company by using the email address kpatelfreedom@gmail.com. Upon the expiration of his non-compete agreement, he became Freedom's and Optimum's CEO. Shah resides in Tampa, Florida and is approximately 49 years old.

37.     Defendant Mital Panara is the Vice President of Revenue Management for Freedom and Optimum. Panara started work at Freedom and Optimum as a financial analyst before rising to become the head of the department overseeing risk adjustment, a major component of Freedom's and Optimum's revenue. He is a resident of Lutz, Florida, and is approximately 30 years old.

## III.    JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

39.     This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the Relator's state law claims, as those claims and the Relator's federal law claims are sufficiently related to form part of the same case or controversy under Article III of the United States Constitution. This Court has supplemental jurisdiction over the State of Florida's claims pursuant to 31 U.S.C. § 3732(b), as the State of Florida's claims arise from the same transactions and occurrences as the federal action.

40.     This Court has personal jurisdiction over the Defendants, pursuant to 31 U.S.C. § 3732(a), as one or more Defendants can be found in, reside in, transact business in, and have committed acts related to the allegations in this Complaint in the Middle District of Florida. Defendants Freedom and Optimum are Florida corporations with a

principal place of business in Tampa, Florida.   Defendants America's 1st Choice Holdings of Florida, LLC, Liberty Acquisition Group, LLC, and Global TPA are each Florida Limited Liability Companies with a principal place of business in Tampa, Florida.   Defendants America's 1st Choice Holdings of North Carolina LLC, America's 1st Choice Holdings of South Carolina LLC, America's 1st Choice Insurance Company of North Carolina, Inc. ("AFC-NC"), and America's 1st Choice Health Plans, Inc. ("AFC-SC") transact business in Tampa, Florida.   Individual Defendants Dr. Kiran C. Patel, Dr. Devaiah Pagidipati, Sidd Pagidipati, Rupesh Shah, and Mital Panara are Florida residents.

41.    Venue is proper, pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c), as the Defendants can be found in, reside in, and/or transact business in the Middle District of Florida, and because many of the violations of 31 U.S.C. § 3729 discussed herein occurred within this judicial district. In addition, statutory and common law violations, as alleged herein, occurred in this judicial district.

## IV.    THE FEDERAL FALSE CLAIMS ACT

42.    The False Claims Act, as amended by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B), . . . or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases

> an obligation to pay or transmit money or property to the
> Government, is liable to the United States Government for
> a civil penalty of not less than $5,000 and not more than
> $10,000 . . . plus 3 times the amount of damages which the
> Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

> A person may bring a civil action for a violation of section
> 3729 for the person and for the United States Government.
> The action shall be brought in the name of the Government.
> . . .

31 U.S.C. § 3730(b)(1).

43.    Under the federal False Claims Act's anti-retaliation provision, 31 U.S.C.

§ 3730(h), any employee, contractor, or agent is entitled to all relief necessary to make

that employee, contractor, or agent whole, if that employee, contractor, or agent is

discharged, demoted, suspended, threatened, harassed, or in any other manner

discriminated against in the terms and conditions of employment because of lawful acts

done by the employee, contractor, or agent on behalf of the employee, contractor, or

agent or associated others in furtherance of other efforts to stop one or more violations of

the False Claims Act.  An employee, contractor, or agent retaliated against in violation of

this section is entitled to reinstatement, double the amount of lost back pay, interest on

the back pay, and special damages, including attorney fees and litigation costs. *Id.*

## V.    THE FLORIDA FALSE CLAIMS ACT

44.    The Florida False Claims Act provides in pertinent part that:

> Any person who: (a) Knowingly presents or causes to be
> presented to an officer or employee of an agency a false or
> fraudulent claim for payment or approval; (b) Knowingly
> makes, uses, or causes to be made or used a false record or
> statement to get a false or fraudulent claim paid or

> approved by an agency; (c) Conspires to submit a false or fraudulent claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid; . . . or (g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency, is liable to the state for a civil penalty of not less than $5,500 and not more than $11,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

Fla. Stat. § 68.082(2).

> A person may bring a civil action for a violation of § 68.082 for the person and for the affected agency. . . .

Fla. Stat. § 68.083(2).

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this act, including investigation for initiation of, testimony for, or assistance in an action filed or to be filed under this act, shall have a cause of action under s. 112.3187.

Fla. Stat. § 68.088.

45.     Section 112.3187 provides, in pertinent part, that employees of persons engaged in business who contract with state agencies

> May, after exhausting all available contractual or administrative remedies, bring a civil action in any court of competent jurisdiction within 180 days after the action prohibited by this section.

Fla. Stat. § 112.3187(8)(c).

## VI.   THE FLORIDA WHISTLEBLOWER ACT

46.   The Florida private-sector Whistleblower Act provides, in pertinent part, that an employer may not take any retaliatory personnel action against an employee because the employee has:

> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency, under oath, in writing, an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation. However, this subsection does not apply unless the employee has, in writing, brought the activity, policy, or practice to the attention of a supervisor or the employer and has afforded the employer a reasonable opportunity to correct the activity, policy, or practice.
>
> (2) Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer.
>
> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation.

Fla. Stat. § 448.102.

## VII.   THE MEDICARE ADVANTAGE PROGRAM

47.   Medicare is a federally-funded health care program primarily serving people age 65 or older.  Initially created in Title XVIII of the Social Security Act of 1965, Medicare now has four Parts, A through D.  The two original components of Medicare are Part A, which covers inpatient hospital costs and related services, and Part B, which covers outpatient health care costs, such as physicians' fees.  Medicare Part D

was created by the Medicare Prescription Drug, Improvement, and Modernization Act established in 2003 ("MMA"), and covers prescription drugs.

48.    Traditionally, Medicare operates on a fee-for-service basis, meaning that Medicare directly pays hospitals, physicians and other health care providers for each service they provide to a Medicare beneficiary.  Medicare beneficiaries are generally required to pay some portion of many of these services in the form of copayments, deductibles, coinsurance, or other set fees (collectively known as the members "out of pocket" expenses).

49.    In 1997, Congress created Medicare Part C, which provides the same benefits to Medicare members, but does so based on a managed care model, rather than the traditional fee-for-service model.  Under Part C, rather than pay providers directly, Medicare pays managed care plans (later named "Medicare Advantage" or "MA" plans) a fixed capitation rate (per member per month) and those plans are responsible for paying providers for the services they provide to members of that specific MA plan.

50.    MA plans must provide Medicare beneficiaries at least the same benefits they would have received under the traditional Medicare Parts A and B.  Depending on the structure of the plan, MA plans may also provide additional benefits beyond what traditional Medicare would have covered, such as dental care, or cover some or all of their members' out of pocket expenses associated with basic Medicare Parts A and B services or Part D prescription drugs.

A.      **Calculation of MA Plan Capitation Rates**

51.      The capitation rates Medicare pays to MA plans are determined based on a complicated process involving consideration of past and expected future medical expenses, the location of the plan's actual and expected members, the health status of those members and whether the plan will include any additional benefits. That process is summarized in Medicare regulations as follows:

> In short, under the bidding methodology each plan's bid for coverage of Part A and Part B benefits (*i.e.*, its revenue requirements for offering original Medicare benefits) is compared to the plan benchmark (*i.e.*, the upper limit of CMS' payment, developed from the county capitation rates in the local plan's service area or from the MA regional benchmarks for regional plans). The purpose of the bid-benchmark comparison is to determine whether the plan must offer supplemental benefits or must charge a basic beneficiary premium for A/B benefits.

Medicare Managed Care Manual ("MMCM"), ch. 8, § 60.

52.      In other words, it is a three-step process involving: (a) development of the MA plan's bid rate; (b) review of the CMS benchmark rate; and (c) comparison of those two rates to develop the base capitation rate and determine whether any adjustments in the plan benefits or member premiums are required.

53.      First, the MA plan develops a bid rate. This rate is the amount that the MA plan expects it will be required to pay to provide Medicare Parts A and B benefits to a hypothetical average member of the plan. This estimate must be based on either the MA plan's prior experience covering Medicare members, or on actuarially validated data analysis of expected costs. To represent an "average" plan member, the bid rate must make adjustments to standardize the effect of expected geographic diversity (because

some areas are more expensive than others) and the relative health status (*i.e.*, the number and nature of chronic conditions) of the members whose claims experience provided the basis for the bid. The bid rate also includes an amount that the MA plan expects to spend on administrative costs, and a profit margin.

54.     The mechanism for standardizing the bids by geographic area is known as the ISAR Factor. Medicare has determined that providing services to its members in certain counties tends to cost more than providing such services to members in other counties—either because the care is more expensive or because more care is required. Medicare has established tables which can be used to determine how expensive care is in one county versus another. When developing their bid rate, MA plans must use these tables to develop a rate that would be required to provide care to a hypothetical member in a county where care for Medicare members costs an "average" amount.

55.     The mechanism for standardizing the bid for individuals' health status is known as the "risk score" or CMS—Hierarchical Condition Category ("CMS—HCC"). It is an artificial score that CMS assigns to every beneficiary. CMS starts with a score of zero, and then adds points for the beneficiary's demographic condition (such as age and gender) and individual disease states (such as diabetes or heart failure). The average CMS—HCC score is one, with most Medicare beneficiaries having scores under three. The system is set so that someone with a risk score of two would be expected to need twice as much health care (in dollars) as someone with a score of one. The bid rate the MA plans develop must reflect the amount they will require to provide services to a hypothetical member with a risk score of one.

56.     Second, the MA plan must review the Medicare benchmark rate provided by CMS. This rate is provided by CMS and is the amount that the Medicare program would spend to provide Parts A and B benefits to an average member in the geographic area covered by the MA plan's bid. This benchmark rate is based on the amount Medicare would pay for a member of standard health status (*i.e.*, a risk factor of one). The benchmark rate also includes several other adjustments, including a bonus payment to incentivize health insurance companies to enter the MA market.

57.     Third, the bid rate and the benchmark rate are compared to determine whether the MA plan must charge its members a premium, or, instead, if it must offer them enhanced benefits. If the bid rate is greater than the benchmark rate, Medicare will only pay the MA plan the benchmark rate per member per month. That benchmark rate becomes the base capitation rate. The MA plan must then charge the beneficiaries who join its plan a monthly premium in order to make up the shortfall between the bid rate and the base capitation rate. *See* MMCM, ch. 8, § 60.1.

58.     If, on the other hand, the bid rate is less than the benchmark rate, then the bid rate becomes the starting point for the calculation of the base capitation rate. The difference between the benchmark rate and the bid rate is then split between the plan members and the Medicare program. The first 25% of the difference is retained by the Medicare program as plan savings. The remaining 75% is returned to the MA plan, which must use the rebate to either provide enhanced benefits to its plan members or to cover the members' out of pocket expenses. In the end, then, in such situations, the base

capitation rate equals the bid rate plus 75% of the difference between the bid rate and the benchmark rate.

59.     Medicare does not, however, pay the plans the base capitation rate. Instead, when payments are actually made, the base capitation rate is adjusted, for each member, to reflect his or her geographic ISAR score (based on the county where they live) and risk score (based on their health status).

60.     Consequently, MA plans whose members live in relatively expensive counties will receive a higher actual capitation rate than another plan, even if both plans had the same base capitation rate. So too, MA plans with a high percentage of members with high risk factors will have a higher actual capitation rate than MA plans with healthier, lower-risk members, even if their base capitation rate is the same.

61.     MA plans must rebid their rates every year.

62.     In the short term, MA plans stand to lose money if their members require more services (in dollars) than the capitation rate, because they are only paid the capitation rate regardless of the actual cost of claims. They also stand to gain if the members require less expensive care, because the plan may retain the difference between the capitation rate and the costs of paying claims. Over the long term, these effects tend to be mitigated because future years' rates are based on the present year's claims experience. Thus plans that experience unexpectedly high claims expense in year one, will generally see higher reimbursement in year two, and so forth.

**B.     Risk Adjustment Depends on Accurate, Substantiated Heath Condition Codes**

63.     As described above, CMS pays MA plans at a capitation rate that reflects, among other things, each member's health status. The process of adjusting the capitation rate to reflect a member's disease states (and predicted claims expense) is known as risk adjustment. Risk adjustment is intended to improve the accuracy of the payments CMS makes to MA plans. To this end, CMS pays a higher future premium for enrollees who required treatment for expensive diseases and conditions in the current year, based on the expectation that the enrollee will require similarly expensive treatment in following years. Conversely, CMS pays a lower premium for enrollees who, although they may have certain typically expensive conditions, did not require treatment for those conditions in the current year. For these patients, the risk adjustment methodology assumes that because their condition did not require treatment in the current year, it has improved or otherwise changed so that it is not expected to require treatment in the following year.

64.     Obviously, such a system depends on access to as much accurate data as is available about the health status of the enrollees. The risk adjustment model will not work if MA plans do not truthfully and accurately report the health conditions of their members to CMS.

65.     As a practical matter, the CMS risk adjustment model evaluates enrollee health (and bases risk adjustment payment rates) using diagnosis classifications set forth in the International Classification of Diseases, 9th Edition, Clinical Modification ("ICD-9-CM") system. The ICD-9 system assigns each diagnosis a specific code. These individual diagnosis codes are then organized into groups, called Hierarchical Condition

Categories ("HCCs").  MMCM, ch. 8, § 50.  Every HCC consists of several ICD-9-CM

diagnosis codes that are clinically related and are expected to require a similar level of

resources to treat.  *Id.*  For example, there are five HCCs for patients with diabetes: HCC

15 (diabetes with renal or vascular manifestation); HCC 16 (Diabetes with Neurologic or

Other Specified Manifestation); HCC 17 (Diabetes with Acute Complications); HCC 18

(Diabetes with Ophthalmologic or Unspecified Manifestation); and HCC 19 (Diabetes

without Complication).  Generally speaking, patients grouped in HCC 15 have the most

serious type of diabetes, and are expected to cost the most to treat.  Patients in HCC 19

have the least cost-intensive type of diabetes, and therefore the CMS risk adjustment

system provides a smaller enhanced payment for these patients.

   66. The CMS–HCC model converts the diagnosis codes the MA plan submits

for each member into a risk score.  When a MA plan inputs a member's diagnoses into

the model, the model outputs "a risk score that reflects the beneficiary demographic

characteristics and combination of HCCs associated with the beneficiary for the data

collection year."  MMCM, ch. 8, § 50.  The CMS—HCC system normalizes the average

CMS beneficiary to a risk score of one; members diagnosed with multiple serious chronic

conditions may have a risk score as high as eight or more.

   67. CMS uses the member's risk score to adjust the MA plan's base payment

rate for member health status, which is the first step in determining the monthly per

capita payment rate for the member.  MMCM, ch. 8, § 50.  The MA plan multiplies its

base capitation rate with the member's CMS—HCC risk score.  Next, the MA plan

multiplies the adjusted rate with the member's geographic ISAR score.  MMCM, ch. 8,

§ 60.3. The ISAR score accounts for cost differences among the counties in the plan's service area, as well as the plan's relative enrollment distribution among those counties. *Id.* Adjusting the base capitation rate by the member's CMS—HCC score and ISAR score determines the member's monthly capitation rate.

68. An individual ICD-9-CM code included in the HCC system corresponds on average to over $2,000 in extra revenue for the plan over the course of the following year.

69. Because submitting incorrect diagnosis codes increases risk adjustment payments, CMS requires MA plans to follow strict guidelines when submitting codes. *See, e.g., 2008 Risk Adjustment Training for Medicare Advantage Organizations Participant Guide ("Participant Guide").* First, CMS requires that the patient must have been treated for the relevant diagnoses during a face-to-face encounter with a physician or a hospital during the year in question. The treating provider must document the facts supporting the coded diagnosis in the patient's medical record and sign and date the record. At a minimum, the plan must record five elements for submission to CMS:

> (a) the member's Health Insurance Claim ("HIC") number;
> (b) the ICD-9-CM diagnosis code;
> (c) the "service from" date;
> (d) the "service through" date; and
> (e) the provider type.

Only services provided by a treating physician, or by a hospital in an inpatient or outpatient setting may be included. CMS expressly prohibits MA plans from submitting "risk adjustment diagnoses based on any diagnostic radiology services." *Participant Guide*, at 4-3. The reason CMS prohibits MA plans from submitting codes based on

radiology charts is that "[d]iagnostic radiologists typically do not document confirmed diagnoses. Confirmed diagnoses come from referring physician or physician extenders." *Id.*, at 4-3. In other words, radiology services are not a valid provider type.

70.    MA plans are responsible for the content of risk adjustment data submissions to CMS, regardless of whether they submit the data themselves or through an intermediary. Before submitting data to CMS, MA plans are required to filter the data "to ensure that they submit data from only appropriate data sources." *Participant Guide*, at 4-11. For example, filters should include checking that physician data comes from face-to-face encounters with patients and ensuring that data does not come from non-covered providers, such as diagnostic radiology services.

71.    MA plans must also filter the data to ensure that only diagnoses treated through approved procedure types are included. In the CMS-HCC system, procedures are classified using Current Procedural Terminology ("CPT") codes.   These codes show whether the type of service in question was a face-to-face procedure such as a physical examination, or a non-qualifying remote procedure, such as a laboratory test or radiology exam.

72.    MA plans are required to correct the risk adjustment data they submit to CMS.  When the MA plan learns that information in a submitted diagnosis (i.e., HIC number, ICD-9-CM code, service dates, and provider type) contains an error, it must submit a "delete record" to CMS for that diagnosis. The MA plan may then submit corrected data.

73.   CMS also requires that diagnosis codes be substantiated through documentation in medical records.  CMS's ability to verify a plan's compliance with ICD-9-CM coding guidelines depends on accurate medical record documentation. *Participant Guide*, at 6-1.  Thus, MA plans must have documentation to support each code and substantiate that the provider followed proper coding guidelines. *Id.* at 6-5; 5-52.  Most important, CMS rules provide that MA plans are responsible for the accuracy of the data they submit to CMS. *Id.* at 3-13.

74.   To test the validity of MA plan risk adjustment data, CMS conducts Risk Adjustment Data Validation ("RADV") audits after the MA plan's final deadline for submitting risk adjustment data for the payment year.  During such audits, CMS validates the MA plan's CMS—HCC scores by reviewing the medical records that the plan contends support the claimed diagnosis codes. *Id.* at 7-1.  To facilitate the RADV audits, MA plans are required to submit to CMS medical records and coversheets for each enrollee, including the "one best medical record" for each HCC. *Id.* at 7-9.

75.   RADV ensures compliance with the "principal risk adjustment rule [that] risk adjustment diagnoses submitted for enrollees must be supported by medical record documentation and based on a face-to-face encounter." *Id.* at 7-3.  CMS rules provide strict requirements as to what documentation must be in the patient's records to validate a diagnosis. *See id.* at 7-14 to -15.   All relevant medical records must contain a physician or physician extender's signature *for each service* date, to ensure the service was provided through a face-to-face encounter with the member. *Id.*

76.     Diagnoses submitted in reliance on incomplete or missing medical records are deemed invalid, and cannot be used as the basis to claim increased risk adjustment payments.

77.     Since the advent of the Risk Adjustment model in 2004, CMS has warned MA plans that RADV audit results will ultimately be extrapolated to the MA plan as a whole.  Under extrapolation, CMS first calculates the MA plan's payment error estimate using the risk adjustment discrepancies it identified during RADV.  The error estimate represents the percentage of invalid HCCs found in the audit sample.  CMS then applies the payment error estimate to the MA plan's entire contract to calculate the plan's contract-level payment adjustment.  Thus, if CMS found during RADV that 30% of the HCCs in the audit sample lacked adequate documentation, CMS would decrease its payments to the MA plan by 30% for that contract year.  CMS currently intends to implement mandatory extrapolation of its RADV audit results for its RADV audits for calendar year 2013 code submissions.

**C.     MA Member Enrollment Rules Designed to Prevent Manipulation of Capitation Rates**

78.     CMS rules and the contracts between CMS and individual plans require MA plans to adhere to (and certify their adherence to) several requirements with respect to who enrolls in the plan, how they are enrolled, and what services will be provided to those members.  Generally speaking, these rules require MA plans, such as Freedom and Optimum, to accept any Medicare beneficiary who is eligible to enroll, without regard for preexisting health condition or prior claims experience.  Thus plans are flatly prohibited

from discriminating on the basis of health in their enrollment and disenrollment activities, and cannot encourage members to disenroll from the plan for any reason.

79. The prohibition against discrimination on the basis of health status, age or other condition is an essential component of any health care program that depends on monthly capitation rates as a means of reimbursement. Such monthly rates are based on average costs per member per month, and thus recognize that some members will require more care than the capitation rate will cover, but others (most others) will require less care. In fact, as a general rule, a small segment of the membership of most managed care plans—the sickest members—generally account for a substantial portion of all of the health care expenses for the entire plan. Accordingly, a substantial portion of the capitation rate for each member is actually attributable to the expected cost of treating those few sickest patients.

80. For this reason, a managed care plan that "cherry picks" its members by excluding the sickest members will receive a windfall at the expense of CMS and other MA plans because it is being paid based on an assumption that the profits it makes on the majority of members will be offset by the loss it will take on those sick members. Thus, the prohibition against cherry picking in the contracts between MA plans and CMS is an essential component of the program, without which the capitation-rate-setting process does not work.

81. This principle applies with particular force when capitation rates are adjusted by a risk factor, such as the one used for MA plans, that reflects the patient's health status, but does not account for past claims. This is so because risk status does not

necessarily predict how much and how many health care services a patient will require. For example, patients with diabetes are generally classified as higher risk than patients without diabetes. Yet there is substantial variation among diabetes patients as to their health needs. A patient who attentively manages his or her blood sugar level, and otherwise lives a healthy life, may require little extra treatment compared to a non-diabetic. On the other hand, a patient who fails to monitor or control his or her blood sugar levels, regularly consumes alcohol and sugary foods, and otherwise lives a lifestyle that is incompatible with diabetes, will likely require substantially more care, often including multiple hospitalizations or surgical intervention. Thus two patients with the same overall risk score may cost a plan substantially different amounts in claims expense.

82.    In general, the use of risk adjustment rather than claims experience encourages honest plans to manage their patients' health care more aggressively. Because CMS calculates risk adjustment by disease states, and not claims history, MA organizations will lose money on beneficiaries whose claims exceed their risk-adjusted Medicare premiums. Even the highest risk-adjusted annual premium will generally not cover two or three average hospitalizations. Conversely, MA organizations that successfully reduce the claims volume/cost of their sickest beneficiaries will make a profit on them, as CMS will continue to calculate the beneficiaries' premiums by their multiple disease states, and not by their low claims expense. The risk adjustment system, therefore, rewards MA organizations that improve their members' health outcomes.

83.    However, unscrupulous plans could manipulate this system if they were able to pick and choose their patients based on claims experience rather than just based

on health status.  By so doing, plans could select the patients who have a high risk score—and a correspondingly high capitation rate—but who have not, in fact, historically required expensive care.  These plans would then shift the cost of caring for the more expensive patients either to other, honest plans or to traditional Medicare Parts A and B.

84.     Another rule that prevents cherry picking is the requirement that members may only join or leave MA plans at certain limited times, or under certain conditions.  These rules are necessary to prevent a member—whether on their own or under pressure from the plan—from switching from one plan to another, or to standard Medicare, when they need expensive care.

85.     CMS has established fixed procedures for when and how MA organizations may enroll and disenroll Medicare beneficiaries.  To keep Medicare beneficiaries from continually revolving from plan to plan, or from plans to original Medicare, CMS created limited windows during which beneficiaries may elect to enroll or disenroll.  These enrollment windows include the Annual Election Period ("AEP") from November 15 to December 31, in which beneficiaries can freely move in or out of MA plans, and the Open Enrollment Period ("OEP"), from January 1 to March 31, in which beneficiaries are allowed to make a single election to enroll or disenroll from an MA plan.  Special Election Periods ("SEP") also create a fixed window of time for beneficiaries whose status has changed, such as by moving to a new county or losing coverage through their employer, to enroll in an MA plan.

86.     CMS has created an SEP for beneficiaries to enroll in a severe or disabling chronic condition SNP.  This SEP lasts as long as the beneficiary has the qualifying

chronic condition, ending only once the beneficiary has enrolled in the SNP. In other words, so long as he or she has never enrolled in a SNP before, a person with a qualifying condition can enroll in a chronic care SNP any time throughout the year. As will be discussed herein, Freedom capitalized on this SEP during the spring and summer of 2008 by enrolling thousands of beneficiaries into its SNPs, when its other, general MA plans were closed to open enrollment.

**D.    CMS Requires MA Plans To Certify the Validity of Their Bid Rates and Risk Adjustment Data To Prevent Fraud**

87.    In recognition of the fact that the integrity of the capitation rates depends on the integrity of the actuarial information used by the MA plans in developing their bid rates, and to otherwise guard against fraud, CMS requires MA organizations to submit three separate attestations, each signed by the CEO or CFO (or their authorized, direct subordinate). These attestations are a condition that the MA plans must meet to be eligible to receive any capitation payments from CMS.

88.    The first attestation, which the MA organization submits on a monthly basis, requires the MA organization to "attest based on best knowledge, information, and belief that each enrollee for whom the MA Organization is requesting payment is validly enrolled, or was validly enrolled during the period for which payment is requested, in an MA plan offered by the MA Organization."

89.    The second attestation, which is submitted annually, requires the MA organization to attest that the risk adjustment data it submits annually to CMS is "accurate, complete, and truthful." The attestation acknowledges that risk adjustment information "directly affects the calculation of CMS payments . . . and that

misrepresentations to CMS about the accuracy of such information may result in Federal civil action and/or criminal prosecution."

90.     The third attestation is the MA organization's certification "that the information and documentation comprising the bid submission proposal is accurate, complete, and truthful and fully conforms to the Bid Form and Plan Benefit Package requirements; and that the benefits described in the CMS-approved proposal bid submission agree with the benefit package the MA Organization will offer during the period covered by the proposal bid submission." Exhibit 1, incorporated herein.

### E.     Special Needs Plans

91.     The 2003 Medicare Prescription Drug, Improvement, and Modernization Act ("MMA") also created Special Needs Plans ("SNP") to treat the sickest and most vulnerable Medicare beneficiaries.  There are three SNP types: (1) for institutionalized beneficiaries, (2) for beneficiaries eligible for both Medicare and Medicaid, and (3) for beneficiaries with severe or disabling chronic conditions.

92.     Unlike general MA plans, which must enroll and be marketed to the general population of Medicare beneficiaries, a SNP is limited to its statutorily-defined target population.  MA plans may not enroll non-target group members into their SNPs.

93.     MA organizations can market SNPs directly to these target groups, such as diabetics.  Plans cannot "cherry pick" within a target group: they must enroll anyone who is eligible for the SNP, no matter how healthy or how sick.

94.     The purpose of the SNP program is to improve care for vulnerable populations by improving coordination and continuity of care.  SNPs are expected to

improve the benefits available to their members, either by combining Medicare and Medicaid benefits for dual-eligible beneficiaries, or by managing chronic disease through health status and treatment monitoring, with an eye toward improving chronically-ill members' health outcomes. CMS measures SNP service delivery and outcomes through reporting requirements, which it oversees with the help of an outside contractor, the National Center for Quality Assurance ("NCQA").

95.     MA organizations submit bids for their SNPs separately from their regular MA plans, owing to the special services they provide SNP members. Because SNPs serve populations that typically require more care than the general population, their capitation rates are frequently higher than for non-SNP plans.

96.     Such has been the case for Freedom. In 2008, Freedom estimated it would receive $220 to $236 more per member per month for its SNP members, compared to the members in its non-SNP, general MA plans. Exhibit 2, incorporated herein.

## VIII.  FRAUD AGAINST REAL PARTIES

97.     Freedom Health, Inc. ("Freedom") was founded in 2004 by Dr. Devaiah Pagidipati and his son, Siddharta ("Sidd") Pagidipati. Devaiah Pagidipati is a Tampa-area entrepreneur and former physician who began his medical career as a pediatric anesthesiologist soon after emigrating from India in the early 1970s. Sidd Pagidipati is a former investment banker who moved from New York to Tampa to run the new company. Unlike his father, Sidd had no experience in health care, and neither father nor son had experience in running a health plan. To provide health plan expertise for the new company, Sidd recruited several executives from WellCare HMO, Inc. ("WellCare"), a

large health plan founded by Dr. Kiran C. Patel in the 1990s. These executives included Christopher O'Connor, his wife Lucy O'Connor, and Tammy Castano. At the outset, Devaiah Pagidipati was Freedom's President and Chief Executive Officer ("CEO") and Sidd Pagidipati the Chief Operating Officer ("COO").

98. Florida health plans such as Freedom cannot provide coverage to Medicare beneficiaries unless they have a health care provider certificate from the State of Florida's Agency for Health Care Administration ("AHCA") and enter into a Medicare coordinated care plan contract with the federal Centers for Medicare & Medicaid Services ("CMS"). Freedom executed its first contract with CMS on July 8, 2005, with an effective date of September 1, 2005.

99. To succeed, Freedom knew it had to grow rapidly. Like other startup health plans, Freedom was competing against Universal Healthcare, a plan that offered beneficiaries cash-back worth their monthly Medicare Part B premium, and whose membership had doubled every year of its existence (up to 2008). To replicate this level of growth, Freedom emulated Universal Healthcare's business model by offering its enrollees a complete refund on their Part B premiums. The growth plan was successful, with Freedom enrolling 4,000 members in its first year. By 2006, Freedom had expanded from three counties, Marion, Broward, and Miami-Dade, to ten, including Hillsborough, Pasco, Pinellas, and Hernando counties. Its staff had grown to eighty employees, split between two rented offices in St. Petersburg and Clearwater. Still, Freedom was a small plan compared to others in the region, such as Universal Healthcare, which could boast a membership of almost 100,000.

100.   It was Freedom's position as a small but fast-growing company that attracted the interest of Dr. Kiran C. Patel.   Dr. Patel understood how to grow health plans, having co-founded WellCare in 1992, which he quickly built into a billion-dollar-revenue company before selling it in 2002 for an estimated $200 million.   Like Devaiah Pagidipati, Dr. Patel was originally a practicing physician, having emigrated from India and established a cardiology practice in the Tampa area in the early 1980s.   A non-compete agreement from the WellCare sale kept Dr. Patel out of the health insurance market for five years, but upon its expiration he promptly moved to replicate his WellCare success by buying Freedom and another small health plan, Optimum Healthcare, Inc. ("Optimum"), for an estimated $50 million in November 2007.   In Freedom, Dr. Patel saw an opportunity to swiftly grow the business, using skills he had developed at WellCare, after which he could "flip" the expanded company, selling it for a quick profit.

101.   Freedom's founders, the Pagidipatis, allowed Dr. Patel to buy the company because he had the financial resources needed to accelerate Freedom's growth. Following the sale, Dr. Patel became Freedom's new President and CEO, while Sidd Pagidipati remained Freedom's COO.   Devaiah Pagidipati, Freedom's former President and CEO, remained on the board of directors.   Dr. Patel invested $6,100,000 in Freedom in 2007.

102.   Freedom had ambitious growth targets from its inception, and these only increased under Dr. Patel.   Dr. Patel expected Freedom to double its revenue within the first year of his ownership.   Freedom had 12,554 members at the end of 2007; Dr. Patel

wanted it to have 50,000 within three years. Freedom seemed poised to achieve that target, as it nearly doubled its membership during the 2007–2008 Medicare open enrollment period, boasting over 24,000 members in May 2008. The staff had more than doubled (from eighty to 190) by that point, and Dr. Patel expected to hire another 25–50 by the beginning of the 2009 open enrollment period. Expansion, however, did not bring immediate profits. Freedom lost $10.7 million in 2007 on $98.4 million in revenue.

103.    In August 2009, Freedom was the seventh-fastest-growing company in America, according to Inc. Magazine. Freedom's revenue growth between 2005 and 2008 was an astonishing 10,035.3%.

104.    Optimum was founded in 2004 in Spring Hill, FL by a group of Tampa-area physicians led by Dr. Pariksith Singh. Optimum enrolled its first Medicare beneficiaries in late 2006. By the time Dr. Patel bought Optimum in late 2007, it operated three MA plans and had enrolled approximately 3,000 members. Dr. Patel consolidated Optimum's and Freedom's operations, moving Optimum from Spring Hill into Freedom's office in Tampa, and either absorbing Optimum's prior managers and employees into Global TPA or releasing them. Like Freedom, Optimum has expanded its membership under Dr. Patel's control. Optimum had nearly 4,600 members by April 2009 and over 11,700 members by April 2010—after more than doubling its membership during the 2009 AEP, when Optimum enrolled 5,973 new members.

105.    During 2007 and 2008, it was widely known among Freedom's and Optimum's managers that Dr. Patel had set a target for Freedom and Optimum to grow to $50 million in combined earnings before interest, taxes, depreciation, and amortization

("EBITDA")—the size at which they would become valuable enough to attract potential buyers—as quickly as possible.   It was also well known that Dr. Patel would sell Freedom and Optimum once they reached this target, just as he had done with WellCare. Dr. Patel's plan set the tone for the entire company.

106.   The changing climate for Medicare Advantage plans in 2009 and 2010 forced Dr. Patel to table his plan to sell Freedom and Optimum, but it did not change his approach to managing them.   Unable to sell, Dr. Patel and CEO Rupesh Shah focused on extracting as much revenue as they could from Freedom and Optimum, through increased incentive contracts with providers and aggressive risk adjustment programs.   Dr. Patel and Shah also diverted Freedom's and Optimum's profits to themselves by contracting services to vendors they own and by forming their own independent practice associations ("IPAs") to split revenue from incentive contracts with Freedom and Optimum.   To those who own and manage it, Freedom and Optimum are revenue engines first, and health insurers second.   From the outset, Freedom and Optimum have focused on enrollment growth and short-term profitability instead of improving long-term health outcomes for their members.   As will be discussed below, Freedom and Optimum pursue these two goals at every turn, often taking shortcuts at the expense of Medicare beneficiaries.

107.   Freedom's and Optimum's fraudulent activities fall into three basic categories.   First, Freedom and Optimum, along with their capitated providers, have fraudulently increased their capitation rates during the risk adjustment process by submitting false information to CMS to improperly increase their risk adjustment payments and by concealing known overpayments. Second, Freedom has turned the idea

of health insurance on its head, and sought to eliminate any element of risk, by engaging in a systemic practice of cherry picking, i.e., identifying sick, costly beneficiaries and removing them from its plans. Third, subscribing to a theory of "grow the membership first and worry about how to provide services later," Freedom and Optimum have fraudulently induced approval from CMS to operate their special needs plans ("SNPs") and to expand their service areas, by making multiple false representations in their applications regarding their ability to provide the basic services inherent to a SNP plan, or to secure an adequate provider network to support expansion into new counties.

A.    **Freedom, Optimum, AFC-NC, and AFC-SC Fraudulently Submit Improper Diagnosis Codes to CMS to Falsely Increase their Risk Adjustment Payments**

108.    Freedom, Optimum, AFC-NC, and AFC-SC knowingly submit to CMS tens of thousands of incorrect and unsubstantiated diagnosis codes in order to fraudulently increase their per-member-per-month risk adjustment payments from CMS. The plans' fraudulent risk adjustment conduct began in 2007 and continued through at least September 7, 2012 (when Relator was constructively discharged),and includes, without limitation, the following five practices.

109.    First, acting on orders from CEO Rupesh Shah, Freedom and Optimum use their internal team of coding auditors, which is supposed to review risk adjustment data for accuracy, as a profit center. Freedom's and Optimum's auditors scour medical records looking for "missing" diagnosis codes that Freedom and Optimum can submit to CMS. Freedom and Optimum instruct their auditors to ignore CMS and ICD-9-CM coding standards in order to maximize the number of codes they send to CMS for risk

adjustment. They know the majority of the codes their auditors "find" are baseless, but submit them to CMS anyway.

110.   Second, Freedom, Optimum, AFC-NC, and AFC-SC routinely fraudulently increase their risk adjustment payments by submitting risk adjustment data to CMS without filtering the data to exclude improper diagnosis codes. This practice is a flagrant violation of CMS rules.

111.   Third, Freedom and Optimum have conducted internal audits of their risk adjustment data, which have found that as many as 80% of the risk adjustment codes Freedom submitted for 2009 codes were unsubstantiated. Rather than correcting these known false codes, Defendants simply instructed their auditors to review less strictly.

112.   Fourth, in addition to their internal audits, Freedom and Optimum frequently discover that the diagnosis codes submitted by certain providers are incorrect or even fraudulent. Despite knowing in most circumstances that the incorrect codes were the basis for risk adjustment claims to CMS, Freedom and Optimum do not submit delete codes to CMS, or refund CMS for any overpayments they may have already received.

113.   Fifth, toward the end of each contract year, Freedom and Optimum cause their physicians to bring certain members in for medically unnecessary office visits with members for the sole purpose of capturing diagnosis codes. The office visits are not medically necessary, nor are they performed for the benefit of the patient. Instead, Freedom and Optimum cause these visits to happen solely for the purpose of fraudulently increasing their risk adjustment-based reimbursement.

1.      **Freedom and Optimum Conduct Bogus Audits To Generate
False Diagnosis Codes To Fraudulently Increase Their Risk
Adjustment Payments**

114.    Freedom and Optimum fraudulently use internal coding auditors to manufacture fraudulent records that purport to show their patients are sicker than they actually are.  Defendants then submit these incorrect and/or unsubstantiated diagnosis codes to CMS for retroactive risk adjustment, resulting in millions of dollars in additional (improper) payments.

115.    CMS sets risk scores based on risk adjustment data submitted for services provided during the year preceding the payment year.  42 C.F.R. § 422.310(g).  The annual deadline for submitting risk adjustment data to CMS is in early September.  *Id.* The data submitted by the September deadline determines members' risk scores for the following year.

116.    Despite the September deadline, CMS accepts late submissions of risk adjustment data and, through a reconciliation process, adjusts its payments to the MA plan retroactively to account for codes submitted after the September deadline.  MA plans are allowed to submit risk adjustment data until after the end of the payment year.  After the payment year ends, CMS recalculates the risk score for any members for whom the MA plan made a late submission.

117.    The first deadline for submitting diagnoses with 2009 service dates was September 4, 2009 and the final submission deadline was January 31, 2011.  Thus, CMS calculated members' initial risk factors for 2010 based on the March 5, 2010 data, but MA plans have been allowed to continue to submit 2009 diagnoses until January 31,

2011. After that date, CMS recalculated the risk score for every member with a new diagnosis submitted after March 5, 2010, and reconciled the member's payments in 2010 with the amount it would have paid at the new score.

118. MA plans often employ a team of coding auditors to review providers' medical charts during the "reconciliation period" to identify diagnosis codes that were not reported by the initial submission deadline.

119. Because the MA plans have a duty to submit accurate data, the auditors should look both to verify the accuracy of the already-submitted codes, and for codes that should have been, but were not, submitted to CMS. Moreover, and fundamentally, the MA plan may only submit new diagnosis codes if those codes are supported by the patients' medical record.

120. Freedom and Optimum violate this duty and exploit the reconciliation process by submitting large numbers of retroactive codes to CMS that are unsupported by medical records or otherwise invalid. Freedom and Optimum employ a team of internal coding auditors to review providers' medical records to find new diagnosis codes for which the patient was purportedly treated, but which the provider did not code when it provided its services, or that the provider coded but did not transmit to Freedom/Optimum. In their review, the auditors supposedly look for evidence of chronic disease and compare any possible conditions to the patient's existing HCC codes. When done properly, these audits are intended to catch physician mistakes.

121. Freedom and Optimum, however, instruct their auditors to submit as many diagnosis codes as possible, without regard to CMS coding rules. Freedom/Optimum

auditors look for any hint of medical conditions that correspond to HCC codes that substantially increase CMS payments, and then claim that the patient was treated for that condition – regardless of whether the patient actually has the condition or was treated for it in the year in question, by a qualified provider type in a face-to-face visit.

122.    The auditors then create spreadsheets of the diagnosis codes they find during their reviews and create new patient encounter forms reflecting the new ICD-9-CM codes. The auditors send the forms to the treating physicians for signature. Freedom and Optimum submit the codes to CMS directly, however, and without waiting for signatures. These practices are clear and knowing violations of CMS regulations and guidance.

123.    As part of Freedom's and Optimum's retroactive review of 2008 patient records, in 2009 Freedom audited medical records from Manatee County Rural Health Services ("MCRHS"), an independent practice association ("IPA") operating on information and belief under an incentive-based contract with Freedom/Optimum. Freedom sought to find "missing" diagnoses from 2008 that it could submit to CMS as additional, payable HCC codes. Based on its audit, Freedom submitted additional HCC codes to CMS for MCRHS on or about January 31, 2010.

124.    In the summer of 2010, Rupesh Shah and Mital Panara, Freedom's and Optimum's CEO and Vice President of Revenue Management, respectively, instructed Relator to review MCRHS's medical records for conditions that Freedom could ask its doctors to code in the future. Acting on their instructions, Relator reviewed the codes that MCRHS submitted in 2008, the codes that Freedom submitted following its

2009/2010 audit, and the medical records supporting each.  In reviewing MCRHS's records, Relator noticed flagrant coding violations in the codes from Freedom's 2009 audit.  Relator found that Freedom had coded every condition it could find, consistently assigning the highest possible value code to each condition, regardless of whether those codes violated CMS rules.

125.    Freedom primarily submitted two types of incorrect codes after its 2009 MCRHS audit.  First, Freedom submitted codes from impermissible sources (i.e., outside of any face-to-face encounter between physician and patient), such as laboratory, electrocardiogram ("EKG"), and radiology reports, even though Freedom's auditors know that ICD-9-CM coding guidelines forbid Freedom to submit codes based on these sources. *See* ¶69.

126.    Second, Freedom "upcoded" certain medical conditions by replacing codes chosen by doctors with higher-value codes that had no support in the medical records.  For example, for members with multiple, coexisting conditions, Freedom coded one condition as a complication of the other, when the medical records did not support a causal relationship between them.  Freedom coded in this manner because Medicare assigns a much more valuable HCC to conditions where a causal relationship exists.  Thus, a patient diagnosed with diabetes and renal failure should have ICD-9-CM codes 250.00–.03 (general diabetes) and 585.10–.90 (renal failure).  These codes correspond to HCCs 19 and 131.  HCC 19 adds .162 to the patient's risk score and HCC 131 adds .368.  Combined, the risk score for the two codes is .530.  Freedom auditors, however, code renal failure as a *complication* of diabetes, using ICD-9-CM code 250.40–.43 (diabetes

with renal complications), even though Freedom had no evidence that diabetes contributed to the member's renal failure.  By coding renal failure as a complication, Freedom replaces HCC 19 (.162) with HCC 15 (.508). The combined risk score is .876. Because HCC 15 has a higher value than HCC 19, it overrides the HCC 19 code in CMS's system.   Freedom thus increases the member's risk score by .346, which corresponds to approximately $3,000 or more in extra annual revenue for each such patient.   Based on conversations with Freedom auditors, Relator believes Freedom instructed its auditors in 2009 to code HCC 15 whenever they came across a member with diabetes and renal failure (or vascular disease).

127.    Freedom knowingly submitted a large amount of false codes to CMS due to the MCRHS audit. Relator found that approximately 30% of the MCRHS charts he reviewed contained codes that were incorrect on the face of the chart.  This high percentage is especially egregious because retroactive audits are supposed to *reduce* the inaccuracy of risk scores by filling out CMS's data sample and correcting past mistakes. Instead, Relator believes that Freedom's audit *increased* the number of incorrect codes Freedom submitted to CMS.  The average annual value of the incorrect codes was nearly $3,000.  In total, the incorrect codes Relator found for MCRHS likely generated more than $250,000 in CMS overpayments.

128.    On or about September 16, 2010, Relator spoke with Biju Lukose, Freedom's senior coding auditor and the administrator of the 2009 MCHRS audit. Relator told Lukose that he had found many incorrect and impermissible codes during his review of MCRHS's records.  Lukose affirmed that Freedom had audited MCRHS and

that the codes the audit produced were "totally" against CMS regulations.  Lukose said
Freedom's coders had been told to code everything they could find, whether or not it
could be properly coded.  When Relator asked Lukose if Mital Panara knew the codes
were false, Lukose replied that he did, and said Panara had told the auditors to comb
through MCRHS's medical records and find new codes regardless of their truth.
According to Lukose, Panara had been the Freedom manager in charge of the audit.

129.   As the MCRHS audit demonstrates, Freedom's management directs its
internal auditors to fraudulently submit incorrect CMS—HCC codes to CMS that
increase its risk adjustment payments.   Reviewing medical charts for incremental
diagnosis codes that can be submitted to CMS for risk adjustment payment is a policy
and practice of Freedom and Optimum and is applied to nearly all provider groups with a
fee-for-service contract.   In addition, Freedom and Optimum process and submit
diagnosis codes that auditors employed by risk-based provider groups (i.e., groups that
receive a percentage of Freedom's and Optimum's capitation payments for their
members) have reviewed.  On information and belief, Freedom and Optimum know that
many of the diagnoses from risk-based provider group auditors are false, but they
nonetheless submit the diagnoses to CMS.  Mital Panara is Freedom's Vice President
responsible for risk adjustment.  Panara reports directly to CEO Rupesh Shah, who
personally directs and oversees Freedom's and Optimum's retroactive coding audit
program.  Together, Panara and Shah have instructed Freedom and Optimum auditors to
identify invalid diagnosis codes that increase members' risk scores and have caused

Freedom to submit those codes, along with false codes retroactively submitted by risk-based provider groups, to CMS.

130.    On December 17, 2010, Biju Lukose explained Freedom's audit strategy to Relator.  According to Lukose, Freedom gives its auditors medical records and a list of ICD-9-CM codes that the auditors must look for.  Relator asked Lukose if Freedom followed CMS rules in its coding audits.  Lukose replied that Freedom "would never find a single code" if it followed CMS rules.  Relator then asked if Freedom waits for physicians to sign encounter forms (which auditors mail to the physician after finding a code) before it submits a code to CMS.  Lukose replied that Freedom often does not bother obtaining physician signatures before it submits codes, especially in the periods before submission deadlines, i.e., CMS's deadlines for submitting corrected and/or additional risk adjustment data.  Relator then asked if Freedom loses out on reimbursable codes because it lacks signatures.  Lukose replied that Freedom submits codes to CMS without waiting for physician signatures.  Lukose intimated that Freedom never receives a physician signature for many codes that it submits.  Relator asked Lukose if Mital Panara was aware of his view that Freedom would not "find a single code" if it followed CMS coding rules.  Lukose said that Panara had told Freedom auditors to "loosen up" their coding and to not follow CMS rules.  According to Lukose, Panara said that Freedom did not need to follow CMS coding rules because Freedom would be receiving signatures from the doctors.  In other words, Freedom could knowingly submit bad codes to CMS because Freedom would ultimately receive physician signatures for them. Panara is an expert on coding, and knows that a physician signature, though required for

every code, cannot absolve Freedom for having submitted erroneous codes. *See* ¶72. Furthermore, Panara knows that Freedom submits codes that physicians have not signed and in many cases *never* receives a signature for submitted codes.

131.   On or about December 20, 2010, Relator showed Mital Panara medical records that Freedom auditors had coded incorrectly. The charts showed diagnoses of lymphedema and dermatitis; the auditors had coded lymphoma and decubitus ulcer, both higher paying conditions. Relator told Panara that the codes, which Freedom had submitted to CMS, were wrong. Panara acknowledged the errors but told Relator not to fix them. This was a violation of CMS rules, which require MA plans to delete incorrect diagnosis codes from CMS's database and substitute corrected codes. *See* ¶72.

132.   Freedom and Optimum do not correct erroneous codes because their management does not want to lose potential revenue. On or about December 17, 2010, Mital Panara spoke with Relator about two IPAs that had recently sent delete codes to Freedom (for submission to CMS) to correct codes they had decided were unsubstantiated. Panara said he was "shocked" that any provider would delete a code that stood to give it extra revenue.

133.   Freedom's risk adjustment audits increase its revenue significantly. In 2009 and 2010, Freedom employed 4–12 internal auditors. On or about December 28, 2010, Mital Panara told Relator that these auditors had submitted 10,934 additional Medicare Part C codes from the 2009 service year and 17,814 additional Part C codes from the 2010 service year. Many of those additional codes were false due to Freedom's and Optimum's policy and practice of instructing auditors to submit incorrect and/or

unsubstantiated diagnosis codes. The average Part C code is worth approximately $1,500–$2,000 annually in CMS payments. Thus, Freedom's small team of coding auditors increased Freedom's risk adjustment payment by $16.4 million in 2009 and $26.7 million in 2010, using a conservative estimate. Based on these amounts, each coder submitted codes worth over $1 million in 2009 and *over $2 million* in 2010.

134.   Freedom has fraudulently received over $40 million dollars from CMS during the 2009 and 2010 reconciliation process by hiring auditors to identify tens of thousands of additional codes, many of which are unsubstantiated and/or fraudulent. Indeed, the supervisor of Freedom's auditors, Biju Lukose, has admitted that Freedom would have submitted *no additional codes* had its auditors followed CMS's coding rules. *See* ¶130. On information and belief, the use of auditors to retroactively scour medical records for additional diagnosis codes is a policy and practice of Freedom and Optimum extending back to the creation of the Revenue Department in 2007. Relator has information and believes that Freedom and Optimum have known from the outset (2007) that many of the diagnosis codes they submit retroactively to CMS are false.

> **2.   Freedom, Optimum, AFC-NC, and AFC-SC Fraudulently Increase Their Payments by Submitting Risk Adjustment Data to CMS Without Filtering the Data to Exclude Improper Diagnosis Codes.**

135.   Freedom knowingly submits incorrect risk adjustment data to CMS due to known deficiencies in Freedom's and Optimum's system for submitting risk adjustment data to CMS. The system is responsible for receiving coding data, filtering the data for ineligible codes, and submitting the filtered data to CMS. When submitting codes to CMS, CMS requires MA plans to filter diagnosis codes by provider type (among other

filters).  The requirement prevents diagnosis codes from ineligible providers, such as radiologists, from being submitted to CMS and used for risk adjustment.  When Freedom and Optimum enter providers into their systems during credentialing, however, they do not assign the providers an identifier by which to sort and filter for provider type. Similarly, AFC-NC and AFC-SC do not enter their providers into the system in a manner that allows for filtering by provider type.  Without provider type identifiers (e.g., a code identifying the provider as eligible or ineligible for risk adjustment), Freedom and Optimum lack the ability to filter diagnosis codes by provider type.  Consequently, Freedom and Optimum are improperly submitting diagnosis codes associated with invalid providers to CMS because they are not screening the codes for ineligible providers.

136.   In February 2011, Relator spoke with Mark Livingston, a Freedom IT employee responsible for Freedom's and Optimum's system for submitting risk adjustment data to CMS.  Livingston told Relator about Freedom's and Optimum's failure to set up the system to allow for provider type filtering.  Livingston confirmed that Freedom and Optimum are unable to filter by provider type, and further explained that Freedom and Optimum did not even know their system was capable of provider type filtering were the plans to use identifiers that could be filtered.  Livingston said that Freedom and Optimum knew about the filtering problem, as he had told Mital Panara, who is responsible for risk adjustment at Freedom/Optimum, about the deficiency on several occasions.

137.   In addition, Freedom and Optimum submit diagnosis codes to CMS knowing their system is not programmed to filter out ineligible CPT codes.  For example,

on February 16, 2011, a Freedom/Optimum auditor informed Mital Panara that approximately 70 of one primary care physician's 108 patients had an HCC 105 (abdominal aortic atherosclerosis) code submitted to CMS when those 70 patients did not in fact have the coded condition. Panara asked Relator to investigate. Relator reported to Panara that the codes had been taken from radiology claims that had *ruled out* abdominal aortic atherosclerosis for the patients, and that the claims "were billed with CPT codes that should have been excluded before CMS submission." The cause of the problem was that Freedom and Optimum used custom structured query language ("SQL") code to filter out ineligible codes using CPT codes, and that SQL code was not programmed to filter out the relevant radiology CPT codes, including 93925 and 93880, which are ineligible for risk adjustment. Radiology charts, generally speaking, list the diagnosis codes the patient's doctor wants the radiologist to look for, not which diagnoses the patient actually has. In this case, the radiology tests came back negative, showing the patients did not have the diagnoses listed in the radiology charts. The radiologist, in his claims, properly submitted the codes to Freedom and Optimum to justify the need for the tests. CMS prohibits Freedom and Optimum, however, from claiming risk adjustment payment for the ruled-out diagnosis codes in those claims records. Freedom and Optimum do exactly that by not screening for the radiology CPT codes. Thus, Freedom and Optimum knowingly claimed risk adjustment payments from CMS by falsely representing that their members were treated for abdominal aortic aneurysms that they did not actually suffer. On information and belief, Freedom and Optimum have not added the radiology CPT

codes to the filter and therefore continue to submit false claims for payment for diagnoses taken from radiology charts.

138.    Dr. Patel's private fee-for-service plans, America's 1st Choice Insurance Company of North Carolina and America's 1st Choice Health Plans, use the same SQL code (and share the same risk adjustment staff as Freedom and Optimum) and likewise knowingly submit false claims due to the defective filter.  In addition, Freedom and Optimum have contracted with Passport Advantage, an MA plan located in Kentucky, and JMH Health Plan, an MA plan located in Miami, Florida, to filter the plans' risk adjustment data in preparation for submission to CMS.  Freedom and Optimum use their SQL code to filter Passport Advantage's and JMH Health Plan's risk adjustment data, and therefore submit, or cause to be submitted, false claims for those plans' members.

139.    Freedom, Optimum, AFC-NC, and AFC-SC submit all of their diagnosis codes to CMS through the same system.  The problems the plans have identified with the system's filters affect every diagnosis they submit to CMS, and have caused the plans to submit and receive payment for large numbers of false and/or unsubstantiated diagnoses. As described above, these problems include, without limitation, the inability to filter diagnoses by provider type and certain CPT codes.  On information and belief, the defects that the plans have identified in the system's filters have existed since the plans first adopted the system.  Nonetheless, the plans continue to submit codes through the flawed system and have not corrected the incorrect and/or unsubstantiated codes they previously submitted to CMS due to the flaws.

140.   In addition, Freedom and Optimum have contracted with Passport Advantage, an MA plan located in Kentucky, and JMH Health Plan, an MA plan located in Miami, Florida, to filter and submit the plans' risk adjustment data to CMS.  As with AFC-NC and AFC-SC, Freedom and Optimum use the same flawed SQL code to filter Passport Advantage's and JMH Health Plan's risk adjustment data, and therefore knowingly submit false claims to CMS for those MA plans' members.

141.   Freedom and Optimum also knowingly submit unfiltered data to CMS during retrospective coding sweeps.   In advance of the deadline for retroactively submitting 2009 codes, Freedom targeted certain physician practice groups (IPAs) with low risk scores for a special data collection project.  Freedom suspected that the IPAs had failed to submit many of their diagnosis codes to Freedom, often due to transmission errors.  To ensure that it received every code from the IPAs, Freedom asked the IPAs to resend *all* of their 2009 ICD-9-CM codes and supporting data.  Consistent with CMS rules, the supporting data was supposed to include patient identifiers, dates of service, and CPT codes showing the provider type and service performed. *See* ¶¶69, 71.

142.   During the data collection process, Freedom discovered that two IPAs, MCRHS and Cornerstone Medical Care of Brandon ("Cornerstone"), did not send it all of the information that was required to determine if any valid diagnosis codes had been missed.   Specifically, they failed to include the CPT code: the key information that indicates what type of service each patient received in connection with any given diagnosis code.   Without this data, Freedom could not determine whether any new diagnosis codes were connected with valid, face-to-face services performed by a

physician or hospital, and could not exclude inappropriate diagnosis codes, such as codes from diagnostic radiology or lab tests. *Participant Guide*, at 4-11.

143.    Although Freedom knew it could not determine whether any new diagnosis codes for these practices were valid, it nonetheless submitted codes that triggered payment for approximately 635 new HCC codes from the unfiltered MCRHS data.    The value of the additional codes, which date from MCRHS's 2009 and 2010 service years, is approximately $1.6 million.    From Cornerstone's unfiltered data, Freedom identified 393 new codes, worth approximately $980,000.    On information and belief, Freedom submitted some or all of the additional codes to CMS for retroactive risk adjustment on or around January 31, 2011.

144.    On or about December 17, 2010, Freedom recognized that MCRHS and Cornerstone had not included CPT codes in the data they had provided Freedom.    In a conversation with Relator, Mital Panara said that not having CPT codes for these IPAs would benefit Freedom.    Panara explained that Freedom could not filter risk adjustment data if it lacked CPT codes.    He said that MCRHS and Cornerstone had low risk scores, and so Freedom could increase their scores the most by submitting their diagnosis codes to CMS without filtering inappropriate codes based on their CPT codes.

145.    On or about December 27, 2010, Relator asked Panara again about submitting unfiltered risk adjustment data.    Panara told Relator that Freedom normally obtains CPT codes to avoid submitting invalid codes, such as those based exclusively on laboratory tests, to CMS.    However, when Relator asked if Freedom should submit MCRHS's and Cornerstone's codes to CMS without having received their CPT codes,

Panara said Relator should submit them. Panara said it was "not a big deal" for Freedom to submit unfiltered codes.

146. Therefore, Freedom knowingly submitted risk adjustment data to CMS for MCRHS, Cornerstone, and possibly other IPAs, without filtering the data using CPT codes or any proxy for CPT codes, such as previously submitted fee-for-service claims data. By submitting unfiltered data to CMS, Freedom intended to defraud CMS into making risk adjustment payments for invalid diagnosis codes.

### 3.   Freedom's Internal Audits Show That It Is Submitting False Risk Adjustment Codes and Freedom Fails To Correct Them

147. In the summer of 2010, Freedom began to conduct a mock Risk Adjustment Data Validation ("RADV") audit to prepare for a possible CMS RADV audit of its 2009 codes. Freedom's mock audit was designed to resemble a RADV audit and to give it a head start on assembling the materials it would need to respond to a CMS records request if CMS selected it for one of its RADV audits. Freedom hired Linda Bognolo, a nurse and certified coding specialist, to conduct the mock audit.

148. Unlike Freedom's internal coding audits, the mock RADV audit (like a real RADV audit) was not intended to identify additional codes for submission. Instead, the mock audit was designed to determine if the diagnosis codes Freedom had already submitted to CMS were valid.

149. Freedom conducted the mock RADV audit to assess its risk in the event that CMS conducted a real RADV audit of one or more of Freedom's plans. When CMS conducts a RADV audit, to the extent it finds errors, it has said it would consider applying that error rate to the entire MA plan. *See* ¶77. Accordingly if a CMS RADV

audit found that 15% of audited HCC codes lacked substantiation, Freedom would lose 15% of its revenue for the audit year.

150.    To carry out the mock audit, Freedom collected medical records from physician's offices. Freedom focused on physicians, rather than hospitals, because physicians account for approximately 80% of its CMS—HCC codes and, as smaller entities, are more prone to incorrect coding. Freedom asked the physicians to submit various medical records and documents, which were then reviewed by Ms. Bognolo to determine if Freedom's CMS—HCC codes were valid.

151.    Ms. Bognolo soon found that a staggering percentage of Freedom's 2009 CMS—HCC codes are unsubstantiated. During the early stages of the audit, she found that approximately 48% of the HCC codes she reviewed were invalid (the percentage has increased as her audit sample has grown). She found several significant problems, such as physicians coding for conditions that were no longer being actively treated. For example, cancer was frequently coded years after the patient stopped requiring treatment. Thus, Freedom was being paid in perpetuity for conditions that were dormant or cured.

152.    The percentage of codes that Ms. Bognolo was able to substantiate decreased with every chart she audited. By September and October 2010, she was finding substantiation for only 20–30% of the HCC codes she audited. She noticed that certain provider groups' codes were especially likely to contain incorrect or groundless codes.

153.    In a conversation with Relator on December 20, 2010, Ms. Bognolo said she had validated only 20% of the HCC codes she had audited to date. Bognolo said she

was surprised the percentage was so low.  She explained that she tried to audit HCC codes as though she were a CMS auditor, and that, based on the percentage she was confirming, Freedom and Optimum would face substantial liability for unsubstantiated HCCs in a RADV audit.

154.   Ms. Bognolo told Relator that she had informed Mital Panara that she was unable to validate 80% of Freedom's HCC codes.  According to Ms. Bognolo, Panara asked her to validate codes more "leniently."  She said that she told Panara that "the rules are the rules," implying she would not break CMS and ICD-9-CM coding rules for the sake of Freedom's mock audit results.

155.   After Ms. Bognolo insisted on following coding rules, Mital Panara decided to improve the appearance of her audit results by misrepresenting data.  She was reporting her results on a spreadsheet that listed the confirmed and unconfirmed codes. Panara modified the spreadsheet by dividing the unconfirmed codes into two columns. The first column showed whether the code was totally unsubstantiated, i.e., lacked a diagnosis.   The second column showed whether the code, while diagnosed by the physician, was improperly documented.  Panara's plan was to count the codes in the second column—those with diagnoses but improper or missing documentation—as "confirmed."  This tactic violates coding guidelines, which require *both* a diagnosis *and* proper documentation, among other requirements.  *See* ¶73.  Even with Panara's artificial increase, Freedom has only "confirmed" 60% of the HCC codes in its audit sample.  The rest lack a valid diagnosis.

156.   In her conversation with Relator on December 20, 2010, Ms. Bognolo said she had approached Mital Panara on multiple occasions with specific HCC codes that Freedom had submitted to CMS improperly and that could not be validly used to increase risk adjustment payments.   Bognolo said Panara acknowledged her statements but gave no indication that Freedom would delete or correct the flawed codes.

157.   Freedom's computerized claims system includes a field for comments.  In the course of her audit, Ms. Bognolo has made a comment in the claims system whenever she identifies an incorrect or unsubstantiated code.  The comments identify the code as deficient and state that it should not be "paid," i.e., be used for risk adjustment.  When Mital Panara learned that she was marking incorrect codes, he ordered her to stop.

158.   On March 10, 2011, Relator and Ms. Bognolo reviewed a sample of the charts she had audited.  The 30 charts they reviewed ostensibly supported 102 separate diagnoses.  Of those diagnoses, 25 were documented properly, 62 were mentioned in the charts but not documented, and 15 were missing entirely—a validation rate of 24.5%. Mital Panara asked Relator about the 30 charts.  After Relator reported the poor results, Panara stated that he was worried about Ms. Bognolo talking to people about her audit results and the low percentages she was validating.  From now on, Panara said, Ms. Bognolo would report her results only to him.

159.   Based on the results of Ms. Bognolo's audit, Freedom should—pursuant to CMS rules—have deleted the codes that were found to be unsubstantiated. *See* ¶72.  On information and belief, until at least April 25, 2012, Freedom took no corrective action with respect to the incorrect codes that Ms. Bognolo identified.  Freedom did not delete

records or otherwise inform CMS about the codes it identified as false during the mock RADV audit. Accordingly, Freedom has knowingly retained overpayments from CMS attributable to the false codes. Likewise, by concealing the false codes from CMS, Freedom caused CMS to make unwarranted payments to Freedom during the reconciliation process for 2009 codes.

### 4.   Freedom Knows that Providers Have Submitted False and Inaccurate Diagnoses, But Fails to Correct the Diagnoses

160.   Apart from the internal RADV audit, Freedom and Optimum have identified, in the course of their business, providers that submitted false and inaccurate diagnoses that were the basis for risk adjustment claims sent to CMS. Under CMS rules, Freedom and Optimum are required to submit delete codes to CMS for any submitted diagnoses they identify as false or incorrect. In addition, because they receive heightened risk adjustment payments due to the providers' incorrect diagnoses, Freedom and Optimum have an independent obligation under the FCA to refund the overpayments they received to the government. Freedom and Optimum did neither. Upon discovering that a provider's diagnoses had been false or fraudulent, Freedom and Optimum did not submit delete codes to CMS for the diagnoses, refund CMS for overpayments they received for the diagnoses, or even notify CMS that it had been overcharged.

161.   Beyond simply ignoring provider mistakes, Freedom and Optimum offer financial incentives to their providers to submit as many diagnosis codes as possible. Freedom and Optimum hold contracts with many IPAs under which the IPAs furnish health care services to Freedom's and Optimum's members in exchange for a fixed percentage of Freedom's and Optimum's monthly capitation payments for the members

the IPAs treat.  Such IPAs are known as "capitated" or "risk" providers because they assume the financial risk that the cost of treatment may exceed their share of the capitation payments.  Conversely, the capitated providers stand to profit if the capitation payments exceed the providers' treatment costs.  Capitated providers therefore have a financial incentive to increase the risk scores for the Freedom and Optimum members they treat.

162.    Freedom's and Optimum's capitated providers include FIPA, LLC ("FIPA"), an IPA owned and controlled by Dr. Pagidipati and affiliated with Freedom and Optimum, PrimeCare, LLC ("PrimeCare"), an IPA owned and controlled by Optimum founder Dr. Pariksith Singh, Access 2 Health Care, LLC ("Access"), another IPA owned and controlled by Dr. Singh, and Best Group, LLC, another IPA.

163.    Freedom and Optimum also incentivize providers, through America's 1st Choice Managed Care Services LLC, an IPA formed by Freedom's and Optimum's owners and executives, to increase risk scores by offering providers financial bonuses for reaching certain financial results (which are tied to risk scores).  The bonuses give non-capitated providers an incentive to submit diagnosis codes, while capitated providers stand to receive not only a share of Freedom's and Optimum's inflated capitation payments for submitting diagnosis codes, but also a bonus.  Moreover, several owners of capitated IPAs, including FIPA, have equity interests in Freedom and/or Optimum, such that the owners benefit financially from the profits that Freedom and Optimum wrongfully receive due to the false diagnosis codes the IPAs submit.

164.    Through these arrangements, many of Freedom's and Optimum's providers share the plans' financial interest in increasing risk scores.   The shared incentive, however, has led some providers to submit diagnoses to Freedom and Optimum inappropriately.    In particular, Freedom and Optimum know that some capitated providers "upcode" diagnoses in order to wrongfully increase their risk adjustment payments.  In March 2011, for example, Linda Bognolo identified a capitated primary care provider from PrimeCare – Dr. Paul Pulcini -- who consistently diagnosed his patients with an extremely rare and serious form of back pain (sacroiliitis), similar to rheumatoid arthritis, rather than common back pain.  Diagnoses of the more serious form of sacroiliitis stood to increase the patients' risk scores, and thus the provider's compensation from Freedom and Optimum, while diagnoses of common sacroiliitis would not.  Regardless of whether Dr. Pulcini upcoded the diagnoses intentionally or by accident, Freedom and Optimum knew the diagnoses were incorrect.   Ms. Bognolo reported Dr. Pulcini's practices to Relator, who reported them in turn to Mital Panara.  To Relator's knowledge, however, neither Freedom nor Optimum deleted any of the incorrect sacroiliitis codes Dr. Pulcini had coded.

165.    Similarly, in August 2011 Linda Bognolo reported to Mital Panara three diagnoses that two Access providers had "upcoded." Panara met with Relator and Vijay Bapatla, the manager of Freedom's internal coders and a Freedom coder himself, to discuss the three codes.   There was no dispute at the meeting that the codes were incorrect, and the meeting adjourned with Panara stating that he would speak to one of the Access providers, Dr. Singh, about them.  However, Freedom and Optimum did not

submit delete codes to CMS for the three diagnosis codes, even though Panara knew the codes were wrong.

166.    Likewise, in December 2010 a provider notified Rupesh Shah, Mital Panara, and Relator about a diabetes diagnosis that the provider believed was incorrect. The provider told Shah, Panara, and Relator that Freedom or Optimum chart reviewers had coded the diagnosis improperly.    After investigation, however, Freedom and Optimum determined in January 2011 that the source of the incorrect diagnosis had in fact been another doctor in the provider's group, not Freedom's or Optimum's chart reviewers.  This fact was reported to Shah, and Relator conveyed it to the provider in an email.  However, Freedom and Optimum did not submit a delete code to CMS for the diagnosis they knew was incorrect.  Moreover, after Relator forwarded to Shah the email he had written to the provider, Panara admonished Relator for having sent Shah, Freedom's CEO, an email that referenced an "inaccurate" diagnosis code.

167.    In addition to the examples listed above, Freedom and Optimum have learned on numerous other occasions that providers from PrimeCare, FIPA, Access, and Best Group submitted incorrect diagnosis codes.  Freedom and Optimum did not delete any incorrect diagnoses submitted by the IPAs, nor did they audit the IPAs to determine if the providers had submitted other codes that were similarly incorrect.  The reasons Freedom and Optimum did not act are three-fold: (1) they stood to lose revenue from any codes they deleted; (2) the provider groups/IPAs were important to their business; and (3) Freedom's and Optimum's owners and managers have close ties to the IPAs— particularly PrimeCare, FIPA, and Access.

### 5.    Freedom Causes Providers to Perform Medically Unnecessary Procedures in order to Increase Risk Adjustment Payments

168.    Freedom further maximizes the number of codes it submits to CMS in each service year by causing its providers to schedule medically unnecessary visits with certain members, solely to increase the risk adjustment payments Freedom receives from CMS. CMS rules provide that such visits should not be considered in the risk adjustment process, because they serve no valid medical purpose. By factoring these coding visits into its bid rate, and by submitting diagnosis codes from the visits to CMS, Freedom has fraudulently increased its capitation payments.

169.    Toward the end of every year, Freedom identifies patients who were previously diagnosed with certain, potentially-high dollar conditions, but who were not treated for that condition during the year (or, at least, not treated in a way that would allow Freedom to seek risk adjustment payments). Freedom sends a letter to the member's doctor, asking the doctor to schedule office visits with the member. The purpose of the visits, the letter explains, is for the doctor to generate a claim for "treating" the member for the specific condition (diagnosis code) Freedom has identified.

170.    For example, on or about November 18, 2010, Relator spoke with Dr. Stephen Greenfield, a physician from MCRHS, and LaTonya Tyus, a MCRHS coder. Dr. Greenfield complained that Freedom was pressuring him and other MCRHS doctors to schedule patient visits strictly for coding / risk adjustment purposes. Dr. Greenfield said the visits would not treat unaddressed conditions. Instead, he explained that Freedom was encouraging visits for conditions that were diagnosed but not coded to Freedom's satisfaction. As an example of Freedom's misconduct, Dr. Greenfield said Freedom had

asked him to schedule visits for members whom he had diagnosed with diabetes and renal failure, so he could code the members with HCC 15—diabetes with renal complications. *See* ¶126. As explained above, HCC 15 is a code for patients whose diabetes causes renal failure. It is a "linking" code between diabetes and renal failure; it does not represent a new condition. Dr. Greenfield said that because he had already addressed and treated the members' diabetes and renal failure, there was no reason to "bring the patients back" solely to change their HCC code so Freedom could make more money. Dr. Greenfield said doing so was fraud.

171. Freedom claims it encourages end-of-year visits to improve member health by ensuring their medical conditions are addressed. This claim is false. Freedom only encourages such visits when it will receive additional risk adjustment payments as a result. Freedom makes no effort to assess whether the patient would actually benefit from any given treatment. Nor does Freedom encourage patients—regardless of their medical condition—to receive such visits, unless Freedom stands to gain substantial risk adjustment payments as a result. For example, Freedom does not encourage doctors to schedule visits for members with undiagnosed hypertension, because hypertension is not a high-value Part C condition. Freedom's letters cover only those members with "high value" health problems. Second, Freedom's letters and member lists attempt to exclude members who are disenrolling from its plan. Freedom ignores these members because the member's new plan, and not Freedom, would receive the benefit from increasing the member's risk score.

172.   On December 17, 2010 Mital Panara emailed Relator and told him to remove 37 members from the list Freedom was preparing to send to a doctor for end-of-year visits, because the members were disenrolling on December 31.   Exhibit 3, incorporated herein.

173.   In December 2010, Cornerstone sent Relator a routine report showing its upcoming office visits with Freedom members.   The report covered visits in late December and early January.   Out of the 109 visits scheduled between December 27 and December 31, the report listed the reason for 60 visits as "FREEDOM MRA," "FREEDOM ASSESSMENT," or "FREEDOM."   Freedom was not listed as the reason for any of the visits after December 31.   By contrast, Cornerstone's January 2011 office visits have evident medical purposes, such as "test results."   Therefore, the report shows that Cornerstone scheduled the 60 visits for the singular purpose of improving Freedom's risk scores.

174.   Scheduling end-of-year visits violates CMS guidelines for risk adjustment even for those members who have not seen a doctor during the year.   CMS requires that medical conditions be actively treated (by an approved provider type) each year to be used for risk adjustment.   Freedom, by causing providers to schedule office visits at the end of the year based on old diagnoses, causes providers to code diagnoses that would otherwise have not been shown to be treated that year.

175.   A program to encourage end-of-year visits could be legitimate if it was done pursuant to a disease management program, by which it encouraged all of its members to see their doctor at least once a year, for example.   This is not what Freedom

is doing, though. In fact, Freedom routinely neglects its obligation to perform such disease management programs—e.g., for its Special Needs Plans. Instead, Freedom picks only members for these year-end office visits, based on the value of their past conditions.

176. Freedom has instructed Relator to deliver member lists for end-of-year visits to multiple provider groups in its network. In preparation for 2011, Freedom also began to hire nurses whose only responsibility is to promote coding visits year-round. (By contrast, as of September 7, 2012, Freedom had yet to hire nurses to staff its SNPs adequately.) Like Freedom's previous program, the 2011 program focused on maximizing Freedom's revenue, not improving member health. Members who receive their coding visits in January, for example, will be "checked off the list" and will not receive further attention from Freedom for the rest of the year.

177. In addition to contacting providers about scheduling office visits, Freedom calls members with undiagnosed conditions directly to encourage them to schedule end-of-year visits. Relator understands that Freedom only calls members with "high value" medical conditions.

178. For example, MCRHS is a risk IPA that conducted several hundred coding visits toward the end of 2010. On or before January 7, 2011, MCRHS audited the codes from these visits and sent Freedom a representative sample of the audited data. The data showed that MCRHS, in conducting the end-of-year visits, had found that its members often did not have the medical conditions Freedom had identified as not coded.

179. When Freedom had encouraged MCRHS to schedule patients for end-of-year visits, it sent MCRHS "HCC Review—Membership Listing" forms, listing the HCC

codes Freedom identified as missing.   The "missing" HCC codes were taken from Freedom's risk adjustment database, called "MRA Portal." Freedom had submitted most, if not all, of these HCC codes to CMS in 2009.

180.   The MCRHS physicians found their patients did not have many of the conditions associated with the HCCs Freedom had submitted to CMS and was being paid on.   They marked the nonexistent HCC codes on Freedom's HCC Review—Membership Listing forms, and returned the forms to Freedom.

181.   On January 7, 2011, Relator emailed Ellen Adams, MCRHS's Vice President of Clinical Support Services, to ask why MCRHS physicians had written "no" next to the HCC codes on many forms.  Exhibit 4, incorporated herein.  Adams said the "no's" signified that the patients lacked the conditions listed on the form.  Adams said MCRHS physicians had been frustrated because many of the patients they called did not have *any* of the conditions Freedom identified.  In other words, the visits were a complete waste of time.  Adams said "diagnoses were either denied by the patient, not found on PE [physical examination], or through diagnostic testing (i.e., diagnosis of DM [diabetes] in a patient who denied ever being diagnosed with DM who had an A1C [hemoglobin level] of 5.1)."  Adams then said: "I know you got the codes from previous claims but there seemed to be a fair amount of misinformation. (Or perhaps miraculous recoveries?☺)."

182.   The incorrect HCC codes Freedom used in its HCC Review—Membership Listing forms were taken from its MRA Portal and were therefore used for risk adjustment in 2009.  As described above, Freedom auditors knowingly submitted false MCRHS codes to CMS for risk adjustment in 2009.  Furthermore, the end-of-year visits

and diagnostic testing MCRHS performed were totally unnecessary, as the patients never had the conditions that prompted the visits. Thus, Freedom's end-of-year coding campaign illustrates both its high levels of incorrect coding submissions—which its internal RADV audit is confirming independently—and the lack of medical necessity for the coding visits.

183. Despite the myriad inaccuracies caused by the fraudulent risk adjustment practices described above, Freedom and Optimum continue to submit annual certifications to CMS attesting falsely to the truthfulness, completeness, and accuracy of their risk adjustment data submissions. On March 15, 2011, Mital Panara told Relator that CFO Jigar Desai no longer signed risk adjustment certifications for Freedom and Optimum due his concern about the plans' risk adjustment practices. Panara said that Desai had delegated him the task of signing the certifications (which he was), and joked that Desai was "afraid of prison."

184. Finally, in addition to increasing revenue by wrongfully increasing risk adjustment payments, Freedom and Optimum increase revenue by fraudulently inflating their costs. As described above, the base capitation rate CMS pays to MA plans reflects the plans' cost assumptions plus a fixed amount of profit. Likewise, Medicaid requires HMOs to spend a fixed amount of their capitation premiums on benefits, and remit any excess to Medicaid. Freedom's and Optimum's management has abused the bid process and Medicaid by laundering profits into costs through non-arm's length deals with companies they control. For example, in 2008 Freedom and Optimum contracted with Spectral Solutions, a company owned by Dr. Patel, to serve as their pharmacy benefits

manager. Spectral Solutions, however, employs a small number of employees and performs only preauthorization—a small fraction of Freedom's and Optimum's pharmacy work. The remainder is performed by Express Scripts, which was an exclusive pharmacy benefits manager prior to Dr. Patel's tenure. On information and belief, Freedom and Optimum pay Spectral Solutions an above-market price. Thus, Dr. Patel interjected a middleman between Freedom/Optimum and Express Scripts to uneconomically perform a small amount of work at a high price. Dr. Patel siphons Freedom's and Optimum's profits into Spectral Solutions, a less regulated entity, and profits outright by parlaying Freedom's and Optimum's apparent cost increase into a higher CMS capitation rate in future years.

185. As Spectral Solutions demonstrates, Freedom's and Optimum's deals with its subcontractors have not been at arm's length and serve to skim Freedom's and Optimum's profits for the benefit of their owners. This misconduct affects Freedom's and Optimum's bid rates by making their profits seem lower than they would be absent the improper dealings of their ownership. Because CMS accounts for a profit margin in setting the bid rate, the arrangements stand to wrongfully increase Freedom's and Optimum's reimbursement rate in the coming years.

**B.    Discriminatory "Cherry Picking" to Exclude Unhealthy Beneficiaries**

186. To maximize its profit, Freedom has developed several means for discriminating against sick, high-cost beneficiaries, including without limitation by (1) paying sales brokers to encourage expensive members to disenroll, (2) disenrolling its most costly special needs plan ("SNP") beneficiaries, both confirmed and unconfirmed,

as "lacking a qualifying condition" for the SNP, while at the same time keeping unconfirmed but healthy beneficiaries in the SNPs long after it should have disenrolled them, (3) in the wake of a provider's termination, directing its member retention efforts to only its healthy, profitable beneficiaries, and (4) during the CMS reconciliation process, concealing from CMS its obligation to reimburse CMS for expensive claims it knew it was responsible for covering.

187.    Though the discriminatory practices described below pertain to Freedom, Relator has information to believe that Optimum has engaged in the same conduct, e.g., paying brokers to encourage disenrollments, manipulating its SNP membership by disenrolling costly members while retaining ineligible members who were low-cost, selectively failing to notify costly members of provider terminations, and concealing from CMS its responsibility for expensive claims during the claims reconciliation process.

### 1.    Paying Sales Brokers to Selectively Encourage Expensive, Unhealthy Members to Disenroll

188.    Freedom has repeatedly and fraudulently encouraged its high-cost beneficiaries to disenroll from its plans, a practice sometimes referred to within the industry as "lemon dropping." It has done so by identifying the costliest members in its plans and giving their names to sales brokers, with the expectation that the brokers would contact the members and encourage them to switch to other health plans, in exchange for a cash payment from Freedom for every patient moved.

189.    Removing the costliest beneficiaries from Freedom's plans would yield a sizable profit.  Like other health insurers, Freedom turns a profit when its total

expenditures are less than the sum of its premiums and payments from Medicare. The level of profit depends on the medical-loss ratio ("MLR"). MLR, also referred to as medical-cost ratio, is the insurer's total inpatient, outpatient, professional, and pharmacy costs divided by its total premiums and health care revenue. The lower Freedom's medical-loss ratio, the higher its profits. Since Freedom charges no premium, its MLR is calculated by dividing its expenses against Medicare's monthly capitation payments.

190. Because large institutional claims, particularly hospitalizations, account for the bulk of a health plan's costs, it would be in the plan's interest to selectively enroll beneficiaries with low claims and avoid beneficiaries who are chronically ill and frequently hospitalized. Therefore, federal law flatly prohibits discrimination on the basis of health status:

> [A]n MA organization may not deny, limit, or condition the coverage or furnishing of benefits to individuals eligible to enroll in an MA plan offered by the organization on the basis of any factor that is related to health status, including, but not limited to the following: (1) Medical condition, including mental as well as physical illness. (2) Claims experience. (3) Receipt of health care. (4) Medical history. . . .

42 C.F.R. § 422.110(a). Furthermore, federal law forbids health plans from encouraging their beneficiaries to disenroll: "[A]n MA organization may not orally or in writing, or by any action or inaction, request or encourage an individual to disenroll." 42 C.F.R. § 422.74.

191. The contracts Freedom signed with CMS required Freedom to certify that it would "comply with the provisions of § 422.110 concerning prohibitions against discrimination in beneficiary enrollment . . . ." *See* Exhibit 1, incorporated herein.

Compliance with this anti-discrimination provision is material to Freedom's performance of its CMS contract, and thus to its ability to receive payments.   42 C.F.R. § 422.504(a)(2), (a)(14).

192.   In its contract with AHCA, Freedom likewise certified that it would not discriminate in beneficiary enrollment: "The Health Plan shall accept Medicaid Recipients without restriction and in the order in which they enroll.  The Health Plan . . . shall not use any policy or practice that has the effect of discriminating on the basis of . . . health, health status, pre-existing condition, or need for health care services."  Exhibit 5, incorporated herein.  Freedom further certified that it would not engage in "practices that are discriminatory, including, but not limited to, attempts to discourage Enrollment or reenrollment on the basis of actual or perceived health status." *Id.*

193.   Encouraging disenrollment, however, was exactly what Freedom did to meet its aggressive profit targets.  In late 2007, Sidd Pagidipati and Mital Panara, then a Freedom   business   analyst   working   under   Sidd's   direction   in   the Operations/Finance/Medical Risk Adjustment Departments, compiled a list of 274 beneficiaries who had cost Freedom over $14 million in claims.  In a conversation with Relator on October 13, 2008, Panara explained that Sidd had provided $100 in cash for every beneficiary that sales agents moved to other health plans.  Using three internal sales agents and 3–4 external agents, Freedom had successfully induced 190 of the 274 targeted members to disenroll from its plans, with Sidd funding the scheme and Panara delivering the cash to the sales brokers.

194.    Freedom continued to encourage expensive members to disenroll during 2008 by creating lists of costly members and giving the lists to sales brokers with the promise of a commission for each beneficiary who disenrolled. Sidd instructed Panara and Relator to refer to these lists as "DM lists" to conceal their illicit nature. Sidd chose the term "DM" because it also refers to disease management, and thus Freedom could explain the lists of unhealthy beneficiaries by saying they were created for disease management purposes, when in fact they were created for targeted disenrollment.

195.    Freedom relied on sales broker Jeff Wood for removing expensive members from its plans.   Jeff Wood is an independent broker working for Accent and Florida Insurance Group. Sidd Pagidipati and Mital Panara use Wood for their "special projects," foremost among them the removal of members on the DM lists.   Though Freedom has occasionally approached other sales brokers, such as Mary Szafranski, a licensed independent broker, and Beverly Parrish, a sales agent for Universal Health Care, Inc., it has depended primarily on Wood, making him an integral part of its efforts to purge expensive members from its rolls.

196.    In July 2008, Freedom took a list of active members, each of whom had more than $30,000 in 2007 expenses, identified the 57 most expensive members, and placed them in a separate list titled "for Mary" that included only information a broker would need: name, sex, address, and phone number. *See* Exhibit 6, incorporated herein. On information and belief, "Mary" refers to Mary Szafranski, who received the list from Freedom with instructions to encourage the listed members to disenroll.

197.    In October 2008, Relator witnessed Beverly Parrish having a phone conversation with Mital Panara. After the call, Parrish told Relator that Panara had said he would give her a list of members to move to another health plan, and that he wanted to meet with her personally to discuss payment. Parrish also told Relator that Panara had given her such a list before, near the end of the 2008 open enrollment period.

198.    In rough notes on November 24, 2008, Mital Panara set out his ideas for inducing unhealthy members to leave, including offering financial incentives to sales agents such as Jeff Wood to encourage disenrollments:

> DM List,
>
> . . .
>
> Compare FH [Freedom Health] benefits with other plans.
>
> Call DM list members (by sales agency like Jeff wood) and explain them other plan benefits.
>
> Can we Send them letter with benefits compare.
>
> Invite them on lunch on seminar.
>
> Delay their membership card and other documents, diabetic supply, OTC [over-the-counter] supply etc.
>
> If PCP [primary care physician] is at risk or good relation. Tell them to move to some other plans.
>
> . . .
>
> More Incentive to DM agents.

Exhibit 7, incorporated herein.

199.   On or about September 22, 2009, Relator asked Mital Panara whether Freedom was still using brokers to induce disenrollments.  Panara said that Freedom had stopped using brokers because the practice had become too risky.

200.   By skimming the most unprofitable beneficiaries from its membership rolls, Freedom was able to receive Medicare's adjusted capitation rates without taking on the risk of losses from covering the sickest, most unprofitable beneficiaries.  Therefore, Freedom's service costs were artificially low, and its profits artificially high.  Meanwhile, Medicare has been deprived of the benefit of its bargain that Freedom take on the risk of covering expensive beneficiaries.

### 2.   Discriminatory Cherry Picking of Special Needs Plan Beneficiaries

201.   As Freedom explored ways to grow in early 2008, its management discovered a way to both increase its revenue for existing members and enroll new members outside of Medicare's fixed enrollment windows, the annual election period and open enrollment period.  Freedom's plan was to transfer existing beneficiaries from its general MA plans, and enroll new ones, into its two chronic condition SNPs.  As discussed above, CMS created the SNP program to improve care for the frailest and most vulnerable Medicare beneficiaries.  Because Freedom was preparing bids for new chronic condition SNPs for 2008, the bids Freedom submitted to CMS necessarily used external data, such as figures from competitors' preexisting SNPs, to estimate its costs and form the bid amount.  Because Freedom could not draw on its own past results, its bid was inevitably rough.  And as it happened, Freedom ended up receiving a higher capitation rate—over $200 more—for its SNP members compared to its regular MA plan members.

For Freedom's managers, this unexpected discrepancy was a strong incentive to grow its new SNPs. Unlike normal MA plans, moreover, there are no enrollment windows for chronic condition SNPs, so Freedom was free to enroll eligible Medicare beneficiaries in them at any time.

202.   To Freedom's management, the SNP program was an opportunity to receive higher Medicare payments for free. From early 2008, when Freedom's managers realized its potential, Freedom has knowingly misused its SNPs to generate artificial profits at the expense of Medicare and its beneficiaries. It carried on these fraudulent activities in several ways, including without limitation (1) knowingly identifying and disenrolling expensive SNP members, including members that Freedom had previously confirmed as being qualified for the SNP, and (2) knowingly failing to disenroll unqualified or unconfirmed members by CMS deadlines, so that Medicare would continue to pay higher rates for them.

203.   To enroll in a SNP, a Medicare beneficiary must have a qualifying condition, such as a severe or disabling chronic disease. The MA organization is responsible for confirming the existence of the qualifying condition with the beneficiary's provider. CMS requires MA organizations to disenroll SNP members whom they find lack a qualifying condition (such as a chronic disease), or whose condition they are not able to confirm within a certain timeframe. For 2008, MA organizations had until October 1 to confirm their SNP members or, if they could not, notify them of their disenrollment; for 2009, CMS gave MA organizations thirty days to

confirm their new enrollees' qualifying conditions, before they would have to disenroll them:

> Previously [in 2008], if the enrollee was accepted into the SNP, but was later determined not to have had the targeted condition . . . , the enrollee would remain in the SNP until the end of the calendar year and would be disenrolled at that time. The MAO must notify the enrollee of this disenrollment by October 1 of each year. . . . For CY 2009, SNPs will be required to disenroll individuals following determination that the individual did not have the targeted condition. The MAO will be required to provide notice of this prospective disenrollment. Disenrollment will be effective the first of the month following the month in which the plan provides the member with notification of disenrollment.

Centers for Medicare & Medicaid Services, 2009 Call Letter for Medicare Advantage Organizations 32–33 (2009).

204. Beyond the narrow task of confirming that a SNP member suffers a qualifying chronic condition, an MA organization may not use health status as a basis for choosing whom to enroll or disenroll. *See* 42 C.F.R. § 422.110(a); 42 C.F.R. § 422.2 (stating that CMS reviews SNP proposals to ensure they do not "discriminate[] against sicker members of the target population"). In its contract, Freedom certified to CMS that it "shall comply with the provisions of § 422.110 concerning prohibitions against discrimination in beneficiary enrollment, other than in enrolling eligible beneficiaries in a CMA-approved [*sic*] special needs plan that exclusively enrolls special needs individuals as consistent with §§ 422.2, 422.4(a)(1)(iv) and 422.52." Exhibit 2.

205. At the beginning of 2008, Freedom's three SNPs accounted for a tiny fraction of its total membership. Freedom's SNPs were the "Medi-Medi" plan, which

covers benefits for beneficiaries eligible for both Medicare and Medicaid, the "VIP Care" plan, which covered beneficiaries with chronic conditions with a supposed emphasis on cardiac care, and the "VIP Care+" plan, which also covered chronic condition beneficiaries, but with a focus on diabetes. (Freedom has subsequently renamed the VIP Care+ plan the "VIP Care Savings" plan. It reconfigured its plans to have different benefit structures instead of different disease focuses for 2009, but reverted to disease-based plans by 2010.) In March 2008, the Medi-Medi plan had 725 enrollees, the VIP Care plan 57 enrollees, and the VIP Care+ plan 5 enrollees. *See* Exhibit 8, incorporated herein.

206. In or around February 2008, Freedom managers realized that CMS was paying Freedom more for SNP beneficiaries than for regular plan beneficiaries. The managers therefore calculated that they stood to receive over $200 in additional per member per month payments if they moved eligible beneficiaries into the VIP Care plan from their current, general MA plans. With Freedom's general MA plans containing an estimated 8,125 SNP-eligible beneficiaries, extra payments could reach $1.89 million per month. *See* Exhibit 2, incorporated herein. Better yet, Freedom could get this extra revenue without having to wait for the next open enrollment period in November. And as a further incentive, Freedom could market the VIP Care plan year-round, a crucial tool for growth during the months when promoting ordinary MA plans is not allowed.

207. Soon after this, Freedom began moving members out of its general MA plans, and into its SNP plans, at a phenomenal rate. Freedom termed this effort the "VIP Care Project," and it grew the VIP Care plan from 57 enrollees in March 2008 to 5,795

enrollees in August 2008. *See* Exhibit 8. Most of the early converted beneficiaries came from Marion County, where Dr. Pagidipati had strong provider connections that he enlisted to rapidly convert hundreds of members. Freedom closely watched the rate of conversions, tracking the number of enrollees as a percentage of overall eligible members. By December 2008, Freedom had 8,279 beneficiaries enrolled in the VIP Care plan. By 2009, the VIP Care and VIP Care+ plans ranked among the top five largest SNPs in the country.

208.    Pressure to expand the SNPs came from the top. Mital Panara told Relator and Patricia Petro, Freedom's Case Management Manager, that Dr. Patel had asked him at the beginning of the year to convert at least 4,000 members into the SNPs. According to Panara, Dr. Patel was "very happy" that Panara had exceeded the target by 3,200.

### a)    October 2008 Discriminatory Disenrollments

209.    Having enrolled as many beneficiaries as it could into its SNPs, Freedom now confronted the task of managing them. A test came on October 1, 2008, when it faced a CMS deadline to send disenrollment notices to all members that it had enrolled in the SNP but not yet confirmed. This should have posed a problem for Freedom, as it had confirmed only 1,781 of its more than 7,000 SNP members by October 8. Losing over 5,000 lucrative members was unthinkable to Freedom management, however, because they needed uninterrupted growth to make Freedom valuable enough to sell on a short timeframe. Therefore, instead of disenrolling all unqualified/unconfirmed SNP members, Freedom's management knowingly engaged in a two-sided scheme to defraud CMS.

210.    First, Freedom used the disenrollment deadline as an opportunity to get rid of its least healthy SNP members. On October 20, 2008, Mital Panara and Relator met in Relator's office. Panara told Relator that he wanted to disenroll all expensive members from the SNP, whether they had been confirmed or not. Panara said that disenrolling unconfirmed members was easy, but that disenrolling confirmed members would require him to destroy the members' qualifying forms. Panara said he would remove the qualifying forms from the members' files and burn them, adding (paraphrase) "I do not trust shredding, I burn things."

211.    Mital Panara, a finance expert with no medical background, then asked Relator how to predict if a member with high costs in the present year would be profitable in the next. Relator is not normally involved in Freedom's enrollment decisions; Panara was approaching him because of his medical knowledge. Relator explained to Panara that members with multiple hospitalizations usually continue to be unprofitable, while members with a single hospitalization are more likely to become profitable, as they are often healthy patients who had suffered an isolated illness. From this, Panara concluded that Freedom should disenroll SNP members with multiple hospitalizations.

212.    The next day at about 3:20 p.m., there was a meeting between Relator, Mital Panara, and Sidd Pagidipati. Relator had called the meeting to discuss the changes Freedom had to make to comply with the October 1st deadline for qualifying SNP members. Sidd asked what Freedom needed to do about the issue. Panara replied that Freedom should be disenrolling the unqualified SNP members, and that it would do so,

but only for the most expensive members. Panara told Sidd he would compile a list of members with four or more hospitalizations and over $10,000 in claims, and disenroll them. Panara also told Sidd that Freedom only had one copy of qualified members' confirmation forms, and that he would make those forms disappear. Sidd responded "good work" and instructed Panara to "move forward" with this plan. Panara said he would have a disenrollment list ready for Sidd in the next day or two. Relator had been working with IT on a report of high-cost members to use for case management stratification, and Panara asked Relator to forward it to him so he could use it to identify members with more than four hospitalizations.

213.   Immediately after the meeting, at 3:44 p.m., Relator sent an email to Freedom's data managers, copying Mital Panara, repeating his request for an updated version of Freedom's 2008 expenses data. At 4:27 p.m., a Freedom data employee sent an email to Relator and Panara with a spreadsheet of Freedom's 2008 expenses attached. *See* Exhibit 9, incorporated herein.

214.   At about 4:50 p.m., Mital Panara came to Relator's office and began sorting the 2008 expenses spreadsheet. Panara isolated SNP members with four or more hospitalizations, and also picked out three SNP members with no hospitalizations but high claims costs, so that CMS would be less likely to spot a pattern. Relator asked Panara to email him the sorted spreadsheet, and said he would email Panara the 2007 and 2008 Medicare Call Letters, so that Panara could find the appropriate disenrollment letter to send to the members. Panara then said he would get final approval from Sidd to go ahead with the disenrollment. After this meeting, at 5:16 p.m., Relator emailed the Call

Letters to Panara, and at 5:37 p.m. Panara replied to Relator's email, with the sorted spreadsheet attached, showing the 51 members Panara intended to disenroll. Exhibit 10, incorporated herein.

215. The 51 beneficiaries Mital Panara targeted included both beneficiaries whom Freedom had confirmed as being SNP qualified, and beneficiaries whom Freedom had not yet confirmed. Panara understood that his and Sidd's plan would disenroll confirmed SNP members, as he created a spreadsheet on October 23 that listed only the 31 confirmed target beneficiaries. Exhibit 11, incorporated herein.

216. Freedom's Enrollment Department received the list of 51 targeted beneficiaries, and sent each a disenrollment letter on October 29. Exhibit 12 (Enrollment Department's disenrollment list), incorporated herein. When Freedom discovered a typo in the letters it had mailed, it sent out a corrected batch on October 31. Exhibit 13 (representative disenrollment letter), incorporated herein. America Young, an enrollment department employee, was in charge of sending out the disenrollment letters.

217. Knowing that Mital Panara would destroy the qualification documents for the confirmed SNP members on Freedom's disenrollment list, Relator went to the members' files and made copies of thirteen members' qualification letters. Exhibit 14. Sure enough, when Relator asked Panara about the files on October 27, Panara said he "had taken care of them," and Relator later spotted the files on Panara's desk. On October 29, Relator checked the files for several confirmed members, and saw that their qualification letters were gone, just as Panara had said they would be.

218.    Freedom sent disenrollment letters to the 51 beneficiaries, denying that they suffered a chronic condition that would qualify them for the SNP. In response, some beneficiaries complained, calling and sending letters attesting to their serious and chronic health conditions. *See* Exhibit 15, incorporated herein. Others did not respond, and were disenrolled on December 31, 2008. Exhibit 16, incorporated herein. Some of these members later re-enrolled, while others never came back. Though Freedom did not succeed in getting rid of all 51, it still benefited from its scheme. Relator spoke with Mital Panara on November 3 about complaints Freedom had received from targeted beneficiaries who wanted to stay on its plans. Panara said that even if only half stayed off Freedom's plans, Freedom would still come out ahead, because it would still be losing unprofitable beneficiaries. Notably, America Young instructed Freedom's enrollment employees to give her the complaint letters Freedom received from targeted beneficiaries, saying she was "handling these letters for [a] special project from Mital." Exhibit 17, incorporated herein.

219.    On November 24, 2008, Mital Panara wrote down how Freedom was perversely using the SNP enrollment process to disenroll undesirable members. In rough notes, Panara wrote that Freedom could get rid of its high-cost members by moving them into the chronic condition SNP, and then not seeking qualification from their doctors: "Convert them to VIP and disenroll because of chronic condition not verified by PCP [primary care physician]." Exhibit 7, incorporated herein.

220.    In October 2008, Freedom identified 51 of its frailest members—the very ones whom the SNP program is supposed to serve—and sent them disenrollment letters

because of their poor health status.  Had CMS known of this, it could not have continued to contract with Freedom.  By continuing to contract with CMS after October 2008, and by certifying in those contracts that it did not discriminate by health status (as discussed in ¶191), Freedom knowingly and fraudulently induced false payments from CMS.

### b)      March 2009 Discriminatory Disenrollments

221.    The next major enrollment event Freedom faced was the end of the 2009 CMS open enrollment period, on March 31, 2009.  Just as it had in October, Freedom used this deadline as an opportunity to disenroll expensive members.

222.    By March 3, 2009, Freedom knew it had approximately 2,500 unqualified members in its SNPs, and that it would have to disenroll them by the end of the month. In a meeting in Sidd Pagidipati's office between Sidd, Mital Panara, and Relator, Sidd told Panara to disenroll the unqualified SNP members, but to mix in high-cost "dogs" at a 1:1 ratio, so as to intersperse the expensive beneficiaries with those Freedom was supposed to disenroll, and thus keep CMS from suspecting anything.

223.    On March 20, Mital Panara told Relator that he wanted to use data from Freedom's Health Assessment Tool ("HAT") to identify unconfirmed beneficiaries with multiple hospitalizations.  Panara said that even if just 10–20 of the approximately 900 unconfirmed SNP members had multiple hospitalizations, disenrolling them could save Freedom "a couple of million dollars."  As in October, Panara said he would have to go over the plan with Sidd.

224.    The HAT is a form Freedom sent to beneficiaries to fill out their own health history, including past hospitalizations.  Mital Panara used the HAT data to

identify unconfirmed beneficiaries with 2–3 hospitalizations. From a separate list, Panara identified beneficiaries with high claims histories, and added these high-claim members to the list he had created from the HAT data. Panara had settled on a formula for targeted disenrollment: eliminate patients with 2–3 hospitalizations and a high MLR value. In total, Panara singled out 47 sick, unprofitable beneficiaries whom he wanted to disenroll. He saved his work product in a spreadsheet, titled "Sidd—VIP Care Not Verified," with separate worksheets for the HAT and claims lists, and a final worksheet showing the 926 unconfirmed SNP members, with the 47 targets listed prominently at the top. Exhibit 18, incorporated herein.

225.   Mital Panara told Relator that he would remove the 47 targeted beneficiaries from Freedom's list of the SNP members who needed to be confirmed. At the time, Freedom was scrambling to confirm hundreds, if not thousands, of its SNP members.   The enrollment and provider relations ("PR") departments were busy contacting beneficiaries and their doctors, reminding them to send qualifying forms. By removing the 47 targeted beneficiaries from the Enrollment and PR lists, Panara hoped to decrease the odds that they would turn in their forms.

226.   On March 26, Mital Panara created on his computer a spreadsheet titled "VIP Yet to Verify—PR" containing a "Final after DM" worksheet that did not include the 47 targeted beneficiaries. Exhibit 19, incorporated herein. The same day, Panara created two spreadsheets titled "VIP Yet to Verify—Sean" and "VIP Yet to Verify—Sean v2." The first contained two worksheets, "DM" and "After DM." The "DM" worksheet included 42 of the 47 targeted beneficiaries (five having been confirmed in the

interim). The "After DM" worksheet was the same as "DM," but with the 42 targets removed. Exhibit 20, incorporated herein. The spreadsheet "VIP Yet to Verify—Sean v2" contained a single unlabelled worksheet identical to the "After DM" list, showing that Panara had repackaged the "Sean" spreadsheet to hide his efforts. Exhibit 21. On Relator's information and belief, "Sean" refers to Sean O'Sullivan, an employee of the vendor that runs Freedom's call center, who would have been conducting Freedom's campaign to call members and remind them to send qualifying forms.

227. The deadline for qualifying SNP enrollees was March 31, and Freedom had to notify the unqualified beneficiaries of their disenrollment by April 6. By the time Freedom sent disenrollment letters on April 6, approximately 26 of the 42 targeted beneficiaries were still unconfirmed, the others having sent in their qualifying forms. When the April disenrollment became final, Freedom had removed 19 of the beneficiaries it had selectively not tried to confirm.

228. Relator spoke with Mital Panara on May 26, 2009 about the SNP disenrollment. Panara told Relator that Dr. Patel and Rupesh Shah, a former WellCare executive who, despite an active non-compete agreement, was working as a senior advisor to Freedom, both knew about the effort to disenroll expensive SNP members. (Shah formally became Freedom's and Optimum's CEO when his non-compete agreement expired.) When Relator noted his surprise at Dr. Patel and Shah's involvement in the fraud, Panara said that they "are very smart men and are involved in everything."

229.    Unlike the October 2008 disenrollment, Freedom did not try to disenroll confirmed SNP members in April 2009, a decision that reflected its growing concern about increased scrutiny, and an upcoming audit, from CMS.   During his May 26 conversation with Relator, Panara said that Dr. Patel and Rupesh Shah had decided to try to qualify each new April 2009 enrollee, and not to discriminate against the unhealthy ones.   Panara said that Shah had said that Freedom was a big plan now, and that it could not disenroll sick members unless it understood its operations and executed its scheme perfectly.   According to Panara, Shah said that once Freedom better understood CMS enrollment procedures, it could resume its discriminatory enrollment scheme with the May 2009 and subsequent enrollees.

### c)    Retaining Beneficiaries who were Unconfirmed, but Profitable

230.    Removing expensive members from its SNPs was just one half of Freedom's plan to defraud Medicare.   At the same time it was using CMS involuntary disenrollment deadlines to skim high-cost members, Freedom was consciously ignoring those same deadlines as they applied to hundreds of unconfirmed Freedom SNP members whom Freedom was supposed to disenroll.

231.    As Freedom rushed to enroll beneficiaries into the SNPs during 2008, it made little effort to confirm beneficiaries after it enrolled them.   Consequently, unconfirmed SNP members far outnumbered the confirmed ones, as described in ¶209. CMS guidance required Freedom to confirm or send disenrollment notices to all unconfirmed SNP members by October 1, 2008. *See* Centers for Medicare & Medicaid Services, 2009 Call Letter for Medicare Advantage Organizations 32–33 (2009).   With

thousands of unconfirmed members, Freedom knew it had little chance of confirming everyone.

232.    Yet Freedom had no intention of disenrolling all of its hundreds of unconfirmed SNP members, as CMS regulations mandated.  As discussed in ¶¶105–106, Freedom's managers were on a tight schedule to grow the company and sell it, and extracting as much profit as possible from the SNPs was at the heart of their strategy. Forced to choose between their growth targets and compliance, Freedom chose growth.

233.    On October 5, 2008, four days after the October 1 deadline to send disenrollment notices to unconfirmed SNP members, Relator met with Mital Panara and Patricia Petro, Freedom's Case Management Manager, to discuss the SNP program. Panara told Relator and Petro that the SNP team was not qualifying beneficiaries before they enrolled in the SNP, and that he knew Freedom was required to disenroll its approximately 5,200 unconfirmed SNP members, but would not.  When Relator told Panara that Freedom needed to disenroll those members, Panara laughed.

234.    On October 13, 2008, in a meeting with Sidd Pagidipati and Mital Panara, Relator again brought up the confirmation issue.  When Sidd asked Panara how long it would take to qualify everyone in the SNP, Panara said he could get "a good number" qualified by the end of the year, but not all.  Exhibit 22, incorporated herein.  In a meeting on October 16, Relator told Panara that Freedom should send disenrollment letters to the 4,200 unconfirmed SNP members, to which Panara replied that he would not do so, because he was still trying to qualify them.

235.   As might have been expected, Freedom came nowhere near to qualifying every unconfirmed SNP member by the deadline.  A comparison of a July 2008 SNP enrollment list and a December 2008 list of unconfirmed SNP members shows that 773 beneficiaries who were enrolled in the SNP in July were still unconfirmed in December, two months after the October 1, 2008 deadline. Exhibit 23, incorporated herein.

236.   As discussed in ¶¶2209–220, Freedom management decided to disenroll a small number (51) of unprofitable SNP members on October 31, 2008, rather than the hundreds of more profitable beneficiaries who were still unconfirmed.  By purposely not disenrolling members who were unqualified for the SNP, Freedom directly and falsely induced CMS to make payments to it for these members, who should not have remained on Freedom's plans after January 1, 2009, at $100–200 a month above the non-SNP monthly capitation rate.

237.   The direction to keep unqualified members in the SNPs came from the top.  On December 9, 2008, Mital Panara told Relator that he would continue to hold on to unconfirmed members beyond CMS deadlines in the next year, because Dr. Patel and Sidd Pagidipati had told him that Freedom needed the revenue.

238.   Beginning in January 2009, CMS regulations required Freedom to qualify SNP members within thirty days of enrollment.  Pressured for more revenue, however, Freedom ignored this new disenrollment rule.  Freedom had 4,316 beneficiaries who enrolled in the VIP Care and VIP Care+ plans effective January 1, 2009, making them subject to the thirty-day qualification requirement.  Exhibit 24, incorporated herein.  Of these 4,316, 451 were still unconfirmed on March 5.  Exhibit 25, incorporated herein.

Moreover, 181 of the 451 were beneficiaries Freedom had enrolled in *July 2008*, as discussed herein. On March 30, another Freedom list (covering different data) shows that of its 925 unconfirmed SNP members, 543 had been enrolled as of January 2009, clearly establishing that they were overdue for disenrollment. Exhibit 26, incorporated herein. Freedom had made little effort to comply from the start, only sending the January enrollees' confirmation forms to providers on January 22, 2009—leaving just six business days before the confirmation deadline for the providers to review, sign, and return all 4,316 forms, something that unsurprisingly did not happen.

239.    These oversights were not accidental, but rather were part of Freedom's continuing efforts to defraud CMS. On December 9, 2008, as discussed herein at ¶237, Mital Panara told Relator that he planned to not disenroll unconfirmed SNP members in the coming year. On January 9, 2009, Pradeep Kathi, Freedom's Compliance Officer, told Relator that he knew about the thirty-day qualification requirement, and that he would talk to Sidd Pagidipati about it. On February 9, 2009, Relator emailed Sidd to warn him of the looming deadline for disenrolling January enrollees, to which Sidd responded "[e]nrollment is working with compliance on a corrective action plan for January and February enrollments." Exhibit 27, incorporated herein. Given that Freedom still had fourteen business days to qualify its February enrollees, its preparation of a corrective action plan for them suggests that Freedom did not intend to qualify or disenroll them compliantly, but instead was preparing an excuse in case CMS noticed. On February 11, 2009, Relator spoke with Panara and reminded him of the disenrollment deadline, to which Panara laughed and said Freedom "was not going to do that."

240.    That same day, February 11, 2009, Freedom Compliance Officer Pradeep

Kathi warned Sidd Pagidipati that Freedom was noncompliant in its SNP enrollment

practices:

> If we are audited now, we will fail the following audit
> elements . . . :
>
> (1)    Enrollment—delays in upload of forms to CMS,
> delays in sending out required member letters, not acting on
> member calls requesting cancellation/disenrollment
> (2)    Delays in SNP member confirmation of chronic
> condition
> (3)    Not following in Ch 2 timelines on disenrollment of
> SNP members
> . . .

Exhibit 28, incorporated herein.

241.    Except for the October 31, 2008 selective disenrollment of 51 expensive

SNP members, the first time Freedom disenrolled its unconfirmed SNP members—those

from 2008 and 2009—was in April 2009.   This was the direct result of two related

factors.  First, Freedom felt it had to become compliant by the end of the open enrollment

period on March 31, when it would become harder to move beneficiaries to other

Freedom plans.  Second, Freedom knew that its dramatically enlarged SNPs, now ranking

in the top ten nationally by enrollment, would increase the likelihood of CMS

scrutiny/auditing.

242.    For at least the prior six months, however, Freedom had knowingly and

fraudulently filled its SNPs with hundreds and sometimes thousands of unqualified

beneficiaries.  Every month, CMS paid Freedom inflated SNP rates for these members,

who had no business being in the SNPs, or in Freedom plans at all, because disenrolled

beneficiaries revert into traditional Medicare by default. Had CMS known about Freedom's fraudulent enrollment practices, it would not, and indeed could not, have made those payments.

243. In September 2009, CMS performed a targeted audit of Freedom's SNP program. As part of the audit, CMS ordered Freedom to turn over its enrollment and disenrollment records for certain time periods. In advance of the audit, Freedom had worried that CMS would discover that it had not disenrolled any members in early 2009, and it was relieved when CMS submitted its request for enrollment records, which did not include records covering October 2008 to April 2009. At the end of the audit period, Relator spoke with Marie Cardona, Freedom's Enrollment Manager, who told him that CMS, for its audit sample, had not chosen any files from the period when Freedom had not disenrolled any SNP members. Cardona said Freedom had gotten lucky and had not needed to explain anything to CMS. At the end of Freedom's telephonic exit interview with CMS's auditors, Freedom management and staff muted the speakerphone and laughed as the auditors spoke about elements of the audit, such as enrollment, that Freedom had passed but that the managers and employees knew it should have failed.

### 3. Selective Removal of Expensive Members from Retention Mailings Sent to Patients of Terminated Providers

244. Whenever a health care provider leaves Freedom's network, it creates an opportunity for Freedom to discriminate against its sick/unprofitable beneficiaries. Following a termination, Freedom and the provider compete to hold onto the provider's patients, who, if they stay with the provider, will leave Freedom's plan. Freedom, however, cherry picks the patients it tries to retain, through selective marketing. The

departing provider's healthier patients receive letters and phone calls from Freedom, notifying them of the termination and urging them to switch to a new provider in Freedom's network, while the provider's sick, expensive patients receive no contact from Freedom.

245.   This practice squarely violates federal regulations.   MA organizations cannot pick and choose which beneficiaries they wish to notify about a termination:

> The MA organization must make a good faith effort to provide written notice of a termination of a contracted provider at least 30 calendar days before the termination effective date to all enrollees who are patients seen on a regular basis by the provider whose contract is terminating, irrespective of whether the termination was for cause or without cause. When a contract termination involves a primary care professional, all enrollees who are patients of that primary care professional must be notified.

42 C.F.R. § 422.111(e).   And, of course, MA organizations may not discriminate on the basis of health in their enrollment activity, *see* 42 C.F.R. § 110(a), a basic principle that Freedom certified to CMS it would comply with. *See supra* ¶¶191.

246.   Around February 2009, three primary care providers left Freedom's provider network: Healthcare America ("HCA"), Morton Plant Mease Primary Care ("Morton Plant"), and Dr. Augustin Ferreiro ("Dr. Ferreiro").

247.   On February 4, 2009, Mital Panara identified the least profitable HCA patients.   Panara created a spreadsheet listing HCA's 1,180 Freedom beneficiaries.   He then separated the patients into two groups, one for the unprofitable members Freedom would not try to retain, and one for the more profitable members it would try to retain.

Panara expressed this dichotomy by color: the 121 expensive patients were colored red, and the 1,059 inexpensive patients green. Exhibit 29, incorporated herein.

248.    Freedom repeated this process six days later for Morton Plant's patients. In a spreadsheet, Mital Panara created a worksheet with a red list of 135 expensive "DM" patients.  A second worksheet contained the 1,336 "Total" number of Morton Plant patients, using the DM worksheet to identify which were DM patients.  The third, "Final" worksheet contained 1,193 patients, which comprised the total Morton Plant patient list minus the DM patients.  Exhibit 30, incorporated herein.

249.    Freedom then identified the costly patients of Dr. Ferreiro.  Like with HCA and Morton Plant, Panara identified the 112 active Freedom beneficiaries who were patients of Dr. Ferreiro.  Panara then created a new list, seemingly the same as the first, but with the 15 costliest beneficiaries by MLR replaced with 15 new beneficiaries.  In effect, Freedom had swapped out the most expensive beneficiaries from its retention list for Dr. Ferreiro.  Exhibit 31, incorporated herein.

250.    Having filtered out the sick/unprofitable members, Mital Panara passed the adulterated patient lists on to Freedom provider representatives, so they could begin the retention effort.  On information and belief, the same day Panara identified the unprofitable Morton Plant patients as discussed in ¶248, he gave a list containing just the 1,193 inexpensive Morton Plant patients to Chris Curtis, a Freedom Provider Operations Representative.  Exhibit 32, incorporated herein.

251.    Likewise, on February 16, 2009, Mital Panara created a spreadsheet titled "HCA & Morton Plant for Rakesh" with two worksheets.  Sheet1 contained the 1,059

inexpensive HCA patients and Sheet2 the 1,193 cheap Morton Plant patients. Exhibit 33, incorporated herein. The spreadsheet accounted for none of the unprofitable HCA or Morton Plant beneficiaries. On information and belief, Panara gave this spreadsheet to Rakesh Shah, Freedom's Information Systems Project Manager, who is responsible for processing the mailings that Freedom sends to its members.

253. Freedom only mailed retention packets to the healthy/profitable members Mital Panara had identified. On February 18, 2009, Rakesh Shah emailed DeeAnn Garey-Roy, then Freedom's Provider Representative for Manatee County, to report on the number of mailings Freedom had sent:

> DeeAnn,
>
> We printed 1350 kits and we mailed out 1174 (1060 for Manatee and 114 for Ferreiro) so we have balance of about 176 kits
>
> Let us know what you need to with those kits
>
> Thanks
>
> Rakesh

Exhibit 34, incorporated herein. By "Manatee," Shah was referring to HCA. The number of mailings for HCA patients corresponds closely to Freedom's list of profitable HCA patients, discussed above in ¶247.

253. To improve the odds that the unprofitable patients would leave Freedom, Mital Panara listed all of the costly HCA and Morton Plant patients Freedom wanted to lose—121 for HCA and 135 for Morton Plant—and had it given to independent sales broker Mary Szafranski so she could encourage the patients to move to other health

plans. Exhibit 35, incorporated herein. Panara created the list on February 13, 2009, and gave it to Relator with instructions to pass it on to Szafranski. On February 23, Panara asked Relator if he had given the list to Szafranski.

254. Freedom closely tracked its success at retaining beneficiaries. For HCA, Freedom recorded how many beneficiaries had changed to Freedom primary care physicians, how many were staying with HCA, and how many were still undecided. For every beneficiary who switched providers, Freedom recorded which representative had persuaded the beneficiary to do so. However, the retention list Freedom was using to keep these members excluded HCA's sick and costly patients. Exhibit 36, incorporated herein. Indeed, the list had come from Mital Panara, and thus contained only the approximately 1,050 healthy HCA patients.

255. On information and belief, Freedom has engaged in a similar pattern of fraud during the terminations of other providers and/or provider groups, including without limitation eleven Pinellas County providers whom Freedom terminated around the same time as Morton Plant. *See infra* ¶258.

256. Relator discovered Freedom's discriminatory retention activities by talking with DeeAnn Garey-Roy, then Freedom's Provider Representative for Manatee County. In a February 19, 2009 phone call, Garey-Roy told Relator that Freedom was giving member lists for terminated providers to Mital Panara, who was reviewing the lists and removing the costly patients. Garey-Roy estimated that Panara was removing 10% of members. Freedom was then mailing the remaining members a packet explaining how

to switch to a participating provider in Freedom's network, and was also sending their names to customer service for follow-up phone calls.

257.   Soon after the call, Garey-Roy emailed Relator the team report for the HCA retention project, discussed in ¶254, and revealed that Mital Panara, whose finance job belies his role as Freedom's bag man for illicit projects, had supplied the retention list:

> Gabe's team report is attached on the HCA member reach out program. Tab B has the list provided by Mital. They had a total of 1147 members. Dr. Ferreiro had 130 members. I believe that we sent out about 113 letters to his membership. I don't have that list though. Perhaps Mital could get that to you?

Exhibit 37, incorporated herein.   When Relator asked Garey-Roy to explain why Freedom had not sent mailings to every HCA and Dr. Ferreiro patient, Garey-Roy said "I think we addressed that in our discussion as to my theory [*see* ¶256]; but why would you want me to put that in writing?" Exhibit 37.

258.   On June 15, 2009, Relator asked Drea Larson, Freedom's Provider Representative for Pinellas County, about the Morton Plant termination.  Larson said that Freedom had reviewed the profitability of its Morton Plant members and only attempted to retain the profitable ones.  Larson also said that eleven other Pinellas County providers had terminated around the same time as Morton Plant, and that Freedom had looked (paraphrase) "much more carefully at whom they attempted to retain."  When Relator asked whether that meant Freedom had scrubbed its retention lists of the least profitable members, Larson said, "Exactly.  As I said, we looked much more carefully."

259. On or about September 22, 2009, Relator asked Mital Panara whether Freedom was in fact cherry picking its member retention lists by removing high-cost patients. Without compunction, Panara confirmed that Freedom was cherry picking, and explained how the process worked. According to Panara, Freedom only called and sent mailings to a terminating provider's healthy members. Selectively ignoring the high-cost members, he said, allowed Freedom to use provider terminations to improve its profitability by getting rid of both the underperforming provider as well as its costlier patients. In Panara's view, Freedom was killing two birds with one stone. Panara then said he had carried out the scheme during the terminations of several provider groups, including HCA and a large group in Pinellas County—a description that corresponds to Morton Plant. *See* ¶¶246–253.

260. Panara then explained how Freedom's upper management hid their illegal activities. Asked whether Dr. Patel knew that Freedom was selectively removing members from retention lists, Panara replied that Dr. Patel did not want to hear about unlawful acts at the office, and instead wanted them discussed at his house. Panara said that the rule within Freedom's upper management was never to talk about illegal activities at the office, and that Dr. Patel's house was the normal location where illegal activities, such as the enrollment discrimination that Panara had just explained, were discussed. Panara implied that he was a regular participant in these confidential discussions.

261.   By identifying the least healthy, most unprofitable beneficiaries in terminated provider groups, and then omitting them from Freedom's retention efforts, Freedom violated federal law and defrauded Medicare.

### 4.   Fraudulent Omission of High-Cost Patients during the CMS Reconciliation Process.

262.   On January 1, 2008, as Freedom rolled over its Medi-Medi plan from 2007 to 2008, an enrollment error occurred.  A subset of the beneficiaries who had been in Freedom's 2007 Medi-Medi plan were supposed to transition to the 2008 plan, but instead were disenrolled from the Freedom Medi-Medi plans, reverting to original Medicare insurance.  Upon discovering this mistake in early June 2008, Freedom was able to recover some of the erroneously disenrolled beneficiaries by re-enrolling them effective May 1, 2008.  Freedom then sought to recover the revenue that Freedom had lost during the five-month period when the members were mistakenly disenrolled. Munaf Kapadia, Freedom's Vice President of Enrollment, submitted a payment adjustment request to Integriguard LLC ("Integriguard"), a contractor that manages retroactive payments for CMS.  The request asked Integriguard to retroactively enroll the beneficiaries in the Medi-Medi plan effective January 1, 2008—the date they were mistakenly disenrolled.  Because the beneficiaries had reverted to regular Medicare in January, CMS owed Freedom the revenue it should have been paid for the beneficiaries from January to April, and Freedom owed CMS for any claims CMS had paid for the beneficiaries during that same time.  Therefore, Integriguard was to total all revenue due to Freedom, deduct all claims CMS had paid from January to April, and pay Freedom the difference.

263.   CMS has a fixed process for reconciling payments arising from enrollment mistakes. Every week, CMS sends MA organizations a Transaction Reply Report ("TRR"), summarizing the organizations' weekly enrollment activity. Once a month, each MA organization must reconcile the TRRs it has received, which reflect what CMS understands the MA organization's membership to be, with its own records and, if there are any discrepancies, request an enrollment adjustment. The adjustment request goes to Integriguard for analysis. If it is proper, Integriguard validates the change and enters it into the CMS records system. CMS will then account for the change in its next Plan Payment Report ("PPR"), which calculates its payments to the MA organization. As discussed in ¶2622, if a beneficiary has been mistakenly disenrolled, CMS credits the MA organization for the months when the beneficiary was not on the plan and deducts any medical expenses it covered during that same time.

264.   After Munaf Kapadia submitted the reconciliation request to Integriguard for the 2007 Medi-Medi members, Freedom discovered that one of the affected beneficiaries had undergone a heart transplant during the time he had been mistakenly disenrolled. The beneficiary (hereinafter "transplant patient") enrolled in the Medi-Medi plan in November 2007, and was accidentally disenrolled on January 1, 2008. Exhibit 38, incorporated herein. On April 17, 2008, the transplant patient was admitted to Tampa General Hospital ("Tampa General"), and underwent a heart transplant on May 5, 2008. Exhibit 39, incorporated herein. The total charge for Tampa General's services was $1.15 million, and Tampa General invoiced Freedom's Claims Department for the full

amount. Exhibit 40. The amount Freedom was contractually required to pay (i.e., the allowable amount) for Tampa General's invoice was approximately $250,000.

265. Not yet knowing about the transplant, Freedom re-enrolled the transplant patient on June 9, 2008, effective back to May 1, 2008, as part of the reenrollment process for the erroneously disenrolled 2007 Medi-Medi members. It then placed the transplant patient on the Integriguard adjustment list on June 17, 2008, so that CMS would retroactively enroll the patient back to January 1, 2008. Exhibit 41. Freedom did this so it would receive monthly revenue for the transplant patient from January to April. On June 30, 2008, Freedom submitted a "retro packet" to Integriguard for all of the affected 2007 Medi-Medi members, including the transplant patient.

266. Freedom received Tampa General's invoice for the transplant patient on July 9, 2008, and entered the claim into its system on July 11. Because Freedom had re-enrolled the transplant patient effective May 1, 2008, it was responsible for covering the Part B services, such as doctor's rounds, which the patient had received in May, because Part B coverage depends on the date of the service, and the transplant patient became Freedom's responsibility on May 1. Relator estimates these costs to be little more than $15,000—a pittance compared to Tampa General's total bill. By contrast, Freedom was not yet visibly responsible for covering the transplant patient's much more expensive Part A benefits, such as the hospital stay and the heart transplant itself, because Part A coverage is determined by when the patient entered the hospital, and the patient here was admitted in April. Freedom was also not yet visibly responsible for Part B services rendered before May 1. But the reconciliation request, which Freedom had already

submitted, stood to move the transplant patient's enrollment date back to January 1, making Freedom clearly responsible for *all* Part A and Part B services, and thus the entire allowable of approximately $250,000.

267.   To keep Freedom from paying a $250,000 claim it knew it was responsible for, Sidd Pagidipati ordered Munaf Kapadia to cancel the reconciliation request for the transplant patient only, but not for any of the other, less expensive 2007 Medi-Medi members.   On July 31, 2008, Kapadia emailed Sidd: "Retro packet was submitted to IG [Integriguard] (6/30), I have call in to them to find out how to rescind." Sidd replied, "Make it happen!!!!" Exhibit 42, incorporated herein.

268.   On Friday, August 8, 2008, Freedom's Enrollment Department recorded Integriguard's final disposition: "The request for a retroactive change was cancelled. The organization requested that the initial request be disregarded." Exhibit 41. The next business day, August 11, Freedom processed Tampa General's invoice, and denied every procedure as "not authorized." Exhibit 40. By cancelling the reconciliation request for the transplant patient and rejecting Tampa General's invoice, therefore, Freedom concealed from CMS that Freedom was responsible for paying Tampa General's claim.

269.   As a direct result of Freedom's fraudulent conduct, Tampa General sought payment from CMS to cover the transplant patient's benefits, and CMS paid the entire claim for Part A services at the amount it was contractually required to pay: $202,548.38. CMS later billed Freedom for the patient's May 2008 Part B benefits, worth only about $15,000, because the patient had a May 1 effective date. Exhibit 43, incorporated herein. Because of Freedom's deliberate concealment, however, CMS has not sought payment

from Freedom for the bulk of the approximately $250,000 claim, consisting of Part A benefits ($202,548.48) and April 2008 Part B benefits. Nor has Freedom paid CMS for these benefits on its own accord.

270. Through the acts described above, Freedom knowingly made a false record and/or statement material to its obligation to pay over $200,000 to the Government, and knowingly concealed and improperly avoided its obligation to pay that same sum to the Government.

271. On Relator's information and belief, Freedom's cancelling reconciliation of the transplant patient's claims is part of a larger, ongoing practice of reviewing errors in the TRR for their financial cost to Freedom and selectively pursuing reconciliation only when it stands to be profitable. On May 26, 2009, Freedom's Enrollment Manager Maria Cardona told Relator that she discusses all TRR issues with Sidd Pagidipati. Cardona said that Sidd will send TRRs to Mital Panara, then a business analyst. Panara lacks medical and enrollment knowledge; Sidd is sending him enrollment errors so he can analyze the beneficiaries' cost. Freedom therefore keeps the inexpensive beneficiaries, and returns expensive ones to CMS or elsewhere. Relator believes Freedom reviews 5–10 TRR errors this way every month and selectively chooses not to reconcile the expensive beneficiaries.

### C. Fraudulent Inducement of CMS into Approving Freedom's and Optimum's Applications To Expand its Service Area and To Operate Special Needs Plans

272. Freedom and Optimum have fraudulently induced CMS into approving their applications to operate special needs plans ("SNP") and to expand their service

areas. Freedom's and Optimum's fraudulent inducement has included, without limitation, (1) representing to CMS in their service area expansion applications that Freedom and Optimum had contracted with a network of health care providers to serve beneficiaries in the expansion areas, when Freedom and Optimum did not intend to utilize that network due to its high rates, and ultimately did not include the network's providers in their published provider lists, thereby making them invisible—and unavailable—to their beneficiaries once CMS had approved expansion, and (2) falsely representing to CMS that Freedom and Optimum would operate their SNPs in accordance with federal regulations and pursuant to the terms of Freedom's and Optimum's SNP applications.

> **1.   False Use of the Evolutions Provider Network to Support Freedom's and Optimum's Expansion Applications, When in Fact They Never Intended to Use the Network to Provide Services.**

273. Freedom and Optimum defrauded the United States by falsely representing their provider networks in applications they submitted to CMS to expand their service areas. Specifically, Freedom and Optimum represented to CMS that they had contracted with a provider network to provide services to beneficiaries in the expansion areas. This representation was false, because although Freedom and Optimum had entered into a contract with the provider network, they never intended to use the network to provide services to their beneficiaries, due to the network's high rates. Freedom and Optimum carried out this scheme by including the provider network in their expansion applications to CMS, and then, once they received authorization from CMS to expand, removing the network's providers from the list of authorized providers available

to their beneficiaries. To ensure that no Freedom or Optimum employees referred beneficiaries to the network's providers, Freedom and Optimum hid the existence of the contracts from low-level staff. The result was that Freedom and Optimum beneficiaries were often left without adequate access to health services. Had CMS known that Freedom and Optimum would not use the provider network, it would not have approved their applications to operate MA plans in the expansion areas. Accordingly, the United States has paid numerous false claims to Freedom and Optimum, and Freedom's and Optimum's beneficiaries have been left without adequate access to health services.

274. For 2008, CMS had authorized Freedom to operate in 17 counties. To continue to grow, Freedom decided in early 2008 to apply to expand into new counties for 2009. Freedom prepared and submitted to CMS a 2009 Service Area Expansion application ("SAE") for Brevard, Charlotte, Clay, Duval, Escambia, Indian River, Jefferson, Lee, Leon, Martin, Polk, St. Lucie, and Volusia counties. CMS reviewed and approved Freedom's SAE. Freedom expanded into the thirteen new counties effective January 1, 2009, giving it a total service area of thirty counties.

275. CMS authorized Optimum to operate in five counties for 2008. Acting in concert with Freedom, Optimum submitted a 2009 SAE to CMS for 34 new counties. CMS approved Optimum's SAE for 21 counties: Brevard, Broward, Charlotte, Citrus, Collier, DeSoto, Duval, Escambia, Indian River, Lee, Manatee, Marion, Martin, Miami-Dade, Orange, Osceola, Palm Beach, Polk, St. Lucie, Sarasota, and Volusia. Optimum expanded into the new counties effective January 1, 2009.

276.    Unlike traditional fee-for-service Medicare, in which beneficiaries can receive benefits from any provider who accepts Medicare, MA plans can limit their members to receiving benefits through providers that the MA plan has contracted with. Because of this, CMS scrutinizes MA plan applications to ensure that the proposed plan's provider network will offer beneficiaries access to all essential health services. Access denotes both having available the necessary physicians, specialists and hospitals, and having those resources within geographical reach. Accordingly, when an MA plan files a SAE for a new county, the SAE must show CMS that the MA plan has a sufficient provider network in the new county that beneficiaries would be able to access. The county provider network cannot have gaps, such as a lack of oncologists, unless the MA plan can demonstrate to CMS that its beneficiaries are close enough to a provider in another county that they can easily access the service there.

277.    Freedom and Optimum knew they could not contract with enough providers for CMS to approve expansion in 2009 for all thirteen and thirty-four counties, respectively.    Therefore, to complete their SAEs, Freedom and Optimum decided to "rent" an existing provider network to fill in the providers they were missing.   Rather than use providers from the rental network after approval, however, Freedom and Optimum would continue to assemble complete provider networks from scratch, leaving many coverage holes that Freedom and Optimum would fill in over time.

278.    MA organizations inform CMS about their provider networks through health service delivery ("HSD") tables. These tables are organized by county, and list every primary care physician, specialist, hospital, laboratory, and clinic in the MA

organization's county network.  Freedom had to submit HSD tables in its SAE to show CMS that it had complete provider networks in the counties it planned to expand into. Because Freedom did not have complete provider networks when it submitted the SAE, it listed providers from the rental network in the SAE HSD tables.

279.    Aside from submitting its HSD tables to CMS, Freedom and Optimum limit their distribution to their upper management.  The plans maintain a separate, public provider network list for their lower-level staff, providers, and beneficiaries, which they publish through their websites.  Thus when Freedom's and Optimum's members want to pick a doctor, they must choose from the doctors on the public list.  Using these separate provider lists, however, Freedom and Optimum have been able to represent to CMS that they have a complete provider network, while at the same time offering their staff, doctors, and members a different, smaller network that is filled with coverage gaps. CMS—the only outsider that sees the HSD tables—generally does not discover such discrepancies until it conducts an audit, if then.  The secrecy of the HSD tables, therefore, has allowed Freedom and Optimum to tell CMS that their provider networks are complete when in fact they are not.

280.    The rental network Freedom and Optimum hired was Evolutions Healthcare Systems, Inc. ("Evolutions"), a preferred provider organization that maintains contracts with providers across Florida.  By contracting with Evolutions, insurers gain access to its network of providers without having to develop such a network themselves. MA organizations do not normally contract with Evolutions, however, because

Evolutions' providers charge higher rates than most Medicare providers.   As such, Evolutions' clientele is almost exclusively commercial insurers.

281.   In the SAE Freedom submitted to CMS, Freedom said it would rely heavily on the Evolutions provider network to serve beneficiaries in many expansion counties.  For example, of the 104 specialists Freedom listed in its HSD table for Duval County, 87 were Evolutions providers.  Exhibit 44, incorporated herein.  Among the Evolutions providers were vital specialists, such as oncologists, that seniors frequently need to access for critical care.  Even in counties where Freedom had contracted with larger numbers of non-Evolutions providers, Freedom still used Evolutions to plug the remaining gaps.

282.   Optimum's SAE relied on Evolutions to an even greater degree than Freedom's.  Optimum used Evolutions to account for over 75% of its specialists in 13 of the 34 counties in the SAE.  Of the 21 counties into which Optimum expanded in 2009, there were 8 counties in which over 75% of the specialists were with Evolutions.

283.   Freedom and Optimum never intended to use Evolutions providers to serve their members, however, because those providers charged higher rates than Freedom and Optimum were willing to pay.  By submitting to CMS SAEs that falsely claimed that Freedom and Optimum would use Evolutions providers in their provider networks, Freedom and Optimum defrauded Real Parties.  Freedom's and Optimum's scheme was to hire Evolutions to improve the odds that CMS would approve their SAEs. Using Evolutions would make Freedom and Optimum appear to have complete provider networks, when the networks they would actually offer their beneficiaries were

undeveloped and riddled with gaps.  Once CMS had approved the SAEs on the basis of this falsehood, Freedom and Optimum intended to remove, and ultimately did remove, the Evolutions providers from their published provider networks, and did not give their beneficiaries access to them, all the while listing them in their HSD tables.  For example, Freedom could not find an oncologist to contract with in Duval County, so it patched that critical hole with Evolutions oncologists whom it never intended to use and in fact hid from its beneficiaries.  *See* ¶¶292–293.

284.    In early 2009, Relator had a phone conversation with Mark Barrett, an employee of Universal Healthcare, Inc. ("Universal"), one of the largest MA organizations in Florida, and a Freedom competitor.  During the conversation, Barrett marveled at how Freedom—which is much smaller than Universal—had managed to expand into the counties it did.  Barrett said that Universal had been trying to expand into Volusia and Indian River counties, for example, but had not been able to access the local hospitals it needed to convince providers to sign contracts with it.  As Relator later discovered, Freedom had expanded into Volusia and Indian River counties by hiring Evolutions.  Of the 55 Indian River specialists Freedom listed in the SAE, 53 were from the Evolutions network.  Of the 116 providers in Volusia County, 76 were with Evolutions.  Exhibit 45 (SAE HSD tables for Indian River and Volusia counties), incorporated herein.  These providers appeared in Freedom's HSD tables, but not in the published provider list that Freedom gave to its members and network doctors.  The Indian River Medical Center, one of Freedom's two hospitals in that county, is an Evolutions provider.

285. On April 2, 2009, Relator received a phone call from Dr. David Pinzler, a primary care physician, complaining about the sparseness of Freedom's provider network in Martin and St. Lucie Counties. Dr. Pinzler wrote Relator an email to follow up, and reported:

> AS PER OUR CONVERSATION OF 2 APR 2009, THERE ARE GAPS IN THE SPECIALIST COVERAGE IN MARTIN AND ST. LUCIE COUNTIES. ALLERGY, ENDOCRINOLOGY, ENT, GENERAL SURGERY, HEME-ONC, AND ESPECIALLY RADIOLOGY ARE COMPLETELY WITHOUT REPRESENTATION. I WOULD BE GLAD TO PROVIDE SOME NAMES TO CONSIDER IF THAT WOULD BE HELPFUL.
>
> DAVID PINZLER D.O.

Exhibit 46, incorporated herein.

286. Freedom expanded into Martin and St. Lucie counties on January 1, 2009, using the Evolutions provider network. In the SAE HSD tables, Freedom had listed one allergist, three ENT specialists, three general surgeons, and two radiologists in Martin County. For St. Lucie County, Freedom had claimed to have one endocrinologist, two ENT specialists, two general surgeons, and three radiologists. The Martin County providers were affiliated with the Martin Memorial Hospital. The St. Lucie County providers were affiliated with the St. Lucie Medical Center hospital. All were from the Evolutions network. Exhibit 47 (SAE HSD tables for Martin and St. Lucie counties), incorporated herein. Freedom's 2009 Provider Directory does not list any of these providers. (Freedom included Martin Memorial in the Directory, but only because it could not reasonably hide its hospitals in *both* Martin and St. Lucie Counties.)

287.    Dr. Pinzler's email, sent just four months after Freedom had expanded into Martin and St. Lucie counties, shows that Freedom was hiding Evolutions providers, whom it had told CMS were in its network, from its beneficiaries, by purposefully omitting them from the Provider Directory it gave to its beneficiaries and to network doctors like Dr. Pinzler. Had CMS known of the provider gaps Dr. Pinzler identified, it would not have authorized Freedom to expand into Martin and St. Lucie counties.

288.    The same day, April 2, 2009, Relator spoke with Lucy O'Connor, Freedom's Vice President of Claims and Configurations, about Evolutions. O'Connor said that Freedom had never intended to use Evolutions providers because they charged commercial rates, but had nonetheless listed them in its SAE so it would have enough hospitals and providers to "pass." O'Connor said this scheme was Sidd Pagidipati's idea, and that Sidd was handling the Evolutions contract himself.

289.    Relator ran into Jairo Ribero, Freedom's Executive Director for South Florida, on April 3, 2009, and told him about Dr. Pinzler's complaint. Ribero confirmed that Freedom had gaps in its Treasure Coast provider network. When asked about Evolutions, Ribero said (paraphrase) "we only used Evolutions for the application process and stopped using them right after the process was over." According to Ribero, Freedom had planned to assemble its provider networks *after* CMS had approved its SAE.

290.    Pursuing the matter, Relator asked Chris Curtis, a Freedom Provider Operations Representative, about Evolutions on April 6, 2009. Like Lucy O'Connor and

Jairo Ribero, Curtis said that Freedom used Evolutions providers for its SAE but not on a day-to-day basis for its members.

291.    Others in Freedom had already observed that Freedom's actual provider networks were quite different from the networks listed in its HSD tables.  On February 11, 2009, Freedom's Compliance Officer Pradeep Kathi wrote a memorandum to Sidd Pagidipati, warning him about Freedom's provider network deficiencies:

> If we are audited now, we will fail the following audit elements . . . :
> . . .
> (8)    HSD Tables—current HSD tables will not match at all with 2009 SAE application and could raise network adequacy issues.

Exhibit 28.

292.    Toward the end of April, a Freedom beneficiary in Duval County needed to see an oncologist.  Though Freedom had told CMS in its SAE HSD tables that it would have six oncologists in its Duval County network, they were all affiliated with Evolutions, and therefore Freedom had not included them in the directory of authorized Duval County providers it gave to its low-level staff and beneficiaries.  As a result, Freedom appeared to have no oncologist in Duval County, and Freedom employees spent weeks canvassing the county for an out-of-network oncologist willing to see the Freedom beneficiary.  Reacting to this situation, Linda Ward emailed Freedom's managers on May 12, 2009:

> So we have no par oncology in Duval? That is a large county!! How can we have membership there without an oncologist??

> Doris has struck out with even negotiating with providers. I had suggested she offer them Medicare allowable + 115% for office and drugs, but they won't even negotiate.
>
> Clay and Duval are too far to go to Shands [in Gainesville]. Are there any oncology groups that are only hospital based at one of the large centers that you could contact?

Exhibit 48, incorporated herein.

293. Freedom had no oncologist in Clay or Duval County because it had fraudulently used Evolutions oncologists for its SAE, listing them in its HSD tables, and then omitted them from its published Provider Directory. Responding to the same situation, Relator emailed Tammy Castano, Freedom's Provider Operations Director, on May 13, 2009: "Who did we use for our application? If you have a group name I'll give them a holler and see if we can re-convince them to see our members." Castano replied, "[I] think we used the rental network (Evolutions) initially." Exhibit 49, incorporated herein. Therefore, Castano knew that Freedom had a contract with the Evolutions oncologists, and could have sent the beneficiary to see them. Indeed, Freedom still listed the Evolutions oncologists in its Duval County HSD tables as of April 21, 2009. Exhibit 50 (HSD tables for Duval and Clay counties), incorporated herein. But Castano also knew she was not allowed to refer beneficiaries to Evolutions providers, because of their high commercial rates, and thus did not make them available. Freedom facilitated this concealment by not making the HSD tables it sends to CMS available to non-senior staff.

294. Meanwhile, Freedom's provider network in the Treasure Coast area was still missing critical, basic specialties that Freedom had claimed to have possessed in its

SAE.  On May 28, 2009, Dr. Pinzler left Relator a voicemail about his increasing

frustration with Freedom's continuing problems:

> This is Dr. David Pinzler. I've spoken to you before about
> their lack of radiology, and now I have another patient who
> needs a mammogram; she needs a bone density, and she
> can't get it because she has to travel 1,000 miles from
> Martin County. It's totally ridiculous. You blew me off
> last time and said, "We're working on it; we're working on
> it." Well, that obviously was baloney because nothing's
> happened. So, you know you sell these people insurance,
> and then they can't get what they need, so how do you
> figure this works. My phone number is 772-419-5904. It's
> 1:20 on Thursday, the 28th. Goodbye.

Exhibit 51, incorporated herein.  Freedom had listed radiologists in Martin County in its

SAE, but Dr. Pinzler, a Freedom primary care provider, had no knowledge of them.

295.    Freedom and Optimum managers hid their fraudulent practices in part by

selectively removing Evolutions providers from participation in an internal audit.  On

May 18, 2009, Carole Frank, the Compliance Officer for Optimum, emailed senior

Freedom and Optimum staff, including Chris O'Connor, Senior Vice President of

Operations, and Tammy Castano, Provider Operations Director, to inform them that

Freedom/Optimum's Compliance Unit would be conducting a CMS-mandated internal

audit of Freedom's and Optimum's credentialing and contracting practices.  Frank wrote

that, as part of the audit, the Compliance Unit would review a representative sample of

provider contracts, and that "[w]e have randomly selected 1 provider for each county in

our service area for the audit."  Exhibit 52, incorporated herein.

296.    Among the providers randomly chosen from Freedom's and Optimum's

HSD tables, however, were two Evolutions doctors.  Tammy Castano, who knew

Freedom and Optimum were not using Evolutions providers, instructed Carole Frank to

not audit the Evolutions doctors:

> Carol,
>
> This is the status thus far. . . .
>
> We have two files—on Freedom out of Duval and
> Escambia that appear to be Evolutions (our rental
> network). Duval, please make another selection.
> Escambia—see Chris O [O'Connor].
>
> Optimum—the same: Duval—please select another choice.
> Escambia—See Chris O.

Exhibit 52. Frank, not understanding why Freedom wanted to handle its Evolutions

providers differently from its other providers, asked for an explanation:

> I'm confused. Is there a reason we don't want to do
> "Evoloutions"? [*sic*]  We delegate (rent??) to them—as are
> the providers they contract with. They were reviewed last
> year—something different this year?

*Id.* Minutes later, Chris O'Connor responded—this time not copying Castano or anyone

else—to tell Frank to speak with him in person:

> Carol, I will be there at Church [a Freedom office] . . . I
> will educate you about Evolutions.
>
> Chris

*Id.* Soon after their meeting, Frank emailed Chris O'Connor her misgivings about

Freedom's decision not to audit the Evolutions providers:

> I kinda understand...............remember, we are using the
> HSDS tables submitted to CMS and the State. That means
> that either can pull an Evolutions folder ............If we say
> they are in the network, we have to be prepared to have
> them audited.

297.    *Id.*   Soon thereafter, Frank wrote to Pradeep Kathi, her counterpart at Freedom: "They are not wanting to include Evolutions."   Exhibit 53, incorporated herein.

Frank then forwarded him her email exchange with Chris O'Connor, and asked: "Do you know something I don't about this?"   Exhibit 52

298.    On September 17, 2009, Relator again spoke with Lucy O'Connor, who told him the decision to contract with Evolutions had come from Sidd Pagidipati and that Freedom and Optimum had never intended to use Evolutions providers.   She said that Freedom's and Optimum's plan had been to gain CMS approval based on the Evolutions providers, and then backfill the network with its own providers over time.   Soon afterward, Relator asked Sidd Pagidipati about Evolutions.   Sidd said that Freedom and Optimum had used Evolutions in order to gain CMS's approval to expand, and boasted that the scheme was the result of his creative thinking.   Sidd told Relator to contract with out-of-network providers rather than use the Evolutions providers in Freedom's and Optimum's networks.

299.    On September 28, 2009, Relator spoke with DeeAnn Garey-Roy about Optimum's use of Evolutions.   Garey-Roy told Relator that management had decided to expand Optimum into a number of counties at the last minute, just two days before the applications were due, and that Optimum had accordingly used Evolutions in the SAE for those counties.   Garey-Roy said that Optimum had relied on Evolutions even more than Freedom, because it had less time to contract with providers in the expansion areas before submitting its SAE.

300.    CMS's approval for Freedom and Optimum to expand was the direct result of Freedom's and Optimum's misrepresentations.  As it evaluated Freedom's SAE, CMS determined that it needed Freedom to submit additional information on multiple issues, including its relationship with Evolutions.  In an April 15, 2008 letter, CMS instructed Freedom to "[c]larify the relationship between Applicant [Freedom], Evolutions Healthcare System & Guardian Resources, Inc."  Exhibit 54, incorporated herein. (Evolutions was formerly named Guardian Resources.)  Specifically, CMS asked: "Does an administrative & management services agreement exist between Applicant (Freedom Health), Evolutions and Guardian?"  CMS also observed in the letter that the contract signature page Freedom had submitted for Shands Hospital at Starke was between Shands and Evolutions, not Freedom.  CMS therefore told Freedom to "[s]ubmit documentation that legally ties this contractual relationship to Applicant (Freedom Health, Inc.)."  CMS reminded Freedom that it "must provide evidence to CMS that it has an adequate network of healthcare providers to ensure access, availability and continuity of care for all Medicare covered services."  Furthermore, CMS made clear that its evaluation of Freedom's SAE application depended on Freedom's written submissions: "[CMS] will rely on your application, including the materials you submit in response to this letter, to determine your organization's compliance."  By submitting information to CMS about its relationship with Evolutions without disclosing that it would not use Evolutions to provide services to its members, Freedom fraudulently induced CMS into approving its SAE.

301.    Freedom and Optimum also fraudulently induced CMS and AHCA into approving their SAEs by misrepresenting their provider networks on expansion affidavits.  As a condition of approval to expand their service areas, Freedom and Optimum were required to file an "Affidavit by HMO/PHC/EPO for Expansion of Service Area" with AHCA.  Exhibit 55, incorporated herein.  Among other things, the Affidavit required the plans to identify their current service areas, the areas into which they hoped to expand, and the services they would provide in the new areas.  The Affidavit further required each plan to sign an affidavit that it "has the capability to provide comprehensive health care services in the new geographical area . . . ."  Exhibit 55.  However, Freedom and Optimum did not tell AHCA that they were not going to allow many (and sometimes most) of their network providers to perform health care services in the expansion counties.  Through their false affidavits to AHCA, Freedom and Optimum fraudulently induced CMS and AHCA into approving expansion and making payments to which Freedom and Optimum were not entitled.

302.    The inability of Freedom and Optimum beneficiaries to receive essential services has been the direct result of Sidd Pagidipati's fraudulent efforts to boost revenue by expanding Freedom's and Optimum's service areas, on the strength of a Potemkin provider network, without worrying about having actual networks in place.  By filing the false SAEs, Freedom and Optimum reversed the CMS expansion process:  they could assemble provider networks at their leisure, knowing that CMS had already approved them to operate in the new areas.  Freedom fraudulently induced CMS to grant expansion it would never have approved had it known the truth, i.e., that Freedom did not intend to

use, and did not use, the rental network while it assembled its own.   The cost of

Freedom's scheme fell on its beneficiaries, who quickly learned that the gaps in

Freedom's coverage were many, and easy to fall into.

### 2.    Non-Compliance With CMS Regulations for Operating a SNP

303.    The Medicare Modernization Act ("MMA") allows MA organizations to

offer specialized MA plans, known now as SNPs, which limit their enrollment to

individuals with special needs.  The MMA defines a "special needs" individual as one

who is institutionalized, eligible for both Medicare and Medicaid, or has a severe or

disabling chronic condition.  By targeting special needs individuals, the MA organization

can tailor care to address the unique needs of SNP beneficiaries.

304.    From its inception in 2003, the SNP program requires CMS to ensure that

a SNP meets Medicare Advantage SNP requirements, "as determined on a case-by-case

basis, using criteria that include the appropriateness of the target population, the existence

of clinical programs or special expertise to serve the target population, and whether the

proposal discriminates against sicker members of the target population."   42 C.F.R.

§ 422.2.

305.    One basic service a SNP must provide is to establish a model of care by

which it will coordinate care for its beneficiaries.  Starting in 2008, CMS required SNPs

to provide the following:

> The model of care is, in essence, the system of care which
> reflects (1) pertinent clinical expertise and the staff
> structures; (2) the types of benefits; and; (3) processes of
> care (organized under protocols) that will be used to meet
> the goals and objectives of the SNP. The model of care
> should be specific enough to imply what process and

> outcome measures could be used by the SNP to determine
> if the structures and processes of care are having an
> intended effect on the target population.

Centers for Medicare & Medicaid Services, 2008 Call Letter for Medicare Advantage

Organizations 45 (2008). The protocols, through which the SNP coordinates care, should

guide the frequency and nature of beneficiary assessments, as well as case management

("CM"), and disease management ("DM"). *Id.*

306.   In July of 2008, Congress amended the MMA to specify that a SNP must

provide its members with a model of care, supported by an appropriate provider network,

that provides specific, individualized CM to its members:

> [S]pecialized MA plan[s] for special needs individuals
> [must] (A) have in place an evidenced-based model of care
> with appropriate networks of providers and specialists; and
> (B) with respect to each individual enrolled in the plan—(i)
> conduct an initial assessment and an annual reassessment of
> the individual's physical, psychological, and functional
> needs; (ii) develop a plan, in consultation with the
> individual as feasible, that identifies goals and objectives,
> including measurable outcomes as well as specific services
> and benefits to be provided; and (iii) use an
> interdisciplinary care team in the management of care.

42 U.S.C. § 1395w-28(f)(5); 42 C.F.R. § 422.101(f)(1) (effective Sept. 18, 2008).

307.   Effective March 13, 2009, CMS further clarified model of care

requirements:

> MA organizations offering SNPs must also develop and
> implement the following model of care components to
> assure an effective management structure: (i) Target one of
> the three SNP populations . . . . (ii) Have appropriate staff
> (employed, contracted, or non-contracted) trained on the
> SNP plan model of care to coordinate and/or deliver all
> services and benefits. (iii) Coordinate the delivery of care
> across healthcare settings, providers, and services to assure

> continuity of care.   (iv) Coordinate the delivery of specialized benefits and services that meet the needs of the most vulnerable beneficiaries among the three target special needs populations . . . , including frail/disabled beneficiaries and beneficiaries near the end of life.  (v) Coordinate communication among plan personnel, providers, and beneficiaries.

74 Fed. Reg. 1,541 (Jan. 12, 2009).

308.   The CMS SNP program is a pilot program that evolves as CMS gains experience with it.  SNP regulations and guidance have been limited, with strict new rules only having come into effect in 2010.  Until then, many contours of a SNP plan had been left to the MA organization's discretion.

309.   Freedom and Optimum exploited this fluid environment, however, by fraudulently managing three SNPs that provided nothing beyond what their ordinary MA plans already offered.  While CMS continues to refine model of care standards, it has always required some established system for utilizing staff, benefits, and care processes to achieve SNP objectives.  Freedom and Optimum enacted no such systems.  They had no models of care, implemented no protocols for coordinating how their providers delivered care, failed to conduct basic nursing contacts, such as an initial phone call to new enrollees to ascertain their needs and goals, and provided critical CM/DM to just 1% of their members.  Even had they created such a system, Freedom and Optimum lacked the staff to implement it, a deficiency that continues to this day.  That Freedom and Optimum provided so little so soon after executing their contracts with CMS shows that they never intended to comply with federal law, a conclusion that Freedom and Optimum employees have admitted forthrightly (*see* ¶321).

### a)      Freedom Health

310.    Freedom had no model of care for coordinating delivery of health services to SNP beneficiaries in 2008 and much of 2009.  Once it had enrolled a beneficiary into the SNP using a pre-qualification form, Freedom had no system for managing that beneficiary's care, setting health outcome goals, or monitoring if the beneficiary's care was helping to achieve those goals.  What Freedom provided, therefore, was nothing more than traditional MA benefits.  By merely paying for services, Freedom deprived its beneficiaries of the benefits of being in a SNP plan.  Indeed, without models of care or any of the other services it promised to provide in its applications, Freedom's "SNPs" were not really SNPs.

311.    Similarly, Freedom established no protocols for determining which beneficiaries required nursing assessments and CM/DM, or how frequently such services were needed.  As a result, Freedom performed assessments and CM/DM on a minimal basis.  Freedom provided CM/DM to beneficiaries with multiple hospitalizations, those that happened to call and request services, and those with non-healing wounds, such as diabetic wounds and bedsores.  The number of Freedom members who received CM/DM has always been woefully small, accounting for only several hundred out of Freedom's thousands of SNP members.  For the vast majority, Freedom never performed even a basic initial phone call to determine if CM/DM were needed or wanted, and consequently did not provide CM/DM or anything else.

312.    Linda Ward laid bare the artifice of Freedom's SNP program in an email to Sidd Pagidipati on June 15, 2009.  Dr. Pariksith Singh, co-owner of PrimeCare, had

emailed Sidd on June 13 to ask about Freedom's disease management protocols, which

Dr. Singh hoped to harmonize with PrimeCare's operations:

> What kind of Disease Management plans do you have in place for the SNPs?
>
> Can you send me the protocols please?
>
> I will incorporate them in all our practices
>
> I will need your aggressive assistance in providing educational material, tools, seminars, classes, resources to our patients
>
> Can you do this Monday?

Exhibit 56, incorporated herein.   Sidd, in turn, emailed Ward and Relator, asking

"Linda/Darren, please email Dr Singh all details of our Diabetes, CHF, CVD and COPD

SNP programs by COB on Monday. Thanks, Sidd." But Ward, a year and a half after

CMS had mandated a SNP model of care plan, told Sidd that Freedom had no models of

care, CM/DM plans, protocols, or anything else to send:

> "Sidd,
>
> There is no way I can get this all pulled together by Monday—I am still writing them."

Exhibit 56. And Sidd, who had co-authored Freedom's SNP applications that promised

these very services, was well aware that Freedom had done next to nothing to implement

them, as will be discussed herein.

313.    Freedom's fraudulent practices began with the representations it made in

its SNP applications.   For CMS to approve its SNPs, Freedom had to complete a

Solicitation for Special Needs Plans Proposal ("Solicitation") for each.  The Solicitation

is both an evaluative tool and a form of guidance that incorporates elements of CMS policy. Each Solicitation contained multiple certifications, which Freedom did not intend to honor and has not honored, to provide specific care services to SNP beneficiaries. For example, the Solicitation required Freedom to state the goals of its Model of Care, "[d]escribe the specific organization of staff . . . to provide the specialized services available under the Model of Care," "[d]escribe the specific steps the SNP takes (e.g. written protocols and training) to ensure the staff understands how the Model of Care works and to function in accordance with the Model of Care," "[s]tate how this Model of Care will identify and meet the needs of beneficiaries with severe and disabling chronic conditions," "[l]ist and explain the extra benefits and services" available to those beneficiaries, and "[s]tate what specific process and outcome measures [Freedom] will use to measure performance of the Model of Care." Exhibit 57, incorporated herein. In its answers, Freedom represented that it would develop and staff a model of care in accordance with each of these certifications, and CMS approved Freedom's SNPs on the basis of its representations. As discussed herein, however, Freedom created no model of care, employed too few staff to provide specialized services to its SNP members, developed no protocols or training for implementing the (non-existent) model of care, did not identify or meet its beneficiaries' needs, provided the majority of them with no extra benefits or services, and established no process or outcome measures to monitor performance beyond the minimum basic measuring required of all MA plans. In short, Freedom made no effort to provide the services it had promised in the Solicitations, and which were material to CMS approval.

314.    Since at least October 2008, Freedom managers have received numerous internal warnings from Freedom's health services staff that Freedom was not operating its SNP program in compliance with CMS guidance and regulations, or according to the promises it made in the Solicitations.  As Freedom's managers have never intended to follow CMS rules, Freedom continues to devote almost no resources to the SNP, leaving Freedom totally out of compliance with SNP requirements.  As a result, Freedom's hardest-to-treat members, the SNP beneficiaries, have been deprived of the benefits of a true SNP—receiving *coordinated* care that is furnished according to a model of care that considers the beneficiary's individual needs and goals.

315.    On October 5, 2008, Pat Petro estimated that Freedom staff had completed only about 300 general assessments, a basic service wherein a case manager calls new members to ask about their conditions, medications, and doctors.  Likewise, Petro said that Freedom had performed fewer than 100 disease-specific health assessments, and less than 100 member-specific care plans, for the 7,200 SNP beneficiaries.

316.    On October 13, 2008, Relator met with Sidd Pagidipati and Mital Panara.  Relator told Sidd that Freedom had completed only about 100 care plans, when it should have completed care plans for all 7,200 SNP beneficiaries.  Relator told Sidd that Freedom needed both 50–100 nurses and an electronic documentation system to fulfill its obligations.  Sidd ignored the dramatic need for more nurses, saying merely that he was interested in the documentation system.

317.    Relator met with Mital Panara and Patricia Petro on October 16, 2008 to discuss the SNP.  Panara told Relator and Petro that he planned to have 15,000

beneficiaries in the SNP next year, as CMS would pay Freedom an extra $125 per member per month above Freedom's regular plan rate. When Petro said she could not manage that many members, Panara said that was her and Relator's problem.

318. Around the same time, Relator and Linda Ward created a PowerPoint Presentation on the return on investment for CCMS, an electronic documentation system necessary for managing CM/DM services, which they distributed to Dr. Patel, Sidd Pagidipati, and Jigar Desai. The CCMS presentation warned of huge SNP compliance problems. First, Freedom was allocating just four full-time-equivalent nurses and two social workers to the SNP. Along with PPHA, an external medical management company Freedom was using to provide care and disease management ("PPHA"), they had produced fewer than 500 care plans and fewer than 1,200 disease-specific assessments for the already more than 7,200 SNP members. Relator and Ward warned that, with a full-time nurse's case load being 75 beneficiaries, Freedom would have to hire 100 more full-time nurses to perform as promised in the Solicitation. They argued that the CCMS software, if combined with the 10–20x staffing increase, could make Freedom compliant for 2009.

319. Rather than increase staffing, however, Freedom made cuts. On October 1, 2008, Dr. Patel terminated Freedom's contract with PPHA, effective January 1, 2009. Freedom had hired PPHA to provide external CM/DM to SNP beneficiaries, and had invoked its capabilities repeatedly in its Solicitations. In truth, Freedom had only hired PPHA on a penny-pinching, "Volkswagen" contract that could accommodate only a fraction of Freedom's multiplying SNP population. Even so, Freedom became solely

responsible for SNP CM/DM by terminating PPHA's contract, yet instead of increasing staff to handle this new workload, it continued to try to make cuts.

320.    On November 21, 2008, Relator met with Dr. Patel, Sidd Pagidipati, and Jigar Desai. During the meeting, Dr. Patel told Relator that the Utilization Management Department ("UM"), which evaluates the cost and quality of medical services, was overstaffed. Relator told Dr. Patel that UM was severely understaffed relative to SNP requirements.   Dr. Patel persisted, telling Relator to replace two clinical staff with cheaper non-clinical staff.   When Relator again protested that UM desperately needed more staff to perform under its CMS contract, Dr. Patel acknowledged his feelings but said to "consider his suggestions."

321.    On December 10, 2008, Relator met with Pradeep Kathi, Freedom's Compliance Officer, to discuss the SNP further.   Relator asked Kathi why Freedom had made such ambitious promises in its Solicitations in light of its limited experience and resources. Kathi said that he and Sidd Pagidipati had written the Solicitations, and that they had known when they wrote them that Freedom could never perform the services they were promising. According to Kathi, the representations in the Solicitations were just a means to win CMS approval of the SNP contracts.   Though Kathi acknowledged that Freedom "would be dead" if the 2008 SNP were audited, he said the risk of an audit was minimal, and that Freedom should focus on becoming CMS compliant by 2010.

322.    Later that same day, Sidd Pagidipati summoned Relator to meet with him and Rupesh Shah, an unofficial senior advisor to Freedom, about the SNP.   Relator told Sidd that Freedom was not performing under the Solicitations, noting that Freedom had

not undertaken many promised CM/DM activities, and had not filled positions it had promised to create. Sidd said "it would be easy to window dress some of this stuff" by giving extra titles to existing staff to create the illusion that Freedom had filled the missing positions. Relator relayed Pradeep Kathi's conclusion that Freedom "would be dead" in an audit, and Sidd agreed. Like Kathi, however, Sidd said that Freedom had little to worry about, and should work toward 2010 compliance.

323.    The next day, Sidd Pagidipati asked Relator if Freedom could cut some staff. Relator reiterated that Freedom was critically understaffed for the SNP. Sidd acknowledged this but said he thought Freedom was "ok" on SNP staffing.

324.    Soon after this meeting, Relator emailed Sidd Pagidipati and Dr. Patel about SNP compliance. In his email, Relator said Freedom was delinquent in several areas, and that Rupesh had asked him to document the delinquencies. In an attached spreadsheet, Relator directed their attention to the 14 most important delinquencies, including Freedom's wholesale failure to identify and address beneficiary needs, and the lack of a transition plan to take over the services PPHA was providing. Exhibit 58, incorporated herein.

325.    About a week later, on December 18, 2008, Relator gave a handwritten memo to Jigar Desai, Freedom's Chief Financial Officer. The memo asked for a budgetary allotment for the hiring of the 100 nurses Freedom needed to staff the SNP compliantly. Desai responded with handwritten annotations, saying that Freedom did not need to hire more nurses because Freedom would not be providing CM/DM to every SNP member, and that the CCMS software program would improve nurse productivity enough

to cover those SNP members who would be receiving CM/DM. Exhibit 59, incorporated herein.

326. Freedom ignored Relator's repeated warnings that the SNPs were not being run properly because it had never intended to create real SNPs. Freedom wanted the extra SNP revenue, but was unwilling to invest in the programs and processes needed for a SNP. Freedom's fraudulent solution was to falsely promise those programs and processes in the Solicitations, and then ignore them once CMS had approved their SNP contracts. For example, Sidd Pagidipati emailed Berenice Mesa, Freedom's outside compliance consultant, on January 29, 2009, asking her for some computer screenshots to help Relator prepare Freedom's model of care documents. Exhibit 60, incorporated herein. In its Solicitations, Freedom had promised to enact models of care in 2008, and the 2009 Call Letter expected Freedom to have improved these care models for 2009. And yet Freedom had done nothing until late January 2009, when it began to fear that CMS would discover the missing care models in its next audit.

327. On February 2, 2009, Relator asked Pradeep Kathi, Freedom's Compliance Officer, about which CMS regulations Freedom needed to follow for the SNP. Kathi said that Freedom should have completed everything promised in the solicitation in 2008, and in 2009–2010 needed to comply with the CMS Call Letter and MIPPA, as well as its solicitation promises. Again, Kathi remarked that Freedom would be "in big trouble" if it were audited, but said that an audit was unlikely.

328. Pradeep Kathi understood that Freedom was systemically non-compliant and at increasing risk of getting caught. In a confidential memorandum to Sidd

Pagidipati on February 11, 2009, Kathi spelled out Freedom's problems.  First he listed

"failures" that CMS knew about.  He then turned to Freedom's other deficiencies that

CMS might uncover in an audit:

> If we are audited now, we will fail the following audit
> elements in addition to the concerns listed above:
>
> (1)     Enrollment—delays in upload of forms to CMS,
> delays in sending out required member letters, not acting on
> member calls requesting cancellation/disenrollment
> (2)     Delays in SNP member confirmation of chronic
> condition
> (3)     Not following in Ch 2 timelines on disenrollment of
> SNP members
> (4)     Timely claims payments
> (5)     Incorrect member EOBs. This is an element not
> corrected from the 2007 audit
> (6)     Appeals timeframes
> (7)     Grievances not logged properly in call logs
> . . .
>
> Some of the deficiencies are being addressed while many
> are not. We need to correct these deficiencies ASAP. Also,
> we have to be more conservative and more compliance-
> oriented in our approach starting now. The risk of non-
> compliance will be pretty significant, impacting all 4 CMS
> contracts.

Exhibit 28.

329.    Despite Pradeep Kathi's detailed warning to Freedom's COO, Sidd

Pagidipati, Freedom took no corrective action.  On February 27, 2009, Linda Ward,

Freedom's Vice President of Health Services, emailed the CM/DM department to tell

them to accept no new referrals:

> Hello All,
>
> Just a notice to let you know that as of today - Case and
> Disease Management Department is closed. There will be

> no new referrals to CM/DM unless it is an emergency and
> has been approved by Pat. The CM/DM department will be
> working on developing their existing cases in order to meet
> NCQA/CMS guidelines/criteria and also be assisting in the
> development of their new programs and documentation
> system.
>
> Linda

Exhibit 61, incorporated herein.

330.    On March 2, 2009, Linda Ward told Relator that she had closed the

CM/DM Departments due to insufficient staff.  Ward had recently lost 2 case managers,

leaving her with just 2 case managers and 2 social workers for Freedom's 31,612 total

members.  Ward said she needed to catch up and implement the CCMS system.  Ward

said she would reopen CM/DM when she had staff, and that she had informed "the

bosses" of this.

331.    With so few staff, Freedom was giving CM to almost none of its members.

On January 30, 2009, Freedom had about 200 SNP members actively in CM, out of a

total SNP membership of over 13,000.  Exhibit 62, incorporated herein.  In fact, the total

number of SNP members for whom Freedom provided CM between October 1, 2008 and

July 21, 2009—both active and closed cases—was just 406.

332.    During a SNP staff meeting on April 1, 2009, Pradeep Kathi told the SNP

team that Relator had said on numerous occasions that Freedom had not been keeping up

with the Solicitations.

333.    On April 3, 2009, Relator emailed Dr. Patel and again voiced his concerns

about Freedom's compliance,

> As I have mentioned before, I continue to be concerned
> regarding the SNP compliance. My day to day duties
> supervising the UM department leave little time to dedicate
> to the SNP and Linda, I believe, feels the same. Given the
> huge size of our SNP's (I believe the two individual SNP's
> are both in the top 10 largest C-SNP's in the country) we
> need additional resources to become compliant.

Relator then reminded Dr. Patel about the summary of SNP deficiencies he had sent in December. In the email, he updated that summary to detail Freedom's current SNP compliance problems. Exhibit 63, incorporated herein.

334.    The updated summary repeated many of the same deficiencies. Relator reported that Freedom, among other things, still lacked an adequate nursing staff, had no clinically-trained SNP medical director, had not taken over the services PPHA once provided, and was not providing extra services to frail or multiple-illness beneficiaries. Exhibit 63.

335.    Also on April 3, 2009, Relator overheard Patricia Petro tell Linda Ward that she (Petro) had just received SNP lab reports for 2008. Ward told Petro that Freedom could now say it had monitored SNP lab reports in 2008. When Relator corrected Ward and said "you mean 2009," Ward said that she meant 2008—Freedom would doctor its lab reviews to look as though it had done lab reviews in 2008, when in fact it had not.

336.    On May 11, 2009 Relator met with Linda Ward to discuss SNP staffing. Ward told Relator that she had projected the number of man-years it would take to compliantly staff the SNP in 2010. According to Ward, Freedom's 19 clinical staff would be unable to complete the interdisciplinary team meetings, which are just one

aspect of SNP management, even if they spent all year working on them and restricted them to just the sickest SNP members. Soon thereafter, Ward sent a table and organizational chart to Freedom's SNP team that showed the projected deficiency. Exhibit 64, incorporated herein.

337. Around this time, Freedom senior managers Dr. Patel, Sidd Pagidipati, and Rupesh Shah devised a plan to justify providing insufficient care to SNP beneficiaries. Freedom would stratify SNP membership into three layers. Level I, containing the 6,000 healthiest patients, would be managed as a group, with a single care plan (even though the patients have differing conditions), little education, and intervention only through intermittent mailings and/or call center contacts. Level II, holding less healthy patients, would also be managed through mailings and the call center, but would receive more calls. To Linda Ward, even Level II plans are "still not true care plans, but hopefully will suffice." Exhibit 65, incorporated herein. Only Level III, comprising Freedom's most critically ill patients, would receive clinical case and disease management. According to Ward's projections, Freedom lacked the staffing to do anything beyond holding interdisciplinary care team meetings for the Level III beneficiaries. Freedom's stratification plan, therefore, was nothing more than a fresh coat of paint on a rotten house. Freedom bunched members into Level I not because it could manage them as a group, but because it was unwilling to hire the staff to manage them individually.

338. Relator spoke with Linda Ward about her staffing projections again on May 14, 2009. Relator told Ward that the problems she had identified concerned services that Freedom should have been performing in 2009. Ward said "I know. I'm waiting for

a huge corrective plan from CMS. A huge list of deficiencies and a huge corrective plan." Ward also noted that no one had replied to her table and organizational chart.

339.    Freedom hired Dr. Michael Yanuck in April 2009 to serve as the medical director for the SNP. Dr. Yanuck reviewed the Freedom SNP and came to the same conclusion as Relator and Linda Ward. In a staff meeting on May 18, 2009, Dr. Yanuck said that Freedom was 1% compliant, in that Freedom was managing only 1% of its membership to any real degree. He said that Freedom would be "dead for the 2009 audit," and that it had not followed through on its 2009 policies and procedures. To Dr. Yanuck, Freedom needed a drastic staffing increase to be compliant in 2010. Relator and Linda Ward then seconded Dr. Yanuck's analysis. They tried to explain to Rupesh Shah, who is now Freedom's and Optimum's CEO, that Dr. Patel's plan to manage the 6,000 Level I members en masse would not meet CMS SNP requirements for 2010.

340.    On May 19, 2009, Relator voiced his concerns about Freedom's plan to manage all Level I members as a single entity to Pradeep Kathi. Kathi implausibly said there were enough commonalities among the 6,000 beneficiaries that they could be grouped together and managed as one. Kathi also downplayed the risk of an audit, saying that CMS auditors would not compare Freedom to the promises it made in the Solicitations.

341.    Later that day, Dr. Patel phoned Relator about SNP staffing. Dr. Patel said he had reviewed the concerns that Relator, Linda Ward, and Dr. Yanuck had raised, and felt they were making a mountain out of a molehill. To Dr. Patel, the staffing increases that Relator, Ward, and Dr. Yanuck sought were "absurd" and not cost-

effective. When Relator said that CMS expected high service levels for SNP members, Dr. Patel said that was totally ridiculous. Instead of addressing the glaring deficiencies that Linda Ward's staffing projections had spotlighted, Dr. Patel rejected the projections. He told Relator to go back and "review" the projections and find a cheaper way of managing the SNP members.

342. By now, Relator and others had warned Dr. Patel time and again that Freedom was hopelessly understaffed, and shown him what Freedom needed to do to become compliant. But Dr. Patel had no intention of spending the money necessary for providing the services the SNP program requires. CMS makes a demonstrable monthly payment to Freedom to cover the (ostensible) administrative costs of providing SNP services. Under Dr. Patel, however, Freedom pocketed the extra payments from CMS instead of using them to deliver the extra services that CMS was paying for. To Dr. Patel, the SNPs were just extra revenue, the better to grow Freedom to a saleable size.

343. Because of Relator's efforts to increase SNP staffing, Freedom threatened to remove him from the SNP project. Late in the day on May 19, 2009, Dr. Patel called for Relator and, in front of Rupesh Shah, angrily told Relator to abandon his thoughts on making the SNP compliant for 2010. Dr. Patel said that Relator needed to redo the SNP plan using less staff. If Relator and Linda Ward continued to have strong feelings about SNP staffing, Dr. Patel said, they could be removed from the SNP project. Dr. Patel suggested that he could assign Relator to some 9,000 Freedom members and give him a measurable goal to improve their MLRs within a couple of months. This was setting Relator up to fail, as the project's timeframe was too short for any intervention to affect

MLR, something that Dr. Patel knew very well. As a result of this meeting, Relator knew that his participation on the SNP project, and indeed his future with Freedom, depended on his not objecting to Dr. Patel's decisions about the SNP.

344.    On May 26, 2009, Relator spoke with Dr. Yanuck over the phone. Dr. Yanuck told Relator that he had spoken with Sidd Pagidipati and Vikrant Raj and told them that in his opinion Freedom's SNPs did not meet CMS criteria for either 2009 or 2010. Dr. Yanuck explained that he had communicated his concerns "on the record" so that he would not be blamed in the event that CMS rejected Freedom's SNPs. He said that he was developing an alternative to Freedom's new SNP model that would require lengthier contact with Level II and Level III members, and said that his willingness to continue working for Freedom depended on how its upper management responded to it.

345.    Freedom was working in April and May to develop models of care, however inadequate, because it expected to be audited. On or about April 1, 2009, Freedom learned that CMS had pushed forward a scheduled audit from September to July 13. Freedom feared that a July audit would reveal the true chimerical nature of its SNP program, as it had only recently begun to develop its long-overdue models of care, and now had little time to get them in order. With the audit looming, Freedom scrambled to create the documents it needed to appear compliant for 2009. As discussed above in ¶337, Freedom had just begun devising its "layered" model of care system in April 2009, and it was late May, for example, when Linda Ward produced a draft of Freedom's care models for Level II diabetics. Exhibit 65, incorporated herein. Therefore, it was not until

Freedom feared a CMS audit that it finally worked to produce the models of care it had claimed to have had since 2008.

346. Notwithstanding the new models of care that Freedom had outlined, in practice its SNP programs remained impalpable as ever. In an October 2009 report, Freedom calculated the number and percentage of SNP members who had received CM or DM services during the third quarter. The report showed that Freedom, with 19,922 SNP members, provided CM or DM to only 254 members, or 1.27% of the total. Exhibit 66, incorporated herein.

347. Furthermore, Freedom continued to provide insufficient staff to manage the SNPs and the new care models. On August 5, 2009, Rupesh Shah emailed Linda Ward to question her decision to hire sixteen nurses, which had long been a critical need. Shah stated that Freedom needed to "understand and budget" the SNPs "so we do not end up hiring more people with lot of manual processes." Ward wrote back less than an hour later to clarify that she had not, in fact, hired sixteen additional staff. Exhibit 67, incorporated herein. The SNPs' illusory existence is also shown by the fact that the managers responsible for implementing the new models of care knew little about them, even after Freedom had developed them in advance of the audit. On September 2, 2009, Linda Ward asked Vikrant Raj for information about how the Level I and Level II members were being managed. Ward, who runs Freedom's CM and DM department, apparently had not been told how Freedom planned to manage 97% of its SNP membership. Exhibit 68, incorporated herein.

348.    Freedom (and Optimum) continue to defraud CMS through their SNP program.  In 2010, Freedom and Optimum did not increase staffing levels in the CM and DM departments.  In fact, the plans *diverted* the SNP program's already-insufficient nursing resources away from CM and DM and into improving the plans' CMS "star ratings."   Star ratings are a quality measure computed from four sources, including Healthcare Effectiveness Data and Information Set ("HEDIS") scores.  In late 2009, CMS announced that a MA plan's star ratings would affect its reimbursement in the future.  CMS's decision was intended to improve quality, but it had the opposite effect at Freedom and Optimum: the plans reassigned their nurses to increasing their star ratings (by targeting the select quality elements the ratings reflect) at the expense of actually managing their SNP members' health care.  According to a current DM employee, Freedom's and Optimum's DM nurses now spend 85% of their time on improving star ratings and HEDIS.

349.    On March 20, 2011, Mital Panara told Relator that in January 2011 Freedom and Optimum had resumed converting their members from their regular plans into their SNPs.  According to Panara, CEO Rupesh Shah was directing the new SNP growth, and was paying brokers a commission for every Freedom/Optimum member they converted.  Freedom and Optimum decided to convert members into the SNPs toward the end of the AEP on December 31, 2009.  Freedom's and Optimum's board had expected Freedom to grow by 10,000 members during the AEP; instead Freedom lost 3,000 members.   On information and belief, Rupesh Shah turned to SNP enrollment to compensate for the revenue would have earned from membership growth.  At the time,

Freedom/Optimum stood to receive an extra $100 in per-member-per-month capitation payments for their SNP members. Freedom nor Optimum still have not hired staff to manage their SNP members; by contrast, Freedom and Optimum have been hiring nurses for the *Revenue* Department, where they will work on increasing Freedom's and Optimum's risk adjustment payments.

350.    To induce CMS into authorizing it to operate a SNP program, Freedom falsely represented in the Solicitations it presented to CMS that it would comply with federal laws and CMS guidance. As evidenced by its continual, pervasive failure to offer SNP services to its members, Freedom never intended to comply with those laws and guiding materials. Freedom decided to operate its SNPs no differently from its other MA plans, pocketing the additional remuneration from CMS without directing resources to the vulnerable beneficiaries the SNP program is supposed to help.

### b)    Optimum Healthcare

351.    Because Freedom's managers submitted its SNP Solicitations to CMS without any intention of performing the services the Solicitations promised, they naturally had no compunction about submitting a SNP Solicitation for Optimum as well. CMS approved Optimum's Solicitation in 2008 and Optimum began to operate its SNP, for dual-eligible beneficiaries, in January 2009. As with Freedom, however, Optimum's SNP was a sham intended to reap additional capitation payments without providing the targeted health services that CMS had bargained for.

352.    Optimum's and Freedom's SNPs are managed together, such that Optimum SNP members have received the same services Freedom SNP members have

received, and the same Global TPA employees are responsible for operating both SNPs. *See* Exhibit 62 (showing Freedom and Optimum members received the same CM). Consequently, Optimum has failed to provide SNP services to its members by following the same course of conduct as Freedom.

353.     Optimum represented in its Solicitation to CMS that it would operate its SNPs in accordance with federal regulations and pursuant to the Solicitation's terms, which obligated Optimum to establish a model of care, among other things.  These representations were false, however, because Optimum did not intend to perform the services it promised.

354.     Upon joining Freedom/Optimum as Chief Medical Officer in late 2009, Ace Hodgin realized that the plans' SNP programs were totally out of compliance with the CMS requirements they had attested to meet effective January 1, 2010.  Hodgin decided that Freedom and Optimum needed to reduce the risk that CMS would catch them lacking all of the requirements and would terminate their SNP contracts.  Hodgin therefore sought to create a record that Freedom or Optimum could point to in case CMS ever challenged their SNPs.  In a series of meetings in January and February 2010, Hodgin fleshed out the stratified models of care that Freedom and Optimum had devised in 2009.  The care models remained inadequate compared to CMS requirements, but represented the first time that Freedom and Optimum had put any such program to paper. In a meeting on February 4, 2010, Hodgin addressed concerns that the new models of care did not follow the models of care in the 2010 Solicitations.  Hodgin told employees that they should not be nervous about his changing the SNP in ways that did not reflect

the promises in Freedom's and Optimum's Solicitations, because none of them had done anything at all in the previous year to operate the SNP program.  Hodgin said he was trying to do *something*, even if what he proposed was not what was in the Solicitations.

355.   Six days earlier, on January 29, 2010, Ace Hodgin had similarly told staff that he wanted to move the SNP program from "theoretical" to "real" and that, in his view, Freedom and Optimum did not have a SNP program at all.  Even so, the program Hodgin proposed offered beneficiaries little improvement.  To fit a case and disease management program within Freedom's and Optimum's skeletal staffing levels, Hodgin limited the amount of time nurses could spend on each case to 4 hours over 3 months—a totally unrealistic workload.  Reacting to the plan, Linda Ward stated that the proposed model was "worthless" when Freedom and Optimum "never slowed enrollment," and Dr. Yanuck said that Freedom and Optimum were "not trying to make a program to help people" and that their SNPs were "just a business to make money."

356.   While Freedom and Optimum were just beginning in early 2010 to develop the programs they were required to have had in place by January 1, they continued to enroll Medicare beneficiaries into their SNPs.  By February 2010, Freedom had 20,446 active SNP members and Optimum had 686 active SNP members (dual-eligibles).  Moreover, as described in ¶348, Freedom and Optimum never ended up developing true SNP programs, because Rupesh Shah and Ace Hodgin soon diverted SNP nursing resources into improving star ratings.

357.   Optimum fraudulently induced CMS into approving its SNP Solicitations on the basis of misrepresentations in its Solicitations and annual attestations.  As with

Freedom, Optimum operated its SNPs identically to its normal MA plans, collecting the additional revenue without providing the targeted services for which CMS was paying.

## IX.   DEFENDANTS FREEDOM, OPTIMUM AND GLOBAL TPA UNLAWFULLY RETALIATED AGAINST RELATOR

358.    Beginning in the Fall of 2008, as Relator realized the extent of the fraud in which Defendants were involved, he began to take steps to prepare to notify  the Government of the fraud for the Government's investigation and possible prosecution. Relator filed the Complaint for Violation of Federal and State False Claims Acts in this case on August 17, 2009 and filed a First Amended Complaint for Violation of Federal and State False Claims Acts on March 17, 2011.  Following his initial Relator interview with the Government in the Fall of  2009, Relator began to participate actively in the Government's investigation of Defendants and continued to participate actively in the Government's investigation through his constructive discharge on September 7, 2012.

359.    As part of the Government's investigation and prosecution of this Complaint, Government investigators met with Mital Panara on April 5, 2012 and, upon information and belief, confronted him with damaging statements they had learned from Relator.  Hearing these statements, and knowing their context, caused Panara to conclude that Relator was assisting the Government in what appeared to be an ongoing investigation into allegations of fraud by Defendants.

360.    The Office of Inspector General for the United States Department of Health and Human Services served a subpoena to seek information related to allegations made by Relator in this Complaint on several Defendants, including Freedom and Optimum, via Freedom's counsel Bijal Patel, on April 9, 2012.  The same day, Defendant

Freedom changed Relator's computer password blocking him from accessing his work computer or any files stored on it for several days.

361.    Immediately after the subpoena was served, Defendants Freedom, Optimum, and Global TPA greatly reduced Relator's job duties and responsibilities. On April 10, 2012, still locked out of his work computer, Defendants assigned Relator basic administrative tasks of scanning performance evaluations for his department and sending them to employees. This included his own evaluation, which had been signed March 8, 2012, and which stated that he was meeting all expectations. Mital Panara began to give Relator responsibility for making decisions in areas outside of Relator's usual responsibilities, in an apparent attempt to cause him to make a mistake for which he could be blamed.

362.    Even after Relator's computer access was restored several days later, Relator's supervisors began to scrutinize his work closely for any potential mistakes. For example, Rupesh Shah pressured Relator on April 13, 2012, for updates on Relator's visits to physician's offices, insinuating Relator had not visited the offices frequently enough. Shah did so even though he already knew that Relator had not been able to visit as many offices as planned due to certain other competing work responsibilities. Relator's year-end review meeting for 2011 with Shah and Panara had already specifically addressed this issue and there was no legitimate, non-retaliatory reason to revisit the issue.

363.    On April 11 or 12, 2012, Relator brought his personal iMac laptop computer (his own personal property) to his office. While Relator was out of his office,

the iMac disappeared. The iMac contained attorney-client and work product privileged information relating to this Complaint and the investigation by the Government of the allegations in this Complaint.

364.    While Relator looked for his iMac, but before he had reported its disappearance to Defendants, the Company circulated a memorandum to all employees dated April 17, 2012, referencing a Freedom policy prohibiting the use of non-company-issued computers and laptops – a new policy that was neither articulated nor enforced prior to April 17, 2012.

365.    On April 18, 2012, Relator wrote to Company counsel Bijal Patel to report the apparent theft of his iMac from his office. He described the laptop, including its serial number, and informed Ms. Patel that the laptop contained "confidential and private information including privileged communications with my attorneys." Relator stated that he did not give consent for Freedom or any of its affiliates to turn on the computer or review its contents. He also wrote, "If the computer is in the actual or constructive possession of the Company, its employees, officers, directors, attorneys, subcontractors, or agents, the Company must return the computer to me immediately and may not use any information on the computer for any purpose whatsoever."

366.    Defendants did not return the computer to Relator despite the fact that it was taken from Relator's office in a building that requires security credentials to enter and despite the fact that Defendants had a surveillance system that would have allowed it to quickly ascertain who took Relator's computer.

367.    On April 18, 2012, Relator also learned that Freedom's Legal Department had possession of his iMac's spare battery, although the department claimed not to have possession of his iMac or to know where it was.  Relator filed a police report to report the theft of the iMac.

368.    Because the materials on the iMac related to Relator's participation with the Government in this lawsuit, which was under seal at the time, Relator wrote to Patel and stated, "Because there is currently a federal investigation underway and in order to adhere to a court order, I will not be able to answer any further questions about the material on my laptop."  Without revealing the existence of a *qui tam* lawsuit, Relator's email made clear that he was assisting in a federal investigation.

369.    Over the next few weeks, Defendants repeatedly attempted to press Relator further on this issue, in a way that felt intimidating to Relator.  Relator continued to explain that a court order prohibited him from divulging further information.

370.    On April 24, 2012, Panara approached Relator to discuss his performance evaluation.  Panara stated that Shah wanted more information about a statement on the evaluation that Relator assisted with compliance coding.  Panara also wrote an addendum for the performance evaluation, which he asked Relator to sign.   The addendum attempted to blame Relator for any compliance issues being investigated by the federal government, by stating that it was Relator's responsibility to advise reviewers about compliance coding.

371.    On April 25, 2012, Patel and representatives from Freedom's Human Resources department met with Relator without advance warning and told him that

Freedom was putting him on paid administrative leave effective immediately. Defendants immediately cut Relator off access to the Company's computer systems.

372.   Relator did not wish to be placed on administrative leave, where he would have no ongoing responsibilities and no opportunities for professional advancement. He responded to Patel by email on April 26, 2012, objecting to being placed on administrative leave. He informed Patelthat he believed placing him on administrative leave to be retaliatory. Relator also requested that Freedom provide its surveillance tapes of his office to the police, and noted that over the last several days he had heard several worrisome conversations by Freedom's IT department employees discussing changing the method by which surveillance tapes were maintained, suggesting to him that this evidence was being destroyed.

373.   On or about July 10, 2012, this Court granted an Order allowing partial unsealing of this case and disclosure to Freedom of the underlying allegations in this complaint.

374.   In July 2012, Relator's counsel and counsel for Freedom discussed finding a time for Freedom to meet with Relator when Relator's attorney could also be present. This time was set for early September 2012. During the summer of 2012, while he was on administrative leave, Relator began to hear from his contacts at other companies that individuals at Freedom had been impugning his reputation to others in the industry. At first, what he heard from others in the industry was that Freedom had spread the word that he was the whistleblower behind the ongoing investigation against them and that his motives for blowing the whistle had been to punish the Company.

375.   However, in early September 2012, Relator learned from two different individuals at other industry companies that Freedom was spreading the word that Relator himself was responsible for criminal violations by Freedom and had invented false accusations against Defendants to retaliate against Defendants for demoting or failing to promote him.  These statements were false and defamatory per se.

376.   Relator spoke to one individual on September 4, 2012, who informed Relator that Mital Panara had blamed all of the illegalities and criminal conduct at Freedom on Relator, stating that the illegalities and criminal conduct took place in Relator's department and were his fault.

377.   On September 5, 2012, Relator spoke with a second individual at another company in the industry.  This individual told Relator that she had heard from two different people at her company, including its Chief Executive Officer, that Freedom officials were telling others in the managed care industry that Relator was a whistleblower against Freedom, that the ongoing investigation into Freedom was Relator's fault – and, moreover, that Relator was to blame for any criminal conduct that had occurred in Relator's department.   Both individuals told Relator that Freedom officials had stated Relator had manufactured the allegations upon which he blew the whistle to retaliate against Freedom for either demoting him or failing to promote him.

378.   After learning that officials at Freedom were defaming him and informing individuals at least two other companies in the industry that he had engaged in criminal conduct at Freedom, Relator concluded that it would be intolerable to work for an employer that accused him  -- publicly, wrongfully and falsely -- of participating in

illegalities and criminal conduct.  Moreover, Freedom had forced Relator to remain on

administrative leave from April, giving further credence to statements it made both

internally and external to the Company that Relator had engaged in serious misconduct.

379.    Freedom publicly, wrongfully and falsely accused Relator of engaging in

illegalities and criminal conduct.  Moreover, Relator has a good faith belief that the

Company continues to defraud federal and state governments.  Accordingly, by email

dated September 7, 2012, Relator submitted his involuntary resignation to Company

officials.  Relator wrote to Patel and Shah the following:

> I am writing to inform you that effective immediately, I am
> submitting my involuntary resignation from Global TPA,
> LLC.
>
> Since at least April 9, 2012, when the Company first
> became aware that it was under investigation by a Federal
> agency, I have been subjected to intimidation, retaliatory
> harassment, and forced administrative leave by principals
> of and counsel for Global TPA, Freedom, Optimum, AFC
> North and AFC South, and their affiliates.  On multiple
> occasions, I have objected in writing to these practices and
> to the presumed theft of my personal laptop computer from
> Company premises.  I requested corrective action but none
> was taken.  I have put up with these indignities because my
> job is important to me and my family relies on my income.
>   It is therefore not an easy decision for me to bow down to
> the pressure the Company has deliberately exerted on me to
> force me to resign.  However, the Company's actions have
> created working conditions that are so intolerable that I am
> now left with no choice but to submit this letter of
> involuntary resignation.
>
> This week I have come to learn that Company officials
> have repeatedly impugned my integrity and veracity to
> multiple individuals, both inside the Company and outside
> the Company, identifying me as the "whistleblower" who
> created all of the problems the Company now faces.  I have
> learned that high-ranking Company officials have told

individuals that I manufactured allegations against the Company to punish the Company for demoting me and that my actions have been motivated by malice. Alternately, Company officials have told third parties that if in fact the Company submitted improper risk adjustment data to CMS, I (and not other Company officials) am the official who is responsible for the potentially unlawful acts that are the subject of a federal investigation. I was advised by an individual I spoke with this week -- a senior executive at another company in the industry -- that the Company's statements about me have painted me out to be both a rat and a criminal and have made me unemployable in my chosen profession. These statements, which have accused me of criminal activity, are false and defamatory and have created an intolerable employment relationship for me.

I cannot continue an affiliation with a Company that I am firmly convinced defrauded the federal government, retaliated against me in vicious ways when it became clear that it was under government investigation, and is now engaged in a campaign to blame me for its improper actions, claiming that I -- and not other Company officials – am responsible for the wrongdoing for which the Company is being investigated by the federal government. Moreover, the Company has gone out of its way to blackball me and irreparably tar my reputation.

Therefore, effective immediately, I am submitting this forced resignation.

380. Relator's last day of work was September 7, 2012. Since Relator's departure from Freedom, he has heard from several others in the industry that Freedom is stating publicly that Relator was a "whistleblower" that brought Freedom to the attention of federal authorities. These public comments are directly affecting Relator's reputation and ability to make a living in the industry.

381. On or about January 29, 2013, Relator had a phone conversation with Debbie Ouellette about some possible consulting work for him with her company,

Simply Health, which at the time had agreed to purchase Universal Healthcare (the purchase later fell through). Ms. Ouellette told Relator that she needed to ask him a "difficult question": she stated that it was well-known within Freedom that Relator was a "whistleblower" who had triggered an OIG investigation, and said she knew this both from Freedom employee Chris O'Connor and because it had been formally announced by Freedom in a large, formal, scheduled provider operations meeting. She additionally told Relator that she was "nervous" about partnering with him for consulting work with Simply Health because even if it was not true that he was a "whistleblower" who had triggered an OIG investigation, "that was the rumor in the industry," and other companies might not want to do business with her (Debbie Ouellette) if Relator was suspected of being a whistleblower and Debbie was working with a whistleblower.

382.    On or about February 6, 2013, Relator spoke by telephone with Perry Defreitas, also about doing some work together. Mr. Defreitas had previously mentioned to Relator that on one occasion after Relator's departure, Defendant Devaiah Pagidipati had inquired whether Mr. Defreitas was still in contact with Relator. Mr. Defreitas said he replied that he had not spoken with Relator in some time and asked why it mattered, and that Dr. Pagidipati abruptly changed the subject. On or about February 6, 2013, Mr. Defreitas told Relator that Defendant Sidd Pagidipati – Freedom's COO – had asked him whether he still spoke with Relator, and had said that if he did, it would be a problem because Relator had gone to the FBI and complained about Freedom. Mr. Defreitas told Relator that Dr. Pagidipati had said that if Mr. Defreitas were still in touch with Relator, Mr. Defreitas would no longer be allowed to work for Dr. Pagidipati.

## COUNT I

### Substantive Violations of the Federal False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)–(C), (a)(1)(G), and 3732(b).

383.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 382 of this Complaint.

384.   This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

385.   Through the acts described above, defendants Freedom Health, Inc., Optimum Healthcare, Inc., America's 1st Choice Holdings of Florida LLC, Liberty Acquisition Group LLC, Health Management Services of USA LLC, Global TPA LLC, America's 1st Choice Holdings of North Carolina LLC, America's 1st Choice Holdings of South Carolina LLC, America's 1st Choice Insurance Company of North Carolina, Inc., America's 1st Choice Health Plans, Inc., Dr. Kiranbhai C. Patel, Dr. Devaiah Pagidipati, Siddhartha Pagidipati, Rupesh Shah, and Mital Panara ("Defendants"), their agents, employees, and co-conspirators, knowingly presented, or caused to be presented, to the United States false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval from the United States and its contractors, grantees, and other recipients of its funds.

386.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the United States to approve and pay false and fraudulent claims.

387.   Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements material to an obligation to pay and transmit money to the United States, and knowingly concealed and improperly avoided and decreased an obligation to pay and transmit money to the United States.

388.   The United States, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, its agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

389.   By reason of the payment made by the United States, as a result of Defendants' fraud, the United States has suffered millions of dollars in damages and continues to be damaged.

**COUNT II**

**Substantive Violations of the Florida False Claims Act**
**Fla. Stat. § 68.082(2)(a), (2)(b), and (2)(g)**

390.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 382 of this Complaint.

391.   This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. §§ 68.081–.092.

392.   Through the acts described above, defendants Freedom Health, Inc., Optimum Healthcare, Inc., America's 1st Choice Holdings of Florida LLC, Liberty Acquisition Group LLC, Health Management Services of USA LLC, Global TPA LLC, America's 1st Choice Holdings of North Carolina LLC, America's 1st Choice Holdings of South Carolina LLC, America's 1st Choice Insurance Company of North Carolina,

Inc., America's 1st Choice Health Plans, Inc., Dr. Kiranbhai C. Patel, Dr. Devaiah Pagidipati, Siddhartha Pagidipati, Rupesh Shah, and Mital Panara ("Defendants"), their agents, employees, and co-conspirators, knowingly presented and caused to be presented to the Florida State Government, including without limitation the Agency for Health Care Administration ("AHCA"), and its officials false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment and approval from the Florida State Government.

393. Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce the Florida State Government, including without limitation AHCA, to approve and pay false and fraudulent claims.

394. Through the acts described above, Defendants, their agents, employees, and co-conspirators, knowingly made, used, and caused to be made and used false records and statements to conceal, avoid, and decrease obligations to pay and transmit money to the Florida State Government, including without limitation AHCA.

395. The Florida State Government, unaware of the falsity of the records, statements, and claims made and submitted by Defendants, their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

396. By reason of the payment made by the Florida State Government as a result of Defendants' fraud, the Florida State Government has suffered damages and continues to be damaged.

397.     The Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation of Fla. Stat. § 68.082 alleged herein.

## COUNT III

**Claim on Behalf of Relator Darren Sewell Personally**
**Retaliation in Violation of the Federal False Claims Act, 31 U.S.C. § 3730(h) Against**
**Defendants Global, Optimum and Freedom**

398.     Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 382 of this Complaint.

399.     This is a claim pursuant to 31 U.S.C. § 3730(h) for relief from Defendants' retaliatory actions as necessary to make Relator whole for being subjected to unlawful retaliatory harassment culminating in his constructive as a consequence of lawful acts done by him to report what he reasonably believed were false claims for payment from federal payors resulting from Defendants' practices and in furtherance of an action for violation of the federal False Claims Act.

400.     Relator's lawful acts, which § 3730(h) protects from retaliation, include participating in the Government's investigation   (including filing this Complaint and reporting information to Government investigators).

401.     Based on Relator's lawful acts, Defendants removed all of his key duties and responsibilities, placed him on administrative leave for nearly five months, and injured Relator's reputation by falsely informing others outside the company that Relator was engaged in criminal conduct and illegalities and that he had invented untruthful accusations against the Defendants to retaliate against Defendants for demoting or failing to promote him, and interfered with his ability to work once he separated from employment.

402.   Defendants' actions made working conditions intolerable such that any reasonable employee would have no choice but to resign, and Defendants through their retaliatory actions forced Relator into a constructive discharge.

403.   Defendants' actions in stripping him of his duties and responsibilities, stealing his computer, placing Relator on administrative leave, maligning his reputation and defaming him by stating that Relator had engaged in criminal and illegal conduct, constructively discharging him and interfering with his ability to work once he separated from employment constituted unlawful retaliation for Relator's lawful actions in reporting, attempting to stop, and acting in furtherance of other efforts to stop what he reasonably believed were actions by the Defendants in violation of the FCA.

404.   Defendants' actions described above, violate 31 U.S.C. § 3730(h), which prohibits retaliation by employers against employees who investigate or report false statements within the meaning of 31 U.S.C. § 3729, which holds liable any person who, *inter alia*, "knowingly makes, uses, or causes to be made or used, a false… statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). Each claim for payment pursuant to a contract induced by false statements is itself false and fraudulent within the meaning of this provision. Relator's action in reporting to the Government, and his actions in furtherance of the Government's investigation of that report, of Defendants' fraud in obtaining payment from the federal Government reasonably could have led to a viable False Claims Act suit pursuant to 31 U.S.C. § 3729.

405.    As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages including severe emotional anguish and irreparable, continuing harm to his reputation and career.  Relator is entitled to all relief necessary to make him whole.

### COUNT IV

**Claim on Behalf of Relator Darren Sewell Personally**
**Retaliation in Violation of the Florida False Claims Act, Fla. Stat. §§ 68.088,**
**112.3187, Against Defendants Global, Optimum and Freedom**

406.    Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 382 of this Complaint.

407.    This is a claim pursuant to Florida Statutes § 68.088 for relief from Defendants' retaliatory actions as necessary to make Relator whole for being subjected to retaliatory harassment and unlawful constructive discharge because of lawful acts done by Relator in furtherance of an action under the Florida False Claims Act, including his participation in the investigation for the initiation of and his assistance to the Government in an action filed or to be filed under the Florida False Claims Act.

408.    Relator's lawful acts, which § 68.088 protects from retaliation, include participating in the Government's investigation  (including filing this Complaint and reporting information to Government investigators).

409.    Based on Relator's lawful acts, Defendants removed all of his duties and responsibilities, stole his laptop, placed him on administrative leave for nearly five months, and injured Relator's reputation by falsely informing others outside the company that Relator was engaged in criminal conduct and illegalities and that he had invented untruthful accusations against the Defendants to retaliate against Defendants for

demoting or failing to promote him. and interfering with his ability to work once he separated from employment.

410.    Defendants' actions made working conditions intolerable such that any reasonable employee would have no choice but to resign.    Accordingly, Defendants forced Relator into a constructive discharge.

411.    Defendants' actions in stripping him of his duties and responsibilities, stealing his computer, placing Relator on administrative leave, maligning his reputation and defaming him by stating that Relator had engaged in criminal and illegal conduct, constructively discharging him and interfering with his ability to work once he separated from employment constituted unlawful retaliation for Relator's lawful actions in reporting, attempting to stop, and acting in furtherance of other efforts to stop what he reasonably believed were actions by the Defendants in violation of the FCA.

412.    Defendants' actions described herein violate Florida Statutes § 68.088, which prohibits retaliation by employers against employees "because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this act, including investigation for initiation of, testimony for, or assistance in an action filed or to be filed under this act." Fla. Stat. § 68.088.

413.    The Florida False Claims Act provides for treble damages for submission of false or fraudulent claims for payment to state agencies and use of false records or statements to get false or fraudulent claims paid.  Fla. Stat. § 68.082(2); see ¶ 44 supra. Each claim for payment pursuant to a contract induced by false statements is itself false and fraudulent within the meaning of this provision. The Florida False Claims Act gives

employees who are discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by their employers because of their protected activity as described supra a cause of action under the Florida Whistle-blower's Act, Fla. Stat. § 112.3187. Fla Stat. § 68.088. The Florida Whistleblower's Act likewise provides that "an agency or independent contractor shall not dismiss, discipline, or take any other adverse personnel action against an employee for disclosing information pursuant to the provisions of this section," Fla. Stat. § 112.3187(4)(a), and that "An agency of independent contractor shall not take any adverse action that affects the rights or interests of a person in retaliation for the person's disclosure of information pursuant to the provisions of this section."

414.     Relator's action in reporting to the Government Defendants' fraud in obtaining payment from the federal government, and his actions in furtherance of the Government's investigation of that report, were actions in furtherance of an action filed or to be filed under the Florida Whistleblower Act.

415.     As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages including severe emotional anguish and irreparable, continuing harm to his reputation and career.  Relator is entitled to all relief necessary to make him whole.

## COUNT V

### Claim On Behalf Of Relator Darren Sewell Personally
### Retaliation in Violation of Florida Statutes §448.101-448.105, Against Defendants Global, Optimum and Freedom.

416.     Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 382 of this Complaint.

417.   This is a claim pursuant to Florida Statutes §§ 448.101-448.105 for relief from Defendants' retaliatory actions as necessary to make Relator whole for being subjected to unlawful constructive discharge and otherwise subjected to unlawful retaliation because of lawful acts done by Relator in providing information to an appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by his employer, including his participation in the investigation for the initiation of and his assistance to the Government in an action filed or to be filed under the federal Whistleblower Act and Florida Whistleblower Act.

418.   Relator's lawful acts, which § 448.102(b) protects from retaliation, include participating in the Government's investigation   (including filing this Complaint and reporting information to Government investigators).

419.   Based on Relator's lawful acts, Defendants removed all of his duties and responsibilities by placing him on administrative leave for nearly five months, and injured Relator's reputation by falsely informing others outside the company that Relator was engaged in criminal conduct and illegalities and that he had invented untruthful accusations against the Defendants to retaliate against Defendants for demoting or failing to promote him and interfered with his ability to work once he separated from employment.

420.   Defendants' actions made working conditions intolerable such that any reasonable employee would have no choice but to resign, and they forced Relator into an involuntary resignation.

421.    Defendant's actions in placing Relator on administrative leave, maligning his reputation by suggesting he engaged in criminal and illegal conduct and did not tell the truth, and constructively discharging him constituted retaliation for Relator's lawful actions in reporting, attempting to stop, and acting in furtherance of other efforts to stop what he reasonably believed were actions by the Defendants in violation of the federal False Claims Act and Florida False Claims Act.

422.    Defendants' actions in placing Relator on administrative leave, impugning his reputation, constructively discharging Relator and interfering with his ability to work once he separated from employment violate Florida Statutes § 448.102(b), which prohibits retaliation by employers against employees who have "Provided information to, or testified before, any appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of a law, rule, or regulation by the employer." Fla. Stat. § 448.102(b).

423.    Relator's action in reporting to the Government, and his actions in furtherance of the Government's investigation of that report, of Defendants' fraud in obtaining payment from the federal Government constituted providing information to an appropriate governmental agency, person, or entity conducting an investigation, hearing, or inquiry into an alleged violation of law, rule, or regulation by Defendants. Defendants' retaliation against Relator was predicated upon Relator's exercise of rights protected by this Act.

424.    As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment, and has suffered additional economic and non-

economic damages including severe emotional anguish and irreparable, continuing harm to his reputation and career. Relator is entitled to all relief necessary to make him whole.

## COUNT VI

### Claim on Behalf of Relator Darren Sewell Personally
### Slander Against Defendants Panara and Shah

425.   Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 382 of this Complaint.

426.   This is a claim under the common law of the State of Florida for relief as necessary to make Relator whole for Defendants' slander of him.

427.   Defendants published false statements against Relator to third parties by telling others at other industry companies that Relator was to blame for criminal conduct that occurred in Relator's department.

428.   Imputing to another a criminal offense amounting to a felony constitutes slander per se.

429.   The criminal offenses Defendants imputed to Relator – criminal conduct that occurred in his department, as outlined in this Complaint – amounted to a felony.

430.   Defendants also published false statements against Relator to third parties by telling others at other industry companies that Relator had manufactured the allegations upon which he blew the whistle to retaliate against Freedom for either demoting or failing to promote him. These statements imputed to Relator conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office.

431.    As a direct and proximate result of the foregoing, Relator has suffered damages including severe emotional anguish and irreparable, continuing harm to his reputation and career.  Relator is entitled to all relief necessary to make him whole.

432.    Defendants engaged in this unlawful action with actual malice, with wantonness and recklessness  and with reckless indifference to Relator's rights equivalent to an intentional violation of them, and Relator is entitled to punitive damages.

## COUNT VII

### Claim On Behalf Of Relator Darren Sewell Personally
### Conversion Against Defendants Global, Freedom,
### Optimum, Panara, Shah and Patel

433.    Relator realleges and incorporates by reference the allegations made in paragraphs 1 through 382 of this Complaint.

434.    This is a claim under the common law of the State of Florida for relief as necessary to make Relator whole for Defendants' conversion of his personal laptop computer.

435.    On April 11 or 12, 2012, the Defendants or their employees or agents came into possession of Relator's personal laptop iMac computer, which was present in his office.

436.    On April 18, 2012, Relator demanded the return of his personal laptop iMac computer in writing to Bijal Patel in her capacity as corporate counsel for Freedom.

437.    Defendants did not relinquish, and have not relinquished, Relator's computer.

438.   As a direct and proximate result of the foregoing, Relator has suffered damages in the amount of $1000.   Relator is entitled to all relief necessary to make him whole.

439.   Defendants engaged in this unlawful action with actual malice, with wantonness and recklessness  and with reckless indifference to Relator's rights equivalent to an intentional violation of them, and Relator is entitled to punitive damages.

## PRAYER

WHEREFORE, *qui tam* plaintiff Dr. Darren D. Sewell, M.D. prays for judgment against the defendants Freedom Health, Inc., Optimum Healthcare, Inc., America's 1st Choice Holdings of Florida LLC, Liberty Acquisition Group LLC, Health Management Services of USA LLC, Global TPA LLC, America's 1st Choice Holdings of North Carolina LLC, America's 1st Choice Holdings of South Carolina LLC, America's 1st Choice Insurance Company of North Carolina, Inc., America's 1st Choice Health Plans, Inc., Dr. Kiranbhai C. Patel, Dr. Devaiah Pagidipati, Siddhartha Pagidipati, Rupesh Shah, and Mital Panara ("Defendants") as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. §§ 3279–33 and Fla. Stat. §§ 68.081–.092;

2.    That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions in violation of the Florida False Claims Act, as well as a civil penalty of $11,000 for each violation of Fla. Stat. § 68.082(2);

4.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act, and Fla. Stat. § 68.085 of the Florida False Claims Act;

5.     That this Court enter judgment against Defendants Global, Freedom and Optimum pursuant to 31 U.S.C. § 3730(h), including entering an order reinstating Relator to his employment with the full seniority and benefits he would have had but for his retaliatory constructive discharge and awarding him two times the amount of his back pay and compensation for special damages including litigation costs and reasonable attorneys' fees;

6.     That this Court enter judgment against Defendants Global, Freedom and Optimum pursuant to Fla. Stat. §68.088 and § 112.3187(9), including an order reinstating Relator to his employment to the same position held before his constructive discharge or reasonable front pay in the alternative, reinstatement of Relator's full fringe benefits and seniority rights, compensation for lost wages, benefits and other lost remuneration, and temporary reinstatement to Relator's former position pending the final outcome of the complaint.

7.     That his Court enter judgment against Defendants Global, Freedom and Optimum pursuant to Fla Stat. §§ 448.101-448.105, including, pursuant to § 448.103(2), an injunction restraining continued violation of this act, reinstatement of Relator to the same position held before his constructive discharge, reinstatement of his full fringe benefits and seniority rights, compensation for lost wages, benefits, and other remuneration, and other compensatory damages necessary to make Relator whole.

8.     That this Court enter judgment against Defendants Panara and Shah for slander pursuant to the common law of the State of Florida, including an injunction restraining continued slander and damages necessary to make Relator whole.

9.     That this Court enter judgment against Defendants Global, Freedom, Optimum, Panara, Patel and Shah for conversion pursuant to the common law of the State of Florida, including an injunction requiring return of Relator's computer and damages necessary to make Relator whole, in an amount to be determined at trial; That this Court enter judgment against Defendants for punitive damages in an amount to be determined at trial;

10.     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

11.     That the United States and the State of Florida, and each of them, and Relator receive all such other relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby

demands trial by jury.

DATED: March 7, 2013                    Respectfully submitted,

Christopher Casper
Trial Counsel
Florida Bar No. 48320
James, Hoyer, Newcomer & Smiljanich, P.A.
4830 W. Kennedy Blvd, Suite 550
Tampa, Florida  33609-2589
Tel:  (813) 286-4100
Fax:  (813) 286-4174
ccasper@jameshoyer.com


Mary A. Inman
Phillips & Cohen LLP
100 The Embarcadero, Suite 300
San Francisco, California  94105
Tel:  (415) 836-9000
Fax: (415) 836-9001
mai@pcsf.com

Debra S. Katz
Alison B. Asarnow
Katz, Marshall & Banks, LLP
1718 Connecticut Ave, N.W., Sixth Floor
Washington, D.C. 20009
Tel: (202) 299-1140
Fax: (202) 299-1148
katz@kmblegal.com
asarnow@kmblegal.com